[This opinion has been published in *Ohio Official Reports* at 78 Ohio St.3d 193.]

DEROLPH ET AL., APPELLANTS, V. THE STATE OF OHIO ET AL., APPELLEES.

[Cite as *DeRolph v. State*, 1997-Ohio-84.]

*Constitutional law—Education—Schools—Ohio's elementary and secondary public school financing system violates Section 2, Article VI of the Ohio Constitution—Specific school funding statutes that are unconstitutional.*

Ohio's elementary and secondary public school financing system violates Section 2, Article VI of the Ohio Constitution, which mandates a thorough and efficient system of common schools throughout the state. The following specific provisions are unconstitutional:

(a) R.C. 133.301, granting borrowing authority to school districts;

(b) R.C. 3313.483, 3313.487, 3313.488, 3313.489, and 3313.4810, the emergency school assistance loan provisions;

(c) R.C. 3317.01, 3317.02, 3317.022, 3317.023, 3317.024, 3317.04, 3317.05, 3317.051 and 3317.052, the School Foundation Program;

(d) R.C. Chapter 3318, the Classroom Facilities Act, to the extent that it is underfunded.

(No. 95-2066--Submitted September 10, 1996--Decided March 24, 1997.)

APPEAL from the Court of Appeals for Perry County, No. 94-CA-477.

_____

{¶ 1} The constitutionality of Ohio's public elementary and secondary school finance system is at issue in this case. The named plaintiffs-appellants are the Youngstown City School District Board of Education, Mahoning County; the Lima City School District Board of Education, Allen County; the Dawson-Bryant Local School District Board of Education, Lawrence County; the Northern Local School District Board of Education, Perry County; the Southern Local School District Board of Education, Perry County; and the superintendents and certain

named members of the boards of education of these districts, as well as certain teachers, pupils and next friends. Numerous organizations representing such diverse groups as teachers' unions, administrators, school boards, and handicapped children, and various legislators, as well as the American Civil Liberties Union and the Ohio AFL-CIO, have filed *amicus curiae* briefs on behalf of the appellants.

{¶ 2} The defendants-appellees are the state of Ohio, the State Board of Education, the Superintendent of Public Instruction, and the Ohio Department of Education. The Alliance for Adequate School Funding, Stanley Aronoff, JoAnn Davidson, and Governor George Voinovich have filed *amicus curiae* briefs on behalf of the appellees.

PROCEDURAL HISTORY

{¶ 3} On December 19, 1991, appellants filed a complaint for declaratory and injunctive relief in the Court of Common Pleas of Perry County, seeking a determination that Ohio's system of funding public education is unconstitutional. Trial began on October 25, 1993 and lasted thirty days, culminating in more than five thousand six hundred pages of transcript and the admission of approximately four hundred fifty exhibits into evidence. Sixty-one witnesses testified at trial or by way of sworn deposition. Although the parties disagree over the constitutionality of the relevant statutes, plaintiff and defense witnesses alike testified as to the inadequacies of Ohio's system of school funding and the need for reform. In fact, defendant State Board of Education has not only advocated comprehensive reform but has stated the following three goals of such reform: equity, adequacy and reliability of school funding.

{¶ 4} Following trial, the trial court issued extensive findings of fact and conclusions of law. The court determined that Ohio's system of school funding violates numerous provisions of the Ohio Constitution, including Section 2, Article VI, requiring a thorough and efficient system of common schools throughout the state. The trial court ordered the Superintendent of Public Instruction and the State

Board of Education to prepare legislative proposals for submission to the General Assembly to eliminate wealth-based disparities among Ohio's public school districts. The trial court retained jurisdiction in the matter only for a period of time to ensure that the order was followed and that appropriate steps were taken to institute a totally new system of school funding. The trial court also awarded costs and attorney fees to appellants.

{¶ 5} The State Board of Education voted not to appeal from the trial court's decision. However, the Ohio Attorney General filed a notice of appeal to the Fifth District Court of Appeals. The court of appeals, in a split decision, reversed the trial court. The majority relied on *Cincinnati School Dist. Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 12 O.O.3d 327, 390 N.E.2d 813, and found that the current system of school funding is constitutional. The court also determined that the trial court had erred in awarding attorney fees to appellants and in retaining jurisdiction in the case.

{¶ 6} In his concurring opinion, Judge Reader conceded that current school funding was insufficient, but was unwilling to find the statutory scheme unconstitutional. Instead, he stated that it is up to this court to declare the current system unconstitutional and for the General Assembly to repair it. Despite this position, Judge Reader emphasized the peculiar nature of this case and the lack of dispute over the evidence:

"*** The defendants, the State of Ohio, the State Board of Education, the Superintendent of Public Instruction, and the Ohio Department of Education in their appellate brief indicated that there are few facts in dispute. Of course, there aren't -- they agreed with almost everything the [plaintiffs] stated. In fact, an examination of testimony by defense witnesses in this case would indicate that these witnesses stated that the system of funding was immoral and inequitable. If there was ever a case where the parties acted more in concert than this one, I haven't seen it. *** Further, it is a matter of public record that the appellants, having previously

indicated their satisfaction with the trial court's decision, were literally forced to appeal the ruling."

{¶ 7} Judge Gwin, in his dissenting opinion, agreed with the trial court that Ohio's statutory scheme for financing its schools violates the "thorough and efficient" clause of the Ohio Constitution. He stressed that due to the glaring discrepancies in school buildings, facilities, access to technology and curriculum, some students within the state are being deprived of educational opportunity. Furthermore, Judge Gwin stated that the state had shirked its duty to generate revenue for the schools by underfunding Ohio schools and by permitting schools to borrow against future revenue. He also criticized the majority for disregarding certain findings of fact by the trial court and for essentially conducting a *de novo* review. Judge Gwin found that the trial court had not abused its discretion in awarding attorney fees to plaintiffs.

{¶ 8} The cause is now before this court pursuant to the allowance of a discretionary appeal.

_____

*Bricker & Eckler, Nicholas A. Pittner, John F. Birath, Jr., Sue W. Yount, Michael D. Smith* and *Susan B. Greenberger,* for appellants.

*Betty D. Montgomery,* Attorney General; *Jeffrey S. Sutton,* State Solicitor; *Christopher M. Culley* and *Sharon A. Jennings,* Assistant Attorneys General, for appellees.

*Dinsmore & Shohl, Lawrence A. Kane, Jr., Mark A. VanderLaan, Joel S. Taylor, David K. Mullen* and *William M. Mattes,* Special Counsel for appellees State Superintendent of Public Instruction and State Department of Education.

*Ben Espy Co., L.P.A.,* and *Ben E. Espy; Jan Michael Long,* urging reversal for *amici curiae* members of the Ohio House of Representatives Mary Abel, John Bender, Ross Boggs, Dan Brady, Samuel Britton, Jack Cera, Jack Ford, Robert Hagan, David Hartley, William Healy, Troy Lee James, Jerry Krupinski, Lloyd

Lewis, Jr., Sean Logan, June Lucas, Mark Mallory, Dan Metelsky, William Ogg, Darrell Opfer, C.J. Prentiss, Tom Roberts, Frank Sawyer, Michael Shoemaker, Betty Sutton, Vernon Sykes, and Charleta Tavares; Ohio Senators Robert Boggs, Robert Burch, James Carnes, Ben Espy, Linda Furney, Leigh Herington, Jeffrey Johnson, Anthony Latell, Jan Michael Long, Rhine McLin, and Alan Zaleski; and U.S. Representatives Louis Stokes, Robert Ney, and Frank Cremeans.

*Joan M. Englund,* urging reversal for *amicus curiae* American Civil Liberties Union of Ohio Foundation, Inc.

*Means, Bichimer, Burkholder & Baker Co., L.P.A.,* and *Kimball H. Carey,* urging reversal for *amici curiae* Buckeye Association of School Administrators, Ohio School Boards Association and Ohio Association of School Business Officials.

*James A. Ciocia,* urging reversal for *amicus curiae* Cleveland Teachers Union.

*Spieth, Bell, McCurdy & Newell Co., L.P.A.,* and *Frederick I. Taft,* urging reversal for *amici curiae* Coalition for School Funding Reform (Bay Village City School District, Cleveland Heights-University Heights City School District, Lakewood City School District, and Shaker Heights City School District).

*Patrick F. Timmins, Jr.,* urging reversal for *amicus curiae* Coalition of Rural and Appalachian Schools.

*David Goldberger* and *Edward B. Foley,* urging reversal for *amicus curiae* Institute for Democracy in Education.

*Goldstein & Roloff* and *Morris L. Hawk,* urging reversal for *amici curiae* Ohio Association of Elementary School Administrators and Ohio Association of Secondary School Administrators.

*Buckley, King & Bluso, Robert J. Walter* and *Thomas C. Drabick, Jr.,* urging reversal for *amicus curiae* Ohio Association of Public School Employees (OAPSE)/AFSCME Local 4, AFL-CIO.

*Stewart Jaffy & Associates Co., L.P.A., Stewart R. Jaffy* and *Marc J. Jaffy,* urging reversal for *amicus curiae* Ohio AFL-CIO.

*Schnorf & Schnorf Co., L.P.A., David M. Schnorf* and *Johna M. Bella,* urging reversal for *amicus curiae* Ohio Federation of Teachers.

*Susan G. Tobin*, urging reversal for *amici curiae* Ohio Legal Rights Service and Ohio Coalition for the Education of Children with Disabilities.

*Berry, Shoemaker & Clark* and *Kevin Shoemaker,* urging reversal for *amicus curiae* Ohio Professional Staff Union.

*Chester, Willcox & Saxbe, John J. Chester* and *Donald C. Brey*, urging affirmance for *amicus curiae* Governor George Voinovich.

*Benesch, Friedlander, Coplan & Aronoff, P.L.L.,* and *N. Victor Goodman*, urging affirmance for *amici curiae* Stanley J. Aronoff, President of the Ohio Senate, and JoAnn Davidson, Speaker of the Ohio House of Representatives.

*Walter & Haverfield* and *James E. Betts,* urging affirmance for *amicus curiae* Alliance for Adequate School Funding.

_____

**FRANCIS E. SWEENEY, SR., J.**

{¶ 9} In 1802, when our forefathers convened to write our state Constitution, they carried within them a deep-seated belief that liberty and individual opportunity could be preserved only by educating Ohio's citizens. These ideals, which spurred the War of Independence, were so important that education was made part of our first Bill of Rights. Section 3, Article VIII of the Ohio Constitution of 1802. Beginning in 1851, our Constitution has required the General Assembly to provide enough funding to secure a "thorough and efficient system of common schools throughout the State."

{¶ 10} Over the last two centuries, the education of our citizenry has been deemed vital to our democratic society and to our progress as a state. Education is essential to preparing our youth to be productive members of our society, with the

6

skills and knowledge necessary to compete in the modern world. In fact, the mission statement of defendant, Ohio State Board of Education, echoes these concerns:

"The mission of education is to prepare students of all ages to meet, to the best of their abilities, the academic, social, civic, and employment needs of the twenty-first century, by providing high-quality programs that emphasize the lifelong skills necessary to continue learning, communicate clearly, solve problems, use information and technology effectively, and enjoy productive employment." State Board of Education, Preparing Ohio Schools for the 21st Century, Sept. 1990, ii.

{¶ 11} Today, Ohio stands at a crossroads. We must decide whether the promise of providing to our youth a free, public elementary and secondary education in a "thorough and efficient system" has been fulfilled. The importance of this case cannot be overestimated. It involves a wholesale constitutional attack on Ohio's system of funding public elementary and secondary education. Practically every Ohioan will be affected by our decision: the 1.8 million children in public schools and every taxpayer in the state. For the 1.8 million children involved, this case is about the opportunity to compete and succeed.

{¶ 12} Upon a full consideration of the record and in analyzing the pertinent constitutional provision, we can reach but one conclusion: the current legislation fails to provide for a thorough and efficient system of common schools, in violation of Section 2, Article VI of the Ohio Constitution.

{¶ 13} In reaching this conclusion, we dismiss as unfounded any suggestion that the problems presented by this case should be left for the General Assembly to resolve. This case involves questions of public or great general interest over which this court has jurisdiction. Section 2(B)(2)(d), Article IV of the Ohio Constitution.

{¶ 14} Under the long-standing doctrine of judicial review, it is our sworn duty to determine whether the General Assembly has enacted legislation that is

constitutional. *Marbury v. Madison* (1803), 5. U.S. (1 Cranch) 137, 2 L.Ed. 60. We are aware that the General Assembly has the responsibility to enact legislation and that such legislation is presumptively valid. R.C. 1.47(A); *Adamsky v. Buckeye Local School Dist.* (1995), 73 Ohio St.3d 360, 361, 653 N.E.2d 212, 214. However, this does not mean that we may turn a deaf ear to any challenge to laws passed by the General Assembly. The presumption that laws are constitutional is rebuttable. *Id.* The judiciary was created as part of a system of checks and balances. We will not dodge our responsibility by asserting that this case involves a nonjusticiable political question. To do so is unthinkable. We refuse to undermine our role as judicial arbiters and to pass our responsibilities onto the lap of the General Assembly.

{¶ 15} We quote, with approval, the Texas Supreme Court's remarks when it addressed a similar challenge to its authority to review its state's school funding system:

"'[W]e have not been unmindful of the magnitude of the principles involved, and the respect due to the popular branch of the government. *** Fortunately, however, for the people, the function of the judiciary in deciding constitutional questions is not one which it is at liberty to decline. *** [We] cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution; [we] cannot pass it by because it is doubtful; with whatever doubt, with whatever difficulties a case may be attended, [we] must decide it, when it arises in judgment.'" *Edgewood Indep. School Dist. v. Kirby* (1989), 777 S.W.2d 391, 394, quoting *Morton v. Gordon* (Republic of Tex.1841), Dallam 396, 397-398.

{¶ 16} Therefore, we are clearly within our constitutional authority in reviewing this matter and in declaring Ohio's school financing system unconstitutional. We turn now to a review of the record.

OHIO'S SYSTEM OF PUBLIC SCHOOL FINANCING

**{¶ 17}** Ohio's statutory scheme for financing public education is complex. At the heart of the present controversy is the School Foundation Program (R.C. Chapter 3317) for allocation of state basic aid and the manner in which the allocation formula and other school funding factors have caused or permitted to continue vast wealth-based disparities among Ohio's schools, depriving many of Ohio's public school students of high quality educational opportunities.

**{¶ 18}** According to statute, the revenue available to a school district comes from two primary sources: state revenue, most of which is provided through the School Foundation Program, and local revenue, which consists primarily of locally voted school district property tax levies. Federal funds play a minor role in the financing scheme. Ohio relies more on local revenue than state revenue, contrary to the national trend.

**{¶ 19}** Under the foundation program,[1] state basic aid is available for school districts that levy at least twenty mills of local property tax revenue for current operating expenses.[2] R.C. 3317.01(A). State basic aid for qualifying school districts is calculated each biennium as part of the General Assembly's budget pursuant to a formula set forth in R.C. 3317.022.[3]

---

1. The current version of the School Foundation Program is contained in R.C. 3317.01 *et seq.* The School Foundation Program for allocation of state aid has operated in a similar manner from 1981 through the present day despite numerous amendments. The statutory provisions at issue are those that were in existence in January 1992 at the time the amended complaint was filed.

2. A mill is one tenth of a cent. The required twenty mills of local tax includes unvoted or "inside" millage (that portion of the total available ten-mills of unvoted property tax authorized by Section 2, Article XII of the Ohio Constitution that may be levied by a school district) and voted or "outside" millage approved by the voters. The appellant school districts have all participated in the School Foundation Program.

3. The formula was as follows: (school district equalization factor X the formula amount X ADM) - (.02 X total taxable value) = state aid. Former R.C. 3317.022(A). Am.Sub.H.B. No. 298, 144 Ohio Laws, Part III, 3987, 4122. The basic state aid calculation remains essentially the same in the current version of R.C. 3317.022(A).

**{¶ 20}** The "formula amount" has no real relation to what it actually costs to educate a pupil. In fact, Dr. Howard B. Fleeter, Assistant Professor at the School of Public Policy and Management at Ohio State University, stated that the foundation dollar amount "is a budgetary residual, which is determined as a result of working backwards through the state aid formula after the legislature determines the total dollars to be allocated to primary and secondary education in each biennial budget. Thus, the foundation level reflects political and budgetary considerations at least as much as it reflects a judgment as to how much money *should* be spent on K-12 education." (Emphasis *sic*.)

**{¶ 21}** The foundation formula amount, which was set at $2,817 per pupil in the 1992-1993 school year, 144 Ohio Laws, Part III, 4122, is adjusted by a school district equalization factor, now called the "cost of doing business" factor. R.C. 3317.02(E). These rates of adjustment vary from county to county and apply equally to all districts within the county without regard to the actual costs of operations within the individual school districts. The cost-of-doing-business factor assumes that costs are lower in rural districts than in urban districts.

**{¶ 22}** A target amount of combined local and state aid per district is reached by multiplying the formula amount, the cost-of-doing-business factor and the average daily membership. R.C. 3317.022(A). However, subtracted or "charged off" from that figure is the total taxable value of real and tangible personal property in the district times a certain percentage. *Id.* Subtracting the applicable charge-off results in a figure constituting basic state aid for the district in question. The effect of an increase in this percentage would be to decrease the amount of basic state aid, resulting in an even greater burden for local schools to fund education through local property and/or income taxes.

**{¶ 23}** The financing scheme is further complicated when special factors are taken into account. For instance, additional appropriations may be made for categorical programs, such as vocational education, special education and

10

transportation. R.C. 3317.024. However, no adjustment is made for the relative wealth of the receiving district. Moreover, children in funded handicapped "units" are not included in the state basic aid formula. R.C. 3317.02(A). Thus, funds for handicapped students, for instance, whose education costs are substantially higher (due to state mandates of small class size and because of related extra services) are disbursed in a flat amount per unit (see R.C. 3317.05). If the actual cost exceeds the funds received, wealthier districts are in a better position to make up the difference.

{¶ 24} In addition, school districts with children whose families collect Aid to Dependent Children ("ADC") receive additional distributions which increase according to the concentration of ADC pupils. R.C. 3317.023(B). However, the level of distributions freezes once the concentration reaches twenty percent. R.C. 3317.023(B)(1). Thus, districts with higher concentrations of ADC pupils are forced to carry more of the extra cost. Moreover, testimony revealed that above the twenty-percent concentration level, educational need increases at a faster rate than the concentration percentage.

{¶ 25} The School Foundation Program does contain certain guarantees so that a school district receives the greater of the program amount or the guarantee amount. See R.C. 3317.04 and 3317.0212. However, testimony revealed that the guarantees work to the substantial benefit of the wealthier districts and represent a flaw in the system of school funding, because they work against the equalization effect of the formula.

{¶ 26} Another weakness in the system is certain "tax reduction factors" introduced into law by the General Assembly's 1976 enactment of R.C. 319.301 in Am.Sub.H.B. No. 920, 136 Ohio Laws, Part II, 3182, 3194. The purpose of R.C. 319.301, as amended, is to limit growth of real property tax revenues that would

otherwise occur as a consequence of inflation of property values.[4]  R.C. 319.301 requires the application of tax reduction factors when property values increase due to reappraisal or update.  The result is that a school district will receive the same number of dollars from voted tax levies after reappraisal as it did before reappraisal, even though real property valuation in the district has increased through real estate inflation.  As a direct result of these tax reduction measures introduced by H.B. No. 920, local revenues cannot keep pace with inflation, and school districts have been required to propose additional tax levies—most of which ultimately fail.

{¶ 27} H.B. No. 920 has also resulted in a phenomenon called "phantom revenue."  As already explained, tax reduction factors limit revenue growth that would otherwise occur due to inflation of real property values.  However, at the same time, the increased valuation of property is taken into account in the charge-off portion of the foundation formula.  R.C. 3317.022(A).  Thus, a school district can experience an increase in the valuation of its taxable real property without enjoying any additional income and yet receive less under the formula because the total taxable value of property has increased.

{¶ 28} Another inherent weakness in the system stems from forced borrowing.  Districts unable to meet their budgets are forced to borrow funds.  The first type of state-mandated loan is the "spending reserve" loan.  R.C. 133.301.  Under the spending reserve loan program, school districts are permitted to borrow against a subsequent year's revenue with approval of the Superintendent of Public Instruction.  *Id.*  Although there is a statutory maximum amount that can be borrowed by a school district, the superintendent may (and does) permit borrowing beyond that limit.  R.C. 133.301(C).

---

4.  Inside millage (millage levied without the approval of the electorate and limited to a ten-mill ceiling on unvoted property taxes), new construction growth and, of course, tangible personal property are not subject to tax reduction factors.

**{¶ 29}** If a school district cannot meet its current operating needs through a spending reserve loan, it is then required to seek approval of a loan under R.C. 3313.483. These loans are obtained from commercial lenders. R.C. 3313.483(D).

**{¶ 30}** Pursuant to R.C. 3313.483(A), local boards of education in such circumstances declare by resolution that they are unable to remain open for instruction and are unable to meet their expenses. The board must then request that the State Auditor determine that such a condition exists. *Id.* If the auditor finds that the board has exhausted all available revenue sources, the auditor must certify that finding to the Superintendent of Public Instruction and the State Board of Education and must also certify the amount of operating deficit the district will have at the end of the fiscal year. R.C. 3313.483(B). A school district that has been certified as having a projected operating deficit must apply for a loan from a commercial lender. R.C. 3313.483(D). However, if the commercial loan is denied, a school district must submit a plan for reducing the district's budget. R.C. 3313.483(E)(1). The budget reduction plan must provide for repayment of the loan within two years (ten years for very large amounts), R.C. 3313.483(E)(2), but the plan need not provide for repayment of any spending reserve loan. The loan is repaid by diverting funds otherwise available to the school district under the school foundation program to the commercial lender. R.C. 3313.483(E)(3).

**{¶ 31}** Effective December 1992, if a district receives an R.C. 3313.483 emergency school assistance loan in excess of seven percent of the district's general fund expenditures and has received a loan under R.C. 3313.483 within the last five years, the district is subject to state supervision under R.C. 3313.488 for that year and the ensuing two years. R.C. 3313.4810. School districts subject to state supervision are prohibited from making any expenditure of money or any employment, purchase or rental contract, giving any order involving the expenditure of money, or increasing any wage or salary schedule without written approval of the superintendent. R.C. 3313.488(A). The debt which stems from

mandated borrowing programs is in many instances staggering, and the cyclical effect of continued borrowing has made it more difficult to maintain even minimal school operations. See R.C. 133.301 and 3313.483. These loan programs, discussed above, are nothing less than a clever disguise for the state's failure to raise revenue sufficient to discharge its constitutional obligations.

{¶ 32} The School Foundation Program contains no aid expressly for capital improvements for Ohio's public schools. Aid for that purpose is provided by the Classroom Facilities Act, R.C. Chapter 3318. However, the evidence showed, and the trial court found, that the Act is insufficiently funded to meet the needs of districts that are poor in real property value.

A "THOROUGH AND EFFICIENT SYSTEM OF COMMON SCHOOLS"

{¶ 33} In urging this court to strike the statutory provisions relating to Ohio's school financing system, appellants argue that the state has failed in its constitutional responsibility to provide a thorough and efficient system of public schools.[5] We agree.

{¶ 34} Section 2, Article VI of the Ohio Constitution requires the state to provide and fund a system of public education and includes an explicit directive to the General Assembly:

"The general assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the State ***."

{¶ 35} The delegates to the 1850-1851 Constitutional Convention recognized that it was the state's duty to both present and future generations of Ohioans to establish a framework for a "full, complete and efficient system of

---

5. Appellants also contend that education is a fundamental right and that the current funding system violates equal protection. They further argue that the school financing system violates Section 3, Article VIII and Section 4, Article XII. However, since we decide that Ohio's school financing system violates the Thorough and Efficient Clause of our state Constitution, we decline to address appellants' other constitutional claims.

public education." II Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio, 1850-51 (1851) ("Debates"). Thus, throughout their discussions, the delegates stressed the importance of education and reaffirmed the policy that education shall be afforded to every child in the state regardless of race or economic standing. Debates at 11, 13. Furthermore, the delegates were concerned that the education to be provided to our youth not be mediocre but be as perfect as could humanly be devised. Debates at 698-699. These debates reveal the delegates' strong belief that it is the state's obligation, through the General Assembly, to provide for the full education of all children within the state.

{¶ 36} Dr. Samuel Kern Alexander, a leading professor in the area of school law and school finance, testified that, in the context of the historical development of the phrase "thorough and efficient," it is the state's duty to provide a system which allows its citizens to fully develop their human potential. In such a system, rich and poor people alike are given the opportunity to become educated so that they may flourish and our society may progress. It was believed by the leading statesmen of the time that only in this way could there be an efficient educational system throughout the state.

{¶ 37} This court has construed the words "thorough and efficient" in light of the constitutional debates and history surrounding them. In *Miller v. Korns* (1923), 107 Ohio St. 287, 297-298, 140 N.E. 773, 776, this court defined what is meant by a "thorough and efficient" system of common schools throughout the state:

"This declaration is made by the people of the state. It calls for the upbuilding of a system of schools throughout the state, and the attainment of efficiency and thoroughness in that system is thus expressly made a purpose, not local, not municipal, but state-wide.

"With this very purpose in view, regarding the problem as a <u>state-wide</u> problem, the sovereign people made it mandatory upon the General Assembly to secure not merely a system of common schools, but a system thorough and efficient throughout the state.

"A thorough system could not mean one in which part or any number of the school districts of the state were starved for funds. An efficient system could not mean one in which part or any number of the school districts of the state lacked teachers, buildings, or equipment." (Emphasis added.)

{¶ 38} *Cincinnati School Dist. Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 387, 12 O.O.3d 327, 338, 390 N.E.2d 813, 825, cited *Miller* with approval. Additionally, *Walter* recognized that while the General Assembly has wide discretion in meeting the mandate of Section 2, Article VI, this discretion is not without limits. *Id. Walter* found that a school system would not be thorough and efficient if "a school district was receiving so little local and state revenue that the students were effectively being deprived of educational opportunity." *Id.*

{¶ 39} Other states, in declaring their state funding systems unconstitutional,[6] have also addressed the issue of what constitutes a "thorough and efficient" or a "general or uniform" system of public schools. We recognize that some of these decisions were decided on different grounds or involved different

---

6. The following states have declared their school funding statutes unconstitutional: *Roosevelt Elementary School Dist. v. Bishop* (1994), 179 Ariz. 233, 877 P.2d 806; *DuPree v. Alma School Dist. No. 30* (1983), 279 Ark. 340, 651 S.W.2d 90; *Serrano v. Priest* (1976), 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929; *Horton v. Meskill* (1977), 172 Conn. 615, 376 A.2d 359; *Rose v. Council for Better Edn.* (Ky.1989), 790 S.W.2d 186; *McDuffy v. Secy., Executive Office of Edn.* (1993), 415 Mass. 545, 615 N.E.2d 516; *Helena Elementary School Dist. No. 1 v. State* (1989), 236 Mont. 44, 769 P.2d 684; *Abbott v. Burke* (1990), 119 N.J. 287, 575 A.2d 359; *Tennessee Small School Sys. v. McWherter* (Tenn.1993), 851 S.W.2d 139; *Edgewood Indep. School Dist. v. Kirby* (Tex.1989), 777 S.W.2d 391; *Brigham v. State* (Vt.1997), ___ A.2d ___, 1997 WL 51794; *Seattle School Dist. No. 1 of King Cty. v. State* (1978), 90 Wash.2d 476, 585 P.2d 71; *Pauley v. Kelley* (1979), 162 W.Va. 672, 255 S.E.2d 859; *Washakie Cty. School Dist. One v. Herschler* (Wyo.1980), 606 P.2d 310.

education provisions. Despite these differences, we still are persuaded by the basic principles underlying these decisions.

{¶ 40} For instance, in *Edgewood Indep. School Dist. v. Kirby, supra,* 777 S.W.2d 391, the Texas Supreme Court invalidated its state funding structure, in which annual per-student expenditures varied from $2,112 in the poorest districts to $19,333 in the wealthiest districts. The court noted at 393:

"Property-poor districts are trapped in a cycle of poverty from which there is no opportunity to free themselves. Because of their inadequate tax base, they must tax at significantly higher rates in order to meet minimum requirements for accreditation; yet their educational programs are typically inferior. The location of new industry and development is strongly influenced by tax rates and the quality of local schools. Thus, the property-poor districts with their high tax rates and inferior schools are unable to attract new industry or development and so have little opportunity to improve their tax base."

{¶ 41} The plaintiffs in *Edgewood* presented compelling evidence of how fiscal inequities produced inadequate educational opportunities. The court in *Edgewood* stated that the inequalities resulting from Texas's school funding system violated the constitutional requirement of efficiency. Thus, the court declared that the legislature must provide for an efficient system in which funds are distributed more equitably. As the court noted, at 397, to correct the deficiencies, "[a] band-aid will not suffice; the system itself must be changed."

{¶ 42} The dissent believes that we rely too heavily upon anecdotal evidence to support our holding that the current system is unconstitutional. Glaringly absent from the dissenting opinion, however, is any consideration of the massive evidence presented to us. There is one simple reason for this noticeable omission. The facts are fatal to the dissent. The dissent wisely recognizes that it could not, in good conscience, address these facts and then conclude that Ohio is providing the opportunity for a basic education. Therefore, it does the only thing

that it could do, it ignores them. Instead, it turns to facts outside the record and to laws passed by the General Assembly after this lawsuit was filed as a means of justifying its position.[7] We, however, know that it is imperative to consider the record as presented to us. In doing so, we find that exhaustive evidence was presented to establish that the appellant school districts were starved for funds, lacked teachers, buildings, and equipment, and had inferior educational programs, and that their pupils were being deprived of educational opportunity.

{¶ 43} In 1989, the General Assembly directed the Superintendent of Public Instruction to conduct a survey of Ohio's public school buildings. Section 8, Am.Sub.S.B. No. 140, 143 Ohio Laws, Part I, 837. The purpose of this survey was to determine the cost of bringing all facilities into compliance with state building codes and asbestos removal requirements, as well as all other state and local provisions related to health and safety. *Id.*

{¶ 44} The results of this study were published in the 1990 Ohio Public School Facility Survey. The survey identified a need for $10.2 billion in facility repair and construction.

{¶ 45} Among its findings, the survey determined that one-half of Ohio's school buildings were fifty years old or older, and fifteen percent were seventy years old or older. A little over half of these buildings contained satisfactory

---

7. In *State v. Ishmail* (1978), 54 Ohio St.2d 402, 8 O.O.3d 405, 377 N.E.2d 500, paragraph one of the syllabus, we held that a reviewing court may not rely upon matters outside the record in deciding the appeal. Contrary to this holding, the dissent relies upon a nationwide survey of test results which was not part of the record. Since the dissent finds this way of proceeding acceptable, we feel at liberty to point out the stark reality of Ohio's plight. A June 1996 survey conducted by the United States General Accounting Office demonstrates the woeful lack of progress in Ohio's schools. The report notes that ninety-five percent of Ohio's schools reported a need to upgrade or repair buildings to good overall condition. School Facilities: Profiles of School Condition by State, A Report to Congressional Requesters by the General Accounting Office (June 1996) 143. In 1993-1994, Ohio spent an average of only $38 per student for K-12 school facilities. *Id.* Additionally, Ohio ranked last in the number of students per computer among the fifty states. School Facilities: America's Schools Not Designed or Equipped for 21st Century, A Report to Congressional Requesters by the General Accounting Office (Apr.1995) 43.

electrical systems; however, only seventeen percent of the heating systems and thirty-one percent of the roofs were deemed to be satisfactory. Nineteen percent of the windows and twenty-five percent of the plumbing and fixtures were found to be adequate. Only twenty percent of the buildings had satisfactory handicapped access. A scant thirty percent of the school facilities had adequate fire alarm systems and exterior doors.

{¶ 46} Over three years after the 1990 survey was published, the current Superintendent of Public Instruction, John Theodore Sanders, averred that his visits to Ohio school buildings demonstrated that some students were "making do in a decayed carcass from an era long passed," and others were educated in "dirty, depressing places."

{¶ 47} Robert Franklin, the Building Assistant Supervisor for the Ohio Department of Education, gave disturbing examples of incidents where the health and safety of students were threatened. In Buckeye Local, Belmont County, three hundred students were hospitalized because carbon monoxide leaked out of heaters and furnaces. In another school district in Wayne County, an elementary school built in 1903 had floors so thin that a teacher's foot went through the floor while she was walking across her classroom.

{¶ 48} Another major health and safety hazard is asbestos, which has yet to be removed from 68.6 percent of Ohio's school buildings, in direct violation of a 1987 mandate by the United States Environmental Protection Agency. In fact, over ninety-nine percent of public school structures in Ohio have asbestos in them. Jack D. Hunter, supervisor of school facilities with the Ohio Department of Education, testified that around seventy-five percent of Ohio's public school facilities "have asbestos that should be abated *** either immediately or near-term." For fiscal year 1990, over two hundred forty school districts applied for $140,000,000 in asbestos-abatement money from the state. Only sixty-three districts received funds.

{¶ 49} Other conditions which existed within the appellant school districts were equally deplorable. The Nelsonville York Elementary School in Athens County is sliding down a hill at a rate of an inch per month. The school district has hired a registered surveyor to monitor the building's movement. At Eastern Brown High School, the learning-disabled classroom is a converted storage room with no windows for ventilation; a fan is placed on the floor to provide ventilation. The students at Ash Ridge Elementary eat lunches at their desks because there is no school cafeteria.

{¶ 50} In the Dawson-Bryant school system, where a coal heating system is used, students are subjected to breathing coal dust which is emitted into the air and actually covers the students' desks after accumulating overnight. Band members are forced to use a former coal bin for practice sessions where there is no ventilation whatsoever, causing students to complain of headaches. Special education classes are also held in a former closet that has one bare lightbulb hanging from the ceiling.

{¶ 51} Deering Elementary is not handicapped accessible. The library is a former storage area located in the basement. Handicapped students have to be carried there and to other locations in the building. One handicapped third-grader at Deering had never been to the school library because it was inaccessible to someone in a wheelchair.

{¶ 52} The Northern Local School District in Perry County has also been plagued with deteriorating facilities, which include bulging bricks and walls which bow out at the now closed Somerset Elementary School, leaking roofs and windows, outdated sewage systems which have actually caused raw sewage to flow onto the baseball field at Sheridan High School, and the presence of arsenic in the drinking water in the Glenford Elementary School buildings.

{¶ 53} Equally alarming are the conditions found in the Southern Local School District in Perry County, where buildings are crumbling and chunks of plaster fall from the walls and ceiling. In fact, the problem was so severe that the

principal and custodians at Miller Junior High at Shawnee deliberately knocked plaster off the ceilings so that the plaster would not fall on the students during the day.[8]

{¶ 54} Appellant Christopher Thompson poignantly described his experience growing up in this school district. While Chris attended New Straitsville Elementary School in Perry County, plaster was falling off the walls and cockroaches crawled on the restroom floors. Chris said the building gave him a "dirty feeling" and that he would not use the restroom at school because of the cockroaches. In subsequent years, Chris had to contend with a flooded library and gymnasium, a leaky roof where rainwater dripped from the ceiling like a "waterfall," an inadequate library, a dangerously warped gymnasium floor, poor shower facilities, and inadequate heating. In fact, due to construction and renovation of the heating system, when Chris attended high school, there was no heat from the beginning of the fall of 1992 until the end of November or beginning of December. Students had to wear coats and gloves to classes and were subjected to kerosene fumes from kerosene heaters which were used when the building became very cold.

{¶ 55} Obviously, state funding of school districts cannot be considered adequate if the districts lack sufficient funds to provide their students a safe and healthy learning environment.

{¶ 56} In addition to deteriorating buildings and related conditions, it is clear from the record that many of the school districts throughout the state cannot provide the basic resources necessary to educate our youth. For instance, many of

---

8. In late 1990, the Southern Local School District was successful in obtaining Classroom Facilities Act funds and passed a tax levy and a bond issue to help construct new facilities. However, the trial court found that even after the completion of the project in 1993, significant problems will remain. The project will not address all the district's outstanding needs, and the building assistance program will not provide operating and maintenance funds to keep the facilities in good working order.

the appellant school districts have insufficient funds to purchase textbooks and must rely on old, outdated books. For some classes, there were no textbooks at all. For example, at Southern Local during the 1992-1993 school year, none of the students in a Spanish I class had a textbook at the beginning of the year. Later, there was a lottery for books. Students who picked the lucky numbers received a book.

{¶ 57} The accessibility of everyday supplies is also a problem, forcing schools to ration such necessities as paper, chalk, art supplies, paper clips and even toilet paper. A system without basic instructional materials and supplies can hardly constitute a thorough and efficient system of common schools throughout the state as mandated by our Constitution.

{¶ 58} Additionally, many districts lack sufficient funds to comply with the state law requiring a district-wide average of no more than twenty-five students for each classroom teacher. Ohio Adm.Code 3301-35-03(A)(3). Indeed, some schools have more than thirty students per classroom teacher, with one school having as many as thirty-nine students in one sixth grade class. As the testimony of educators established, it is virtually impossible for students to receive an adequate education with a student-teacher ratio of this magnitude.

{¶ 59} The curricula in the appellant school districts are severely limited compared to other school districts and compared to what might be expected of a system designed to educate Ohio's youth and to prepare them for a bright and prosperous future. For example, elementary students at Dawson-Bryant have no opportunity to take foreign language courses, computer courses, or music or art classes other than band. Junior high students in this district have no science lab. In addition, Dawson-Bryant offers no honors program and no advanced placement courses, which disqualifies some of the students from even being considered for a scholarship or admittance to some universities. Dawson-Bryant is not alone— similar problems were being experienced by each of the appellant school districts.

**{¶ 60}** None of the appellant school districts is financially able to keep up with the technological training needs of the students in the districts. The districts lack sufficient computers, computer labs, hands-on computer training, software, and related supplies to properly serve the students' needs. In this regard, it does not appear likely that the children in the appellant school districts will be able to compete in the job market against those students with sufficient technological training.

**{¶ 61}** Lack of sufficient funding can also lead to poor academic performance. Proficiency tests are a method of measuring education. The ninth grade proficiency test was designed to measure that body of knowledge pupils are expected to have mastered by the ninth grade. R.C. 3301.0710. Passage of the ninth grade proficiency test is required before a student may receive a high school diploma. R.C. 3313.61(A). As of the fall of 1993, thirty-two out of ninety-nine seniors at Dawson-Bryant had not passed all parts of the ninth grade proficiency test. This means that nearly one third of the senior class had not met basic graduation requirements. The district did not have enough money to pay tutors to assist these students. Poor performance on the ninth grade proficiency tests is further evidence that these schools lack sufficient funds with which to educate their students.

**{¶ 62}** The dissent emphasizes that since schools have complied with minimum standards enacted in 1983, students are being provided with an adequate education. However, in March 1992, the State Superintendent suspended routine minimum standard evaluations. Consequently, these minimum standards have not been regularly enforced since that time.

**{¶ 63}** All the facts documented in the record lead to one inescapable conclusion—Ohio's elementary and secondary public schools are neither thorough nor efficient. The operation of the appellant school districts conflicts with the historical notion that the education of our youth is of utmost concern and that Ohio

children should be educated adequately so that they are able to participate fully in society. Our state Constitution was drafted with the importance of education in mind. In contrast, education under the legislation being reviewed ranks miserably low in the state's priorities. In fact, the formula amount is established after the legislature determines the total dollars to be allocated to primary and secondary education in each biennial budget. Consequently, the present school financing system contravenes the clear wording of our Constitution and the framers' intent.

{¶ 64} Furthermore, rather than following the constitutional dictate that it is the state's obligation to fund education (as this opinion has repeatedly underscored), the legislature has thrust the majority of responsibility upon local school districts. This, too, is contrary to the clear wording of our Constitution. The responsibility for maintaining a thorough and efficient school system falls upon the state. When a district falls short of the constitutional requirement that the system be thorough and efficient, it is the state's obligation to rectify it. See *DuPree v. Alma School Dist. No. 30* (1983), 279 Ark. 340, 349, 651 S.W.2d 90, 95.

{¶ 65} Also, when we apply the tests of *Miller* and *Walter* as to what is meant by the words "thorough and efficient," the evidence is overwhelming that many districts are "starved for funds," and lack teachers, buildings, or equipment. These school districts, plagued with deteriorating buildings, insufficient supplies, inadequate curricula and technology, and large student-teacher ratios, desperately lack the resources necessary to provide students with a minimally adequate education. Thus, according to the tests of *Miller* and *Walter*, it is painfully obvious that the General Assembly, in structuring school financing, has failed in its constitutional obligation to ensure a thorough and efficient system of common schools. Clearly, the current school financing scheme is a far cry from thorough and efficient. Instead, the system has failed to educate our youth to their fullest potential.

{¶ 66} In so finding, we reject appellees' contention that *Walter* is controlling. The equal yield formula challenged in *Walter* was repealed shortly after the case was decided. See former R.C. 3317.022 as amended by Am.Sub.S.B. No. 221, 137 Ohio Laws, Part I, 581, and repealed by Am.Sub.S.B. No. 59, 138 Ohio Laws, Part I, 188, 200, 230. Moreover, *Walter* involved a challenge to only one aspect of school funding. In contrast, the case at bar involves a wholesale constitutional attack on the entire system. Additionally, in creating the funding system at issue in *Walter,* the General Assembly had relied on a determination of a legislative committee that the statutorily guaranteed amount actually was sufficient to provide a high quality education. *Id.*, 58 Ohio St.2d at 372, 12 O.O.3d at 329, 390 N.E.2d at 817. Here, however, the evidence clearly indicates that the funding level set by today's School Foundation Program has absolutely no connection with what is necessary to provide each district enough money to ensure an adequate educational program. The system in place today differs dramatically from that in place nearly twenty years ago; thus, our holding in *Walter* does not control the outcome in this case.

{¶ 67} We also reject the notion that the wide disparities in educational opportunity are caused by the poorer school districts' failure to pass levies. The evidence reveals that the wide disparities are caused by the funding system's overreliance on the tax base of individual school districts. What this means is that the poor districts simply cannot raise as much money even with identical tax effort. For example, total assessed property valuation in the Dawson-Bryant School District in 1991 was $28,882,580, while Beachwood School District in Cuyahoga County had $376,229,512. (The two districts have about the same number of pupils.)

{¶ 68} We recognize that disparities between school districts will always exist. By our decision today, we are not stating that a new financing system must provide equal educational opportunities for all. In a Utopian society, this lofty goal

would be realized. We, however, appreciate the limitations imposed upon us. Nor do we advocate a "Robin Hood" approach to school financing reform. We are not suggesting that funds be diverted from wealthy districts and given to the less fortunate. There is no "leveling down" component in our decision today.

{¶ 69} Moreover, in no way should our decision be construed as imposing spending ceilings on more affluent school districts. School districts are still free to augment their programs if they choose to do so. However, it is futile to lay the entire blame for the inadequacies of the present system on the taxpayers and the local boards of education. Although some districts have the luxury of deciding where to allocate extra dollars, many others have the burden of deciding which educational programs to cut or what financial institution to contact to obtain yet another emergency loan. Our state Constitution makes the state responsible for educating our youth. Thus, the state should not shirk its obligation by espousing cliches about "local control."

{¶ 70} We recognize that money alone is not the panacea that will transform Ohio's school system into a model of excellence. Although a student's success depends upon numerous factors besides money, we must ensure that there is enough money that students have the chance to succeed because of the educational opportunity provided, not in spite of it. Such an opportunity requires, at the very least, that all of Ohio's children attend schools which are safe and conducive to learning. At the present, Ohio does not provide many of its students with even the most basic of educational needs.

{¶ 71} Since the filing of this lawsuit, the General Assembly has scrambled to enact new laws to soften the blow of the failing system. For instance, beginning in 1992, "equity funds" were provided to supplement distributions under the funding system to those districts with low property valuations and low income. R.C. 3317.0213 and 3317.0214 (Sub.H.B. No. 671, 144 Ohio Laws, Part IV, 6062, effective 6-30-92). In addition, funds were appropriated for technology grants to

assist poorer school districts in purchasing computer equipment. *Id.* at Section 4. However, appropriations for computers are meaningless when school systems cannot use the equipment due to asbestos, faulty electrical wiring, or the lack of teachers. While these programs and funds are desperately needed, they simply are insufficient to get the job done and do not rectify the serious problems inherent in Ohio's financing scheme.

**{¶ 72}** School funding has been, and continues to be, a Herculean task. As thirty-seven lawmakers concede in their *amicus curiae* brief, despite their recent efforts, the General Assembly has not funded our public schools properly. They assert that unless this court rules in favor of the appellants, the urgency of resolving public school funding will quickly fade. We find that this brief eloquently expresses the helplessness felt even by many of our state legislators.

## CONCLUSION

**{¶ 73}** We know that few issues have the potential to stir such passion as school financing. In many districts in this great state of ours, students and teachers must fight a demoralizing uphill battle to make the system work. All parties concede that the current system needs to be reformed.

**{¶ 74}** By our decision today, we send a clear message to lawmakers: the time has come to fix the system. Let there be no misunderstanding. Ohio's public school financing scheme must undergo a complete systematic overhaul. The factors which contribute to the unworkability of the system and which must be eliminated are (1) the operation of the School Foundation Program, (2) the emphasis of Ohio's school funding system on local property tax, (3) the requirement of school district borrowing through the spending reserve and emergency school assistance loan programs, and (4) the lack of sufficient funding in the General Assembly's biennium budget for the construction and maintenance of public school buildings. The funding laws reviewed today are inherently incapable of achieving their constitutional purpose.

**{¶ 75}** We therefore hold that Ohio's elementary and secondary public school financing system violates Section 2, Article VI of the Ohio Constitution, which mandates a thorough and efficient system of common schools throughout the state. The following specific provisions are unconstitutional:

(a) R.C. 133.301, granting borrowing authority to school districts;

(b) R.C. 3313.483, 3313.487, 3313.488, 3313.489, and 3313.4810, the emergency school assistance loan provisions;

(c) R.C. 3317.01, 3317.02, 3317.022, 3317.023, 3317.024, 3317.04, 3317.05, 3317.051 and 3317.052, the School Foundation Program.

(d) R.C. Chapter 3318, the Classroom Facilities Act, to the extent that it is underfunded.

## REMEDY

**{¶ 76}** Although we have found the school financing system to be unconstitutional, we do not instruct the General Assembly as to the specifics of the legislation it should enact.[9] However, we admonish the General Assembly that it must create an entirely new school financing system. In establishing such a system, the General Assembly shall recognize that there is but one system of public education in Ohio. It is a statewide system, expressly created by the state's highest governing document, the Constitution. Thus, the establishment, organization and maintenance of public education are the state's responsibility. Because of its importance, education should be placed high in the state's budgetary priorities. A thorough and efficient system of common schools includes facilities in good repair and the supplies, materials, and funds necessary to maintain these facilities in a safe manner, in compliance with all local, state, and federal mandates.

---

9. The dissent faults us for failing to provide specific guidelines for the General Assembly to follow. However, we recognize that the proper scope of our review is limited to determining whether the current system meets constitutional muster. We refuse to encroach upon the clearly legislative function of deciding what the new legislation will be.

**{¶ 77}** We recognize that a new funding system will require time for adequate study, drafting of the appropriate legislation and transition from the present scheme of financing to one in conformity with this decision. Therefore, we stay the effect of this decision for twelve months.

**{¶ 78}** Appellants are entitled to recover against the state their attorney fees and costs as found by the trial court. *Motorists Mut. Ins. Co. v. Brandenburg* (1995), 72 Ohio St.3d 157, 160, 648 N.E.2d 488, 490.

**{¶ 79}** The court of appeals' judgment is reversed. We remand this cause to the trial court with directions to enter judgment consistent with this opinion. The trial court is to retain jurisdiction until the legislation is enacted and in effect, taking such action as may be necessary to ensure conformity with this opinion.[10]

*Judgment reversed*

*and cause remanded.*

DOUGLAS, RESNICK and PFEIFER, JJ., concur and concur separately.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

———————————

**DOUGLAS, J., concurring.**

**{¶ 80}** I concur in the courageous and well-reasoned decision of the majority. Specifically, I agree that the statutory scheme for funding public elementary and secondary education in Ohio clearly violates Section 2, Article VI of the Ohio Constitution. I write separately only for the purposes of offering some additional explanation why Ohio's statutory scheme violates this provision, to express my view that public education in Ohio is a fundamental constitutional right, and to point out that Ohio's statutory scheme for funding public elementary and secondary schools also violates other constitutional provisions not addressed in the majority opinion.

---

10. We grant plenary jurisdiction to the trial court to enforce our decision. This authority includes the right to petition this court for guidance, if the need arises.

**{¶ 81}** The time has come to end the fact that, in too many cases, the quality of a child's education in Ohio is dependent on the vicissitudes of geography—that is, the place of the child's birth or residence. After an exhaustive review of the record, I am also convinced that it is time for the General Assembly to set education standards and to require performance of the education establishment, with rewards when they meet the standards or severe corrective action when they do not. This should include mandates for cost cutting (additional money is not the only answer) and cost containment with clear accountability.

**{¶ 82}** To do this and be fair, however, each district must be given school structures that are safe and conducive to learning, including the necessary fixtures, equipment and supplies that ensure thorough and efficient opportunity to learn. In addition, each district must be placed on a financial footing that permits the district to compete so as to meet the prescribed standards. That is not only a mandate of equity. It is what our Constitution requires.

**{¶ 83}** By today's decision, a majority of this court has given the General Assembly the opportunity to revamp the entire education system in this state just as a number of other legislative bodies in our sister states have done in recent years.[11] If all of this requires additional revenue, as it almost certainly does, then that is the price we must pay to enforce, protect and preserve constitutional rights. I would only caution those who would castigate us (as some did the trial judge) for their own purposes to remember what Abraham Lincoln said in his First Inaugural Address, March 4, 1861, in discussing the obligations of the United States Supreme Court and its decisions:

"It is a duty from which they may not shrink to decide cases properly brought before them, and it is no fault of theirs if others seek to turn their decisions

---

11. An outstanding example of this is the state of Kentucky, as so clearly chronicled in a series of recent articles in both the *Canton Repository* and the *Akron Beacon Journal.*

to political purposes." Lott, The Presidents Speak; The Inaugural Addresses of the American Presidents, from Washington to Clinton (1994) 143.

I

Jurisdiction and Judicial Review

{¶ 84} This appeal presents a number of issues for this court's consideration. Is the right to a free public education a fundamental right guaranteed by the Ohio Constitution? Does the system of funding public elementary and secondary schools in Ohio violate the Equal Protection Clause of Section 2, Article I of the Ohio Constitution? Does the system of funding public elementary and secondary schools in Ohio violate Section 2, Article VI of the Ohio Constitution, requiring a thorough and efficient system of common schools throughout the state? Does *Cincinnati City School Dist. Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 12 O.O.3d 327, 390 N.E.2d 813, control the disposition of the case at bar? Resolution of these issues requires, among other things, a detailed understanding of Ohio's system of school funding. Equally important to a resolution of these issues are an understanding of the historical development of Ohio's school funding laws and an earnest appreciation of the significance that the founders of our state and nation placed on public education. However, before addressing these various matters, I find it necessary to briefly comment on this court's jurisdiction to entertain the present appeal.

{¶ 85} The court of appeals' majority held that the courts are not the proper place to challenge the constitutionality of Ohio's statutory scheme for school funding. Despite overwhelming evidence that the state has utterly failed to establish a system of school funding that is thorough and efficient, the court of appeals' lead opinion stated that "[i]f changes are needed in the manner in which schools receive funding, this matter is properly within the discretion of the legislative branch of the government, not the judicial branch." Judge Reader reiterated these sentiments in his concurring opinion. However, I respectfully

disagree with that view. Rather, I believe that Judge Gwin of the court of appeals was absolutely correct that the constitutionality of Ohio's statutory framework for school funding is unquestionably a matter for the courts to decide. To hold otherwise would be to ignore the fundamental concept of judicial review established nearly two hundred years ago in *Marbury v. Madison* (1803), 5 U.S. 137, 177-178, 2 L.Ed. 60, 73-74. *Marbury* established, beyond cavil, the inherent powers of the judicial branch of government to review the constitutionality of the acts of the other branches of government.

{¶ 86} In *Walter*, 58 Ohio St.2d 368, 12 O.O.3d 327, 390 N.E.2d 813, this court entertained certain constitutional challenges to a statutory system for school funding that has since been repealed and replaced with the current statutory framework for funding public elementary and secondary education. However, the following observations in *Walter* concerning the power of the judiciary are as applicable today as they were at the time *Walter* was decided:

"We wish to state clearly at the outset that this court has the authority, and indeed the duty, to review legislation to determine its constitutionality under the Constitution of Ohio and to declare statutes inoperative. The doctrine of judicial review articulated by Chief Justice John Marshall in the landmark case of *Marbury v. Madison* (1803), 5 U.S. (1 Cranch) 137, establishes the judicial branch as the final arbiter in interpreting the Constitution.

"The doctrine of judicial review is so well established that it is beyond cavil. Consider this court's opinion in *State v. Masterson* (1962), 173 Ohio St. 402 [20 O.O.2d 36, 38, 183 N.E.2d 376, 379], which states, at page 405, in part:

"'It has long been an established principle of law that courts do not interfere in political or legislative matters except in those instances where legislative enactments violate the basic law. In those instances where enactments violate the basic law, it was determined early in our judicial history that the courts have not only the power but the duty to declare such enactments invalid.

"'One of the basic functions of the courts under our system of separation of powers is to compel the other branches of government to conform to the basic law.'

"* * *

"We find that the issue concerning legislation passed by the General Assembly pursuant to Section 2 of Article VI of the Ohio Constitution [the Thorough and Efficient Clause] presents a justiciable controversy. * * *" *Walter*, 58 Ohio St.2d at 383-384, 12 O.O.3d at 336, 390 N.E.2d at 823-824.

{¶ 87} *Walter* makes it abundantly clear that constitutional challenges to the statutory system for funding public education are a matter for the courts to decide. Obviously, this court is not at liberty to shirk that responsibility, and we cannot simply send plaintiffs-appellants to the General Assembly to seek redress of their grievances. Judge Reader stated in his concurring opinion in the court of appeals: "The tax payers of this state should rise up in righteous indignation and tell all the parties in this case to take their truckloads of paper and solutions if any, to where it would do the most good—the General Assembly of the State of Ohio." However, this case involves a constitutional attack on Ohio's system of funding public schools. The General Assembly is not the appropriate place to raise such a constitutional challenge.

{¶ 88} I completely agree with the majority's astute observations concerning the jurisdiction of this court to resolve this case. Specifically, I join the majority in utterly rejecting any suggestion that this case and the constitutional issues involved herein should be left for the legislature to decide. In my view, fifteen of the most compelling words spoken at the one-and-one-half-hour oral argument of this case were spoken by plaintiffs' counsel: "We're not asking you to do their job, we're asking you to do your job." Accordingly, we have proceeded not with any glee but, rather, pursuant to our constitutional duty.

**{¶ 89}** The cause is properly before this court for review and final determination pursuant to the judicial powers vested in this court pursuant to the Ohio Constitution.

II

Ohio's System of Public School Funding

**{¶ 90}** The focus of this case is R.C. Chapter 3317, the School Foundation Program for the allocation of state basic aid. In *Walter*, 58 Ohio St.2d at 378, 12 O.O.3d at 333, 390 N.E.2d at 820, this court recognized that "[t]he history of educational funding in Ohio * * * has been an accommodation between two competing interests—the interest in local control of educational programs and the means to fund them and the interest of the state in insuring that all children receive an adequate education." In *Walter*, we outlined some of the history of Ohio school funding, and a review of that history is pertinent to the discussion herein.

**{¶ 91}** In 1821, the Ohio General Assembly enacted a bill making the property in the townships subject to school taxes. See 19 Ohio Laws 51, 55. This legislation was largely ineffective because the levying and collection of taxes were at the option of the local district. In 1825, the General Assembly enacted legislation directing county commissioners to levy a real property tax of one-half mill to support local public schools. 23 Ohio Laws 36, 37. At that time in history, the property tax was the primary means of support for the local public schools. See *Walter*, 58 Ohio St.2d at 378, 12 O.O.3d at 333, 390 N.E.2d at 820. In 1906, Ohio undertook a program calling for a large measure of state financial participation to begin assisting financially weak school districts for the purpose of providing those districts with some minimum support for education. *Id.* In 1935, the General Assembly enacted the first Foundation Program, providing substantial financial aid to school districts based on average daily attendance plus additional aid for poorer districts. *Id.* at 378, 12 O.O.3d at 333, 390 N.E.2d at 820-821. The amount of state aid was continually increased over the next twenty-one years. *Id.* at 379, 12 O.O.3d

at 333, 390 N.E.2d at 821. However, despite the increases in the total amount of state aid, the percentage of state support dropped considerably in relation to the local school districts' total operating costs. *Id*. In 1956, the format of state aid was changed to provide state support based on "teacher-units" rather than average daily membership. *Id*. By the 1965-1966 school year, the state was providing approximately one-third of the total operating costs of the local school districts, with local property tax furnishing the remainder. *Id*.

{¶ 92} In fiscal year 1975-1976, the General Assembly enacted the "Equal Yield Formula" for computing state aid. 136 Ohio Laws 475. See *Walter*, at 379, 12 O.O.3d at 334, 390 N.E.2d at 821. This formula was intended to provide an equal sum of combined state and local funds on a per-pupil-per-mill basis for each qualifying school district. *Id*.; former R.C. 3317.022, 136 Ohio Laws, Part I, 492. A qualifying school district was one that levied twenty mills for current operating expenses. Former R.C. 3317.01, 136 Ohio Laws, Part I, 487. The formula provided a two-tiered system. That is, every school district received an amount per pupil per mill for the first twenty mills and additional amounts were given to each school district with millage above twenty mills up to thirty mills. *Walter* at 370-371, 12 O.O.3d at 328-329, 390 N.E.2d at 816. In *Walter*, this court reviewed the constitutionality of the Equal Yield Formula for school funding and, in 1979, upheld that formula as constitutionally acceptable. There is a body of thought that the General Assembly created the Equal Yield Formula in anticipation of the filing of the *Walter* case. After *Walter* was decided, the General Assembly, in 1981, abandoned the Equal Yield Formula, former R.C. 3317.022. See Am.Sub.H.B. No. 694, 139 Ohio Laws, Part II, 3460, 3684. At that time, the Equal Yield Formula was replaced by the School Foundation Program, which remains in use today.

A

The School Foundation Program

**{¶ 93}** Ohio's School Foundation Program can be found in R.C. 3317.01 *et seq.* The School Foundation Program for the allocation of state basic aid has operated in a similar manner since 1981. Under the School Foundation Program, state basic aid is available for school districts which, among other things, levy at least twenty mills of local property tax revenue for current operating expenses. R.C. 3317.01(A). State basic aid for qualifying school districts is calculated pursuant to a foundation formula set forth by law. The version of R.C. 3317.022 that was in effect at the time this case was filed (Am.Sub.H.B. No. 298, 144 Ohio Laws, Part III, 3987, 4122) provided the following calculation for the computation and distribution of state aid to qualifying school districts:

(school district equalization factor X the formula amount X ADM)

- (.02 X total taxable value).

**{¶ 94}** The basic state aid calculation remains essentially the same in the current version of R.C. 3317.022. Through this formula, the School Foundation Program guarantees a minimum level of combined state and local per pupil funding.

*The Formula Amount*

**{¶ 95}** The "formula amount" in the calculation represents a figure set by the General Assembly as part of the biennial budget process. In January 1992, at the time the amended complaint was filed, the formula amount equaled $2,817. See Am.Sub.H.B. No. 298, 144 Ohio Laws, Part III, 3987, 4122. The formula amount is currently set at $3,500 pursuant to R.C. 3317.022. The trial court found (and the evidence supports the finding) that the formula amount is determined by the General Assembly based solely on how much money is left in the budget after all other legal entitlements are funded. In other words, the amount appropriated for education represents a "budgetary residual" that has nothing to do with the true costs of educating a student. Oliver Ocasek, President of the State Board of Education at the time of trial, testified that the State Board of Education believed that a formula amount of $4,000 per pupil was necessary to even approach an

adequate level of funding for Ohio's school districts. It should be noted, however, that Ocasek personally believed that the true egregious impact of the School Foundation Program was that it did not even come close to providing equalization, given the flat distributions in areas of categorical funding, etc., explained *infra*.

### The Cost-Of-Doing-Business Factors

{¶ 96} Under the state basic aid calculation, the formula amount ($2,817 in school year 1992-1993) is adjusted by a school district equalization factor or cost-of-doing-business factor. R.C. 3317.022(E). The applicable rates of adjustment for the 1992-1993 school year were contained in former R.C. 3317.02(E). 144 Ohio Laws, Part III, 3987, 4118-4120. The rates are similar in the current version of R.C. 3317.02(E). These rates of adjustment vary from county to county and apply equally to all districts within the county. The cost-of-doing-business factors assume that costs are lower in rural districts than in urban districts but, as the trial court correctly concluded, that assumption is not always true.

### The "Charge-Off"

{¶ 97} "ADM" stands for average daily membership, which is calculated pursuant to R.C. 3317.03. See R.C. 3317.02(A). By multiplying the formula amount, the cost-of-doing-business factor, and the ADM, the foundation formula establishes a minimum amount of combined local and state per pupil aid per district. A "charge off" is then subtracted from that figure. The charge-off is the total taxable value of real and tangible personal property in the district times a certain percentage. See R.C. 3317.022(A) (computation for state aid) and 3317.02(D) (defining "total taxable value" as the sum of the amounts certified by the Tax Commissioner under R.C. 3317.021[A][1] and [2]). At the time this case was filed, total assessed value was multiplied by *.02* (*i.e.*, twenty mills times total assessed valuation) to produce the applicable charge-off. 144 Ohio Laws, Part III, 3987, 4122. During the pendency of the litigation, the twenty-mill multiplier was increased to 20.5 mills (Am.Sub.H.B. No. 152, Section 36.12, 145 Ohio Laws, Part

III, 4432-4433) and was raised thereafter. Currently, total taxable value is multiplied by *.023* for purposes of calculating the charge-off. R.C. 3317.022. Subtracting the applicable charge-off results in a figure constituting the amount for basic state aid for the district in question.

*Disadvantaged Pupil Impact Aid and Categorical Programs*

**{¶ 98}** In addition to the formula amount, school districts with children whose families collect Aid to Dependent Children ("ADC") receive what is called "Disadvantaged Pupil Impact Aid" or "DPIA." Am.Sub.H.B. No. 298, Section 59.02, 144 Ohio Laws, Part III, 4556-4557. This funding is calculated pursuant to R.C. 3317.023 and consists of flat distributions (distributions that are not equalized) based on ADM. Pursuant to R.C. 3317.022 and 3317.023, the aid to be provided to a local district comprises the amount the district is entitled to receive under the foundation formula plus the amount of DPIA. The state also provides appropriations to school districts for categorical programming such as vocational and special education. R.C. 3317.024. There is essentially no equalization for funding of categorical programs, so that districts receive categorical aid without regard to school district wealth. According to the testimony of Oliver Ocasek, the President of the State Board of Education at the time of trial, the flat distributions for categorical aid represent a major flaw in the system of school funding and reduce the equalization effect of the foundation formula. Ocasek testified that the "main categoricals," such as special education, vocational education, and DPIA, have "never been fully funded." Rather, funding for those categories is accomplished by essentially siphoning funds that would otherwise be available for distribution under the foundation formula. In the words of Mr. Ocasek: "[A]s you take a pot of money and you deduct from that these fine categorical programs and for [DPIA], you, therefore, are siphoning away from the total pot of funds, which I think are basic, and the more categorical money we give, the less equalization

money we have. That simple. I don't think you need to be a professor of school finance to say that."

*Guarantee Provisions*

**{¶ 99}** The School Foundation Program contains certain guarantee provisions to ensure that a school district receives the greater of the program amount or the guarantee amount. See R.C. 3317.04 and 3317.0212. Thus, some districts receive guarantee payments from the state under the School Foundation Program rather than payments calculated pursuant to the foundation formula described above. Oliver Ocasek testified that the guarantee provisions disproportionately benefit the wealthier districts, compromise the equalization effect of the School Foundation Program, and represent a major defect in Ohio's system of school funding.

*Am.Sub.H.B. No. 920 and Tax Reductions*

**{¶ 100}** School districts are required to levy twenty mills for current operating expenses in order to participate in the School Foundation Program. See R.C. 3317.01(A). The twenty mills comprise both "inside" and "outside" mills. Inside mills are levied without approval of the electorate. Unvoted property taxes are limited to ten mills, with the ten mills spread among the various taxing units. See Section 2, Article XII of the Ohio Constitution and R.C. 5705.02. An average local school district in Ohio manages to raise revenue from approximately 4.6 of the ten available inside mills. Theoretically, a school district can raise an unlimited amount of outside millage, with the only limitation being that outside millage must be approved by the electorate. R.C. 5705.07.

**{¶ 101}** For property tax purposes, real property in Ohio is divided into two classifications: Class I property, consisting of residential and agricultural property, and Class II property, consisting of all other real property, including commercial, industrial, public utility and mineral. See R.C. 5713.041; Section 2a, Article XII, Ohio Constitution.

{¶ 102} Complicating the system of school funding in Ohio is the effect of certain tax reduction factors originally introduced into law with the General Assembly's enactment of Am.Sub.H.B. No. 920 (136 Ohio Laws, Part II, 3182, 3194). H.B. 920 was enacted by the General Assembly as a tax reduction measure. The provisions of law enacted by the General Assembly in H.B. 920 have themselves been amended on several occasions since 1976. A product of these various amendments is the current version of R.C. 319.301, which is very similar to the version of that statute in existence at the time this case was commenced.

{¶ 103} As pointed out by the majority, the purpose of R.C. 319.301 (like the predecessor versions of that statute, including the version of R.C. 319.301 introduced into law by H.B. 920) is to limit the effect of inflation in property values on growth of real property tax revenues. These R.C. 319.301 tax reduction factors are applied when property values increase due to reappraisal or update. Pursuant to R.C. 319.301(A)(2), inside millage is not subject to tax reduction factors. Additionally, R.C. 319.301 provides that tax reduction factors do not apply to new construction growth or tangible personal property. The effect of R.C. 319.301 is that a school district will receive the same revenue from voted tax levies after reappraisal as it did before reappraisal, notwithstanding that real property valuation in the district has increased through inflation since the time of the initial tax levy. Thus, revenue derived from effective outside mills essentially remains frozen in time—it does not increase through the life of the levy. As a direct result of the tax reduction measures first introduced by H.B. 920, local revenues cannot keep pace with inflation. To keep abreast of costs, many school districts have been required to propose additional tax levies. However, most of these additional tax levies have failed.

{¶ 104} Since R.C. 319.301 tax reduction factors do not apply to new construction growth, see R.C. 319.301(B)(2)(a), (b) and (D)(1), school districts with new construction growth enjoy additional revenue from an increase in

valuation, while districts with growth attributable solely to inflation do not. Moreover, R.C. 319.301 sets a floor of effective tax rate reductions at twenty mills for each class of real property. School districts that have reached the twenty-mill floor of reductions do not have their effective rates reduced further. R.C. 319.301(A)(2). Consequently, even if all other things are considered equal, school districts with increases in real property valuation receive differing amounts of local tax levy revenue depending on whether the district has reached the twenty-mill floor.

{¶ 105} Suffice it to say that the effects of tax reduction factors are complicated, including the effects of "phantom revenue" discussed in the majority opinion. The effects are varied and uneven among Ohio's school districts, depending on the amount of real versus tangible personal property, the amount of inside mills a district has, the existence and extent of new construction growth, whether the district is at or close to the twenty-mill floor in either class of real property, and the extent of increases in real property valuation.

*School District Borrowing*

{¶ 106} To supplement their budgets, school districts have been forced at an increasing and alarming rate to borrow heavily against future expected revenue receipts. Under the so-called spending reserve loan program, school districts are permitted to borrow against a subsequent year's revenue with approval of the Superintendent of Public Instruction. See R.C. 133.301. There is a statutory maximum amount that can be borrowed by a school district under the spending reserve program, but the Superintendent of Public Instruction may permit excess borrowing. *Id.* Obviously, where a school district borrows against a subsequent year's tax receipts, the district takes away resources for operations for the next fiscal year. Thus, as the trial court found, "[a] school district can get into a spiral where it is continually borrowing and paying back the following year. A school district, therefore, is always taking away from the future. Any time a school district

does such borrowing into the future, it robs future generations of children." For some school districts, borrowing has become a way of life, leading to the proverbial spiral of debt.

{¶ 107} School districts may also borrow from commercial lenders pursuant to R.C. 3313.483 *et seq.*, the emergency school assistance loan program. However, school districts are required to borrow under the spending reserve loan program as a condition precedent to participating in the emergency school assistance loan program. See R.C. 3313.483(B). Pursuant to R.C. 3313.483(A), school districts may determine by resolution that they are unable to remain open for instruction on all days set forth in the adopted school calendar and are unable to pay their expenses. Such a determination may also be made by the Superintendent of Public Instruction pursuant to R.C. 3313.489. In either event, the auditor of state[12] must determine whether such a condition exists. If the auditor finds that the board of education has attempted to avail itself of all revenue sources available, the auditor must certify that finding to the Superintendent of Public Instruction and the State Board of Education and must also certify the amount of operating deficit the district will have at the end of the fiscal year. R.C. 3313.483(B). A school district that has been certified as having a projected operating deficit must apply for an ordinary commercial loan from a commercial lender or underwriter. R.C. 3313.483(D). If the application is rejected, the school district must submit to the Superintendent of Public Instruction a plan for reducing the district's budget and

---

12. It is interesting to note that a news article in the *Athens News* of Wednesday, November 27, 1996, entitled "State Auditor: School equity, an idea whose time has come" stated that:

"An equity lawsuit filed on behalf of the Perry County schools—and a statewide coalition of public schools—is currently being considered by the Ohio Supreme Court, whose decision could pave the way for a major change in education funding.

"Petro said he believes the Supreme Court will overturn an earlier appellate court decision in the case, and will rule that Ohio's school funding method violates the state constitution.

"'And frankly, I think it's time to do that,' he added."

The auditor, a former member of the General Assembly, is faced in his official capacity with having to frequently deal with financially struggling school districts. I find his candor refreshing.

must then apply for a loan from a commercial bank, underwriter or other prospective lender. R.C. 3313.483(E)(1). The superintendent is required to review each budget reduction plan. The plan must include a repayment schedule in amounts sufficient to permit repayment of the principal amount of the emergency assistance loan, but apparently does not require reductions sufficient in amount to pay the interest on the emergency loan or to repay the principal and interest on any spending reserve loan. Thus, as the trial court found, for most school districts with outstanding emergency assistance loans, subsequent borrowing under the spending reserve loan program will be required.

{¶ 108} The superintendent routinely recommends controlling board approval of an emergency school assistance loan for a school district that has completed the application process and has a certified projected shortfall of operating revenue. If a school district receives controlling board approval, the district may obtain the loan from a commercial lending institution. See R.C. 3313.483(E). Pursuant to R.C. 3313.483(E)(3), the loan is repaid by diverting funds otherwise available to the school district under the School Foundation Program to the commercial lender for repayment of the loan. R.C. 3313.483(E)(3) also provides that "[n]o note or other obligation of the board of education under the loan constitutes an obligation nor a debt or a pledge of the faith, credit, or taxing power of the state, and the holder or owner of such note or obligation has no right to have taxes levied by the general assembly for the payment of such note or obligation, and such note or obligation shall contain a statement to that effect."

{¶ 109} Effective December 22, 1992, if a district receives an R.C. 3313.483 emergency loan of more than seven percent of the district's general fund expenditures and has already received an emergency loan under R.C. 3313.483 within the last five years, the district is subject to state supervision. See R.C. 3313.488 and 3313.4810. The State Board of Education may also subject a district to state supervision pursuant to R.C. 3313.487. School districts subject to state

supervision are prohibited from making any expenditure of money, any employment, purchase or rental contract, giving any order involving the expenditure of money, or increasing any wage or salary schedule without written approval of the Superintendent of Public Instruction. R.C. 3313.488. The so-called receivership school districts (certain heavily indebted districts that have been subjected to the provisions of R.C. 3313.488) include school districts from large urban areas in Ohio as well as property-poor rural school districts. Twenty-five school districts were receivership districts as of December 23, 1992.

*Public School Buildings*

{¶ 110} The School Foundation Program contains no express provision for the construction and maintenance of Ohio's public school facilities. Rather, the construction of public elementary and secondary schools in Ohio is primarily financed through the issuance and sale of school district bonds upon approval of the electors in the district. The bonds are repaid with the proceeds of property taxes levied on the taxable property of the school district for that purpose. With stated exceptions, districts are limited by law to a maximum bonded indebtedness of nine percent of the district's total property valuation. See R.C. 133.06(B). This amount is exclusive of, among other things, any emergency school assistance loan. R.C. 133.06(D)(4). However, "special needs" districts may apply to the Superintendent of Public Instruction for permission to exceed the nine-percent limitation. R.C. 133.06(E). A district may qualify as a special-needs district if the superintendent finds that (1) the district does not have sufficient additional funds from state or federal sources to meet projected needs, and (2) the projection of the district's potential average growth of tax valuation during the next five years indicates a likelihood of potential average growth of at least three percent per year. *Id*.

{¶ 111} R.C. Chapter 3318, the Classroom Facilities Act, is essentially a loan program for the construction of public school facilities. Specifically, R.C. Chapter 3318 provides a means by which qualifying school districts may

"purchase" classroom facilities from the state. See R.C. 3318.02. The process of obtaining state assistance under the Classroom Facilities Act for construction of public school facilities is extremely complicated. However, in general terms, this assistance is contingent on, among other things, the existence of adequate state funds, the approval of a school district's proposed project, the passage of a proposition by the electors in the district authorizing the district to issue bonds in an amount sufficient to bring the district to a required level of net indebtedness and authorizing a local tax levy for the purpose of paying the cost of the purchase from the state, and the execution of a written agreement between the State Board of Education and the local school district. See R.C. 3318.01 through 3318.08. Based upon the evidence at trial and the stipulations of the parties, the trial court made the following relevant findings of fact concerning the Classroom Facilities Act:

"In order to participate in Classroom Facilities Act funds, a district must be included on a 'list' of eligible districts. Lists are only created at such time as funds are available. After reviewing the applicants, the Department of Education conducts a statewide survey to determine those districts most in need of additional facilities.

"Approval for participation for Classroom Facilities Act funding involves an inspection by the Ohio Department of Education officials and a determination of the number and percent of inadequately-housed pupils, as well as a prioritization of school district applicants based on the percentage of inadequately-housed pupils that need to be housed with state money.

"From 1976 to the present time, there have been three lists of districts eligible for Classroom Facilities Act funding; the initial list was prepared prior to 1976 when Dr. Phillis became Assistant Superintendent of Public Instruction. A second list was prepared in 1984 and a subsequent list in 1989. The 1989 list was revised with one additional district being included in 1991.

"Plaintiffs' Exhibit 378 is a list of the 44 school districts who have been approved for classroom facilities assistance pursuant to the provisions of Chapter 3318 of the Ohio Revised Code. The list was adopted by the State Board of Education on December 20, 1989, and updated in 1991. The list describes a total of over $114,000,000 [*sic,* $414,000,000 according to the exhibit and the stipulations of the parties] in value of approved facilities needs. Of these school districts, 18 have been approved for school building assistance, passed the requisite levies, and funds have been made available for school construction. Twenty-six (26) school districts remain on the approved building list, for which no funds have been appropriated by the Ohio General Assembly.

"All the pupils identified as 'improperly housed' in 1989 in districts that have not received Classroom Facilities Act assistance continue to be improperly housed unless the school district has provided facilities without state assistance.

"* * *

"Because any school district beyond [those listed in Plaintiffs' Exhibit 378] [is] at least seven to nine years down the road before help will be available to them (assuming a level of appropriations by the General Assembly), the Division of School Building Assistance of the Ohio Department of Education accepts letters of intent from school districts, indicating their interest [in being] placed upon the approved school building assistance list. Stipulation Exhibit 52 lists those 50 school districts who have filed letters of intent with the building assistance office, including Plaintiff Northern Local School District.

"It is the intent of the State Board of Education to take care of all 44 districts set forth on the approved building assistance list, Plaintiffs' Exhibit 378, before the State moves on to any more districts. These districts must pass levies and their projects must be completed before any new schools will make it on to the approved buildings list.

46

"Classroom Facilities Act funds do not include funds for the equipment or operation of schools, but are limited to provision of school facilities only. [See R.C. 3318.01(B).]

"The state has final approval in the design of facilities funded with Classroom Facilities Act funds. [R.C. 3318.091.]" (Citations to evidence omitted.)

**{¶ 112}** The parties have stipulated that as of July 1993, only $2,006,176.83 was available from the state to fund approved classroom facilities projects, not including, among other things, fiscal year 1994 and 1995 budgeted appropriations. In 1990, the Ohio Department of Education conducted a comprehensive survey of Ohio's public school facilities. The survey identified approximately *$10.2 billion* in needs for repairs and improvements for Ohio's public school facilities. The trial court reviewed the Classroom Facilities Act (R.C. Chapter 3318) and found the program to be seriously underfunded. A review of the record can lead to no other conclusion.

*The 1990 Ohio Public Schools Facilities Survey*

**{¶ 113}** In 1989 and 1990, the Ohio Department of Education, at the direction of the General Assembly, conducted a statewide survey of Ohio's public school buildings. The survey cost approximately $3.5 million and involved an on-site review of each public school building in the state that housed pupils. The Facilities Survey was conducted by architects. There is no dispute that the survey represents a fair and accurate report of the conditions of Ohio's schools as of 1990. The results of the survey were published and submitted to the General Assembly. The survey is contained in the record as Plaintiffs' Exhibit 14 and identified $10.2 billion in needed improvements for Ohio's public elementary and secondary school facilities.

**{¶ 114}** The Facilities Survey identified the need for over $153 million to make public school buildings accessible to the handicapped. However, the evidence demonstrates that given the requirements of the Americans with

Disabilities Act ("ADA"), Section 12101 *et seq.*, Title 42, U.S.Code, the $153 million in needs identified by the survey represents a substantial underestimation of the true costs involved in complying with applicable federal mandates. The survey determined that only about twenty percent of existing public school buildings in Ohio are satisfactory in terms of accessibility to the handicapped. The state of Ohio provided grants for architectural barrier abatement in fiscal year 1990 and 1991. Between that time and the time of trial, the General Assembly had provided no additional appropriations for barrier abatement in public schools. The amounts appropriated in 1990-1991 totaled $3.38 million. School districts were permitted to apply for a maximum of three grants for architectural barrier abatement. The grants were doled out on a first-come, first-served basis, without regard to the relative wealth of the districts applying for grant money. Seventy-six school districts that applied for grants received none. As of the time of trial, there were no funds available from the state or federal government to help pay for making public school buildings accessible as required by the ADA.

{¶ 115} The Facilities Survey identified over $328 million in funds needed for the management of asbestos hazards in public school buildings. Funds are available to public school districts on the federal level for asbestos abatement. See, generally, Section 4011 *et seq.*, Title 20, U.S.Code. However, federal funds are scarce. In this regard, the trial court made the following relevant findings of fact. In 1993, school districts in Ohio submitted $120 million in requests for funds to abate "Class 1" asbestos hazards to conform to the federal Asbestos Hazard Emergency Response Act, Section 2641 *et seq.*, Title 15, U.S.Code. Only twenty-nine school districts received a total of $14.7 million in grants and loans for abatement of the Class 1 asbestos hazards. For fiscal year 1990, approximately $18 million was appropriated by the General Assembly for asbestos abatement in the public schools. The funds were available on a first-come, first-served basis. More than two hundred forty school districts submitted applications totaling $140 million

in requests for the $18 million in available funds. Only sixty-three districts received any funding. For fiscal year 1991, thirty-four districts received asbestos abatement grants while more than one hundred fifty-eight districts that had applied for grants received none. Between 1991 and the date of trial, no further state funds were available for asbestos abatement. Aside from the scarce federal funds, no money was available to the districts for asbestos abatement other than local school district revenue.

{¶ 116} Each of the appellant school districts was determined by the Department of Education to have greater facilities needs than could be paid for by the districts on a local level, even if the districts had no other indebtedness and even if the districts were capable of passing local bond issues to the maximum amount permitted by law. The trial court found that in addition to the appellant school districts, sixty-one percent of the school districts in Ohio are unable to meet the amount of their identified facilities needs.

B

The Inadequacy and Inequity of School Funding

{¶ 117} The operation of the School Foundation Program, the emphasis of Ohio's school funding system on local property tax, the effects of the R.C. 319.301 tax reduction requirements, mandated school district borrowing through the spending reserve and emergency school assistance programs, imposition of state and federal unfunded mandates, and the inability or unwillingness of the General Assembly to provide sufficient funding for, among other things, the construction and necessary maintenance of school facilities have all combined to create a severe negative impact on Ohio's public schools. A review of the trial court's findings makes clear the various causes of the deplorable conditions in which some of Ohio's public school students are educated, as well as the nature and extent of such conditions. The trial court's findings of fact in this case are four hundred forty-eight pages in length and document the inequities and fundamental weaknesses of

Ohio's system of school funding. None of the findings are challenged by the parties to this appeal. For the most part, the trial court's findings of fact were premised on the joint stipulations of the parties. Some of the trial court's findings and the evidence upon which the findings were based may be summarized as follows.

• The formula amount provided through the School Foundation Program does not even come close to the average expenditure per pupil in Ohio, and the average per-pupil expenditure is outpacing the formula amount at an increasing rate. The fact that the formula amount does not reflect the true costs of education represents a substantial weakness in Ohio's system of school funding.

• For fiscal years 1994 and 1995, the State Board of Education requested a $1.9 billion increase in funding. The General Assembly appropriated only $625 million in additional funds. The amounts requested by the State Board of Education and denied by the General Assembly were considered to be necessary for the education of Ohio's public school students.

• Categorical program allocations to school districts through the School Foundation Program are not equalized. Wealthy districts receive the same unit funding as poor districts for, among other things, vocational and special education. Further, the amounts received for categorical programs such as vocational and special education are less than the actual costs of the programs, with poor school districts having less ability to make up the difference between the state funding provided and the actual program costs.

• The guarantee provisions of the School Foundation Program diminish the equalization effects of the foundation program. For fiscal year 1993, over one-third of all school districts in Ohio received payments under guarantee provisions as opposed to the formula for state basic aid. A majority of the payments under the guarantee provisions go to the wealthier districts. The operation of the guarantee provisions of the School Foundation Program is considered by the State

50

Board of Education to be a fundamental weakness in the way Ohio funds its schools.

• The formula for determining Disadvantaged Pupil Impact Aid ("DPIA") does not accurately reflect the true costs of educating disadvantaged pupils in high concentrations of poverty. There is no predictability to the DPIA system of funding, and predictability in funding is an important aspect of financial management.

• The amount of charge-off in the foundation formula does not accurately measure the ability of school districts to pay their local share of the basic program.

• The cost-of-doing-business factors in the foundation formula apply equally to all school districts within a county regardless of the true cost of operations in the individual districts. The factors assume that costs are lower in rural districts as opposed to urban districts, but many costs associated with running a school district are not affected by the district's location in the state. Additionally, the cost-of-doing-business factors do not fully reflect differences in costs associated with school district operations and do not adequately account for differences in costs within counties.

• The tax reduction factors of R.C. 319.301 severely limit growth of local property tax revenues. Consequently, school districts must repeatedly propose local tax levies to raise necessary funds. These increased numbers of proposals have met with increasing failure.

• R.C. 319.301 and the effects of phantom revenue in the state aid calculation deprive school districts of necessary funding. Phantom revenue occurs where a school district has inflationary growth in real property valuation, receives no additional local tax receipts commensurate with the increased valuations, and

receives less in state basic aid since the increased valuations increase the amount of the district's charge-off.

- But for tax reduction factors, a total of more than $1.176 billion in additional revenues would have been available for Ohio's public schools in 1990 alone. As a result of the tax reduction factors, school districts lost over $1.472 billion in real property tax revenue in fiscal year 1992. In fiscal year 1992, tax reduction factors reduced property taxes statewide to the tune of 26.12 percent.

- Ohio's system of school funding places so much of the burden for raising required revenues on the backs of the local school districts that it invites disparities among the districts. There is a strong correlation in Ohio between assessed property valuation per pupil and total expenditures per pupil. The top two hundred school districts in Ohio (ranked by assessed value per pupil) spend over $1,000 more per pupil per year than the bottom two hundred school districts. The result is that there are rich and poor school districts in Ohio. Specifically, there are districts in which per-pupil revenue and expenditure levels far exceed the per-pupil revenue and expenditure levels of other (less fortunate) schools.

- The disparities in school district revenues and expenditures are not due to the lack of tax effort of the districts or the voters in the districts. The trial court found that "[f]iscal effort between the top and bottom deciles of assessed valuation per pupil indicates that although there is a revenue and expenditure disparity, the level of effort between the rich and poor is virtually uniform." The trial court also found that "[t]aking into account both the value of assessed property and the adjusted gross income as combined measures of ability to pay taxes, the poorest 200 school districts in Ohio actually exerted a greater level of tax effort in 1990 than the wealthiest 200 school districts."

- Because one mill of local tax effort raises so little in districts with low assessed valuation, those districts have extreme difficulties in passing effective

millage since (1) voters can ill afford to pay the increased tax, and (2) the benefits to the school district are minimal since property valuation is low. The extent of disparities in funds available to Ohio's school districts grew over the decade of the 1980s and continues to grow.

- According to the testimony and the trial court's findings, Ohio is among the states with the greatest disparities in expenditures per pupil. In 1990, Ohio ranked forty-eighth out of the fifty states in the extent of disparity of revenue and expenditure per pupil.

- Predictability and reliability of income are extremely important aspects of school finance. However, the system of school funding in Ohio does not provide stability of income to local school districts and adversely affects the ability of the districts to properly manage the operation of the public schools.

- The trial court found that one of the driving forces behind the financial disparities in Ohio's system of school finance is the differences in Class II real property valuation among the various districts. The growth in inequity in the distribution of Class II property (property other than residential/agricultural) among the districts grew from 1981 through 1990 at a far greater rate than the growth in inequity in Class I (residential/agricultural) real property.

- There is little industry in the Dawson-Bryant School District. Thus, most of the burden of local taxation is placed directly on the backs of the residents of the district. Average income is very low compared to other districts within the state. The residents of the Dawson-Bryant School District have little or no discretionary income with which to pay additional taxes. Twenty-five percent of the district's students are ADC recipients and a great percentage of the students qualify for free or reduced-price lunch programs.

- With respect to the Lima City School District, the trial court found that "[p]eople who move into [this] district tend to be people who are moving to

take advantage of low income housing. As a result, the individuals who attend the Lima City Schools tend to be poor." The trial court further found that "[t]he Lima City School District has not proposed the passage of additional tax levies to its voters because it has one of the lowest tax bases and one of the lowest per capita incomes of any school district in the State of Ohio, such that the tax payers of the District are already assuming a significant burden. * * * Thus, the existing tax burden, combined with an ever increasing population living below the poverty line makes the prospect of passage of an additional tax levy unlikely."

- Northern Local School District has experienced rapid increases in enrollment as a consequence of an increase in the concentration of mobile homes. These homes are taxed at lower rates than permanent structures, and the influx of mobile homes has diminished the district's tax receipts. Given the lower tax rate, an influx of mobile homes generally harms a district by bringing in many new students without adequate corresponding tax revenue. Residents moving into the district tend to be poor and the ability of the district's residents to pay additional taxes has decreased over time.

- The economic situation in the Southern Local School District is grim. Jobs are scarce and large coal companies have either reduced or ceased operations in the district. Additionally, the federal government has purchased large tracts of land in the district and does not pay any taxes on the property.

- The economy of Youngstown has hurt the Youngstown City School District. The combination of steel mill closings and tax abatements to draw new businesses has had a devastating impact on the future viability of the Youngstown city schools. With respect to this district, the trial court made the following relevant findings:

"The Select Committee to Review and Study Ohio's Education System heard testimony from the Superintendent of the Youngstown City Schools that the

Youngstown-Mahoning Valley area lost 40,000 jobs between 1977 and 1987, resulting in income loss to employee wage earners and loss of personal tangible property value throughout the area.

"The plant closings in Youngstown have made it very difficult for the school system to function. The closings have caused tremendous unemployment, increased numbers of people on ADC, increased numbers of students on free or reduced price lunches, increased numbers of single-parent families, increased latchkey situations, increased numbers of neglected children, and many people are functioning on a survival basis with food, clothing, and shelter needs.

"The total value of abated property in the Youngstown City School District grew from $4,073,310 in [1988] to $16,928,920 in 1992. Property in the district, exempt from taxation, was valued at $159,023,950 in 1992.

"In the Youngstown City School District, between tax year 1978 and 1987, the total assessed property value fell from slightly over $1 billion to $606 million, measured in 1990 dollars. By the 1990 tax year, total assessed value had fallen to $547 million.

"In Plaintiff Youngstown City School District, 1 mill of taxes raised about $62 for each student in 1979, $41 in 1987, and only $37 in 1990.

"The average daily membership (ADM) of the Youngstown City Schools has declined by about 1,866 students from 1982 to 1992. * * *" (Citations to evidence omitted.)

- Property-poor school districts and others have been forced to borrow funds to meet their needs. The trend in borrowing has grown, with a growing number of school districts entering into receivership/state supervision. For some school districts, borrowing under the state's loan programs has become a way of life. The majority of these districts have low property valuation and have been unsuccessful in passing additional tax levy millage on more than one occasion. The magnitude of borrowing under the loan programs has become staggering, and most

districts have very little chance of escaping from this vicious circle of mortgaging the future of Ohio's public school students.

• As a condition to receiving emergency school assistance loans, school districts must borrow under the spending reserve loan program and must drastically cut expenditures. Cutting expenditures in anticipation of having to borrow funds is common financial practice. Thus, expenditure reduction is common among financially distressed school districts -- even those that have not entered into the emergency school assistance loan program.

• School district plans for expenditure reductions submitted with applications for emergency school assistance loans normally include, as the first order of business, cuts in school administrators, classroom teachers and support personnel. The next largest area of expenditure reduction comprises materials, supplies and textbooks. Next are early retirement incentives, delay in the purchase of school buses, and cuts in maintenance costs. However, cuts in textbook purchases and maintenance usually occur long before a district applies for an emergency assistance loan. As a result of the cuts that must be made to receive a loan, educational programs are less effective. Reduction of classroom teachers, textbooks and supplies adversely affects educational opportunity.

• At the time the trial court issued its decision in this matter, at least four of the "big eight" city school districts in Ohio had been approved for an emergency school assistance loan. These districts were the Youngstown, Akron, Cleveland and Cincinnati city school districts. The Southern Local School District borrowed money through the emergency assistance loan program in fiscal year 1992 and had instituted many cuts in staff, supplies and materials. These cuts had devastating consequences in the district, including a large number of students not passing on to higher grade levels due, at least in part, to the lack of available staff and the lack of sufficient teaching materials. If Southern Local needs to borrow

additional moneys under the emergency assistance loan program, there is very little (if anything) the district could cut from its bare-bones budget for the required expenditure reduction plan. The trial court found that as of the time of trial, appellant Northern Local School District was the only district in Perry County not to receive an emergency school assistance loan. However, while Northern Local was not a loan fund district, it was considered a "borderline" school district.

- Budget cuts and lack of funding have deprived the students in the appellant school districts of the educational opportunities available to other public school students in Ohio. The trial court found and the evidence confirms that students in the appellant school districts are not being provided with adequate textbooks, a sufficient number of teachers and support personnel, an acceptable level of guidance counseling and necessary supervision, sufficient laboratory equipment, opportunities for advanced placement, acceptable levels of vocational training, and a host of other resources, items and materials necessary to ensure the students a high quality education.

- The appellant school districts have lost or are in the process of losing experienced teachers to districts that are able to pay higher salaries. Property-poor districts, including some of the appellant school districts, have been required to hire less experienced school teachers because they can be paid less. Poorer school districts, including some of the appellant school districts, have had great difficulty hiring necessary personnel. The trial court found that the salary schedule for Dawson-Bryant was inadequate to attract certificated teachers and was not competitive with the pay scales of other districts within the county or the state. Thus, Dawson-Bryant was losing good teachers to neighboring school districts and was in jeopardy of losing more for the same reason. The Lima City School District's average teacher salary was lower than all the other districts of its type in the state. Northern Local has lost teachers and administrators due to a lack of competitive salaries. The district has lost other teachers and support personnel as

a result of budgetary reductions. Northern Local cannot hire experienced teachers because of a lack of funding. Rather, the district has been forced to hire inexperienced teachers whose salaries are lower. The average teacher salary for the Southern Local School District is one of the lowest in the state. For average teacher's salary, Southern Local ranks five hundred fifty-seventh in the state. The district has trouble recruiting teachers in certain specialized areas. The Youngstown City School District generally hires inexperienced teachers due to budgetary constraints. The district's salary schedule is not adequate to draw needed teachers and teachers with certain training into the community. Staff development and in-service teacher training for the appellant school districts and others have been woefully inadequate.

• The curricula in the appellant school districts are severely limited. For example, at the Dawson-Bryant High School, there was only one science lab, which, as of February 1993, was in a general state of disrepair. Dawson-Bryant has been unable to implement model math and language arts curricula due to a lack of necessary resources and materials. Similar problems, to a greater or lesser degree, were being experienced by each of the appellant school districts.

• Generally, reductions by a school district in the number of teachers, textbooks, materials and supplies directly affect the educational opportunity available to students. At the time of trial, the appellant school districts were financially unable to purchase required textbooks, and were using texts with missing pages and with ancient copyright dates. For some classes, there were no textbooks at all. There was evidence as to the inadequacies of school libraries. There were serious shortages of materials and supplies throughout the appellant school districts. Lima City, Southern Local, and Youngstown school teachers often spend a good amount of their own money to bring supplies to work. Teachers in the Southern Local School District are issued one or two boxes of paper that must last them the entire school year, and most teachers end up buying paper to bring to

work. Not only is paper rationed in the Southern Local School District, but paper clips are rationed, time on the copier is rationed, and art supplies, chalk, and even toilet paper are rationed. The paper shortage is so severe in the Southern Local School District due to the lack of adequate funding that the district does not even provide employees with paychecks in envelopes. Resources are so scarce that to receive paychecks during the summer months, teachers must provide the district with an envelope and stamp if they wish to receive their checks by mail -- otherwise, the teachers must pick up their checks in person.

- None of the appellant school districts are financially able to keep up with the technological training needs of the students in the districts, which makes it highly unlikely that the children of the appellant school districts will be able to meaningfully compete in the job market against those students from richer districts who receive a sufficient level of technological training.

- The trial court found that as of October 26, 1993, approximately seventeen thousand Ohio high school seniors had not passed all parts of the ninth grade proficiency exam after having at least six opportunities to do so. The trial court also found that, on the average, pupils in school districts having lower levels of taxable property have lower passage rates on the test than pupils in districts with higher levels. Moreover, the trial court determined on the basis of the information available that "[p]upils from high socio-economic backgrounds have a greater likelihood of passing the ninth grade proficiency tests. Those same pupils generally attend schools that have greater levels of expenditure per pupil." Additionally, the trial court determined that the percentage of pupils passing all parts of the ninth grade proficiency test from the appellant school districts is substantially less than the passage rates for the wealthiest quintile of school districts in the state.

- As of the fall of 1993, thirty-two out of ninety-nine seniors in the Dawson-Bryant Local School District had not passed all parts of the ninth grade

proficiency test. By contrast, only one out of one hundred high school seniors in the Beachwood City School District near Cleveland (a school with a large per-pupil expenditure) had not passed the ninth grade proficiency test. That one student, however, had passed all but one part of the test. Further, that student had been diagnosed as having severe learning problems. In the Lima City School District, seventy-two out of two hundred sixty-eight seniors had not passed and were in danger of not receiving a diploma. As of the time of trial, only fifty-three percent of the juniors and thirty-seven percent of the sophomores had passed all parts of the test. As of the fall of 1993, thirteen out of one hundred fifty-four seniors at Northern Local had not passed all parts of the proficiency test. As with all of the appellant school districts, the Northern Local School District does not have sufficient funds to stop the high rate of failures. Those funds that are available for intervention are expended, but that merely takes away opportunities from other students who are in need of attention. As of the time of trial, sixteen out of seventy-nine seniors in the Southern Local School District had not passed all parts of the ninth grade proficiency test. As of November 1993, three hundred of seven hundred seventy-three seniors in the Youngstown City School District had not passed all parts of the test. The trial court found and the evidence suggests that the massive test failures would result in an increased student dropout rate. Most inmates in Ohio's correctional institutions lack a high school diploma. Obviously, the lack of a high school diploma deprives individuals of a number of opportunities in life.

C

Public School Buildings in the Plaintiff Districts

{¶ 118} The evidence in this case and the trial court's findings of fact pertaining to the condition of the school buildings in the appellant school districts and others provide compelling proof of the economic despair created by Ohio's system of school funding. Some of the trial court's most disturbing findings

relating to the condition of the facilities and the evidence upon which the findings are based may be summarized as follows.

### *Dawson-Bryant*

{¶ 119} At the time of trial, there were four school buildings in operation in the Dawson-Bryant Local School District: Monitor Elementary, Deering Elementary, the intermediate school building, and the Dawson-Bryant High School. Dr. Lee R. McMurren, then superintendent of the Beachwood City Schools near Cleveland, testified concerning a tour he had taken through the Dawson-Bryant School District. According to McMurren, the materials used in the classrooms were worn and outdated. He observed special education classes and testified that the types of classrooms used to educate the students were a disgrace to the state of Ohio and to all Americans.

{¶ 120} At the time of trial, Monitor Elementary had no location for breakfast or lunch programs, no appropriate location for art and music classes, and no location for a physical education program. There were no nursing facilities in the event a child became ill. The library was small and dark, and could house only about ten children at a time, with no room for the children to sit down and browse through books. The building was not accessible to the handicapped. The electrical wiring in the building limited the use of technology. At Monitor, if more than three teachers plugged in fans at the same time, the breaker switch would kick off because the wiring cannot handle the electrical current.

{¶ 121} Deering Elementary was not accessible to the handicapped. Handicapped students had to be carried to certain locations in the building. There were no nursing facilities at Deering. Evaluations for identifying and placing handicapped students were performed in a former closet with one light bulb hanging from the ceiling and no heating or ventilation. Part of the assessment required evaluation of fine motor activities which were extremely difficult to perform in an unheated closet in the depth of winter. The trial court found and the

evidence indicates that from August 23, 1993 to August 30, 1993, the average afternoon temperature in the Deering Elementary building was one hundred degrees downstairs and one hundred fifteen degrees upstairs and in the cafeteria.

**{¶ 122}** The intermediate school building was out of compliance with EPA emissions standards. The coal heating system in the building was a health hazard. Coal dust could be seen in the air within the building. The area used for a band room was a former coal bin with no ventilation and no windows. There was no kitchen or cafeteria in the building and no free breakfast program could be offered. The building had no science laboratories and technology in the school was limited. There was one shower room in the school, which was shared by boys and girls. There was no art or music room. Special education class was held in a former storage area. The Ohio Department of Education had informed Dawson-Bryant of the need to move the special education classroom; however, there was no place to move. From August 23, 1993 to August 30, 1993, the average temperature in the building exceeded ninety-five degrees.

**{¶ 123}** There was no band or music room at Dawson-Bryant High School. The library was located in a modular building that was not readily accessible to students. Water and gas stations in the science laboratory were not functional. Two special education classes were held in former storage areas. The kitchen and cafeteria were insufficient to serve the students' needs. Classrooms were cramped and noisy. The high school had coal-fired boilers which emitted hazardous coal dust into the building. The only rooms in the entire building with hot water were the home economics room, the cafeteria, and the locker room. None of the restrooms had hot water.

**{¶ 124}** In May 1993, the Dawson-Bryant Local School District was successful in passing a bond issue that will allow the district to participate in the public school building assistance program under the Classroom Facilities Act (R.C. Chapter 3318). At the time of trial, the new facilities were expected to be completed

in 1995. The district's plans included closing Monitor Elementary and the intermediate school buildings, making renovations and additions to Deering Elementary to provide a centralized facility for kindergarten through fifth grade, modifying and renovating the high school into a middle school facility, and building a new high school. However, the trial court found that significant problems will remain even after completion of the project due to the lack of sufficient funding.

*Lima City School District*

{¶ 125} The trial court found that the Lima City School District cannot raise enough money through the passage of a construction levy to meet its facility needs. At the time of trial, the district operated sixteen school buildings that housed pupils, *i.e*., eleven elementary school buildings, three middle schools, a high school and an alternative high school.

{¶ 126} Three of the elementary school buildings were built in the 1920s and contained significant amounts of asbestos in the ceilings and piping. The plumbing in the buildings was deteriorating and there was great need for updated electrical service. To provide new electrical service would be extremely costly, since running additional wiring through the floors or ceilings would disturb the asbestos, resulting in substantial effort and expense to prevent friable asbestos from escaping into the air. At the time of trial, only one of the eleven elementary schools was accessible to the handicapped.

{¶ 127} South Middle School in Lima is an ancient building. Testimony established that its electrical problems are so bad that maintenance personnel have to wear rubber gloves and rubber vests to work on the electrical panel. In the fall of 1993, a portion of the exterior of the building collapsed onto a sidewalk. Fortunately, there were no injuries to students who used the sidewalk to enter and leave the building. Certain portions of the building that did not collapse are similar in design to the portion of the building that did collapse. Thus, the building is in

great need of repair. Lima operated a total of three middle schools, none of which met ADA requirements for accessibility to the handicapped.

{¶ 128} At the time of trial, Lima Senior High School had asbestos in every room in the facility. The facility housed approximately one thousand four hundred students. Testimony established that any structural work on the high school is difficult because it disturbs the asbestos, resulting in substantial costs connected with monitoring and encapsulation. As one extreme example of the problem, a shop teacher at the high school removed a dust collection system in a room and disturbed some friable asbestos, costing the district $15,000 to make the room safe for students.

{¶ 129} The trial court found that the Lima City School District is unable to engage in any preventative maintenance of its school facilities and that it repairs its facilities on an emergency-needs basis. Further, the court found that the district needs only seven elementary schools as opposed to the eleven in operation, but that the district is unable to reorganize elementary programs because to do so would require a new larger school building which the district cannot afford.

*Youngstown City School District*

{¶ 130} At the time of trial, many of the school buildings in the Youngstown City School District were in a state of disarray with bad roofs, overcrowded classrooms, and a host of other problems. Building maintenance was performed on an emergency basis only. The 1990 Facilities Survey identified approximately $67 million in needs for the Youngstown schools. Very few of these needs had been addressed by the time of trial. All capital improvements had been put on hold due to a lack of funds. Overcrowding and high student-to-teacher ratios had become common in several of the school buildings. Asbestos removal and architectural barrier abatement needs could not be met due to lack of funds. The following findings of fact by the trial court sum up the state of affairs in many of

the Youngstown city schools, and provide a unique perspective on the educational opportunities available to pupils in the Youngstown City School District:

"The John White Elementary School building has a metal building addition that * * * [i]n the summer * * * heats up during the day so the students can hardly bear to be in their rooms, and in winter it stays so cold there is often frost on the interior walls. The building also houses special education and remediation students in a portable unit. The library * * * has been divided to create more classroom space, so there is not sufficient library space. There is no computer lab[;] computers are placed on carts for intervention classes.

"* * *

"The Lincoln Elementary School has some grades which are overcrowded, computers on carts, and insufficient recreational space. The playground doubles as a parking lot for staff and a shooting gallery for the neighborhood.

"* * *

"The Martin Luther King Elementary School is beginning to have extensive roof leaks which the district has been unable to address due to lack of funds. The building is not handicapped accessible. The Martin Luther King Elementary building has security problems, and equipment has been stolen from the building.

"Taft Elementary School is overcrowded, and the first grade classes in 1992-93 school year had 33, 34 and 35 students, respectively. Some parents voluntarily agreed to allow the district to transport their students to other buildings in the district just to get the first grade classes down to a 30 to 1 ratio. * * *

"* * *

"Volney Rogers Junior High School is the only junior high in the district with a science lab. There are no science labs at the other junior high schools because they are extremely expensive to install and the district cannot afford to use the classroom space to put in science labs. At Youngstown, the first lab courses are offered as a sophomore in high school." (Citations to evidence omitted.)

**{¶ 131}** In all, the record is clear that the facilities in the Youngstown school district are wholly inadequate to meet the district's needs.

*Southern Local School District*

**{¶ 132}** Recently, the Southern Local School District was successful in obtaining funds under the Classroom Facilities Act together with the passage of the necessary tax levy and bond issue to provide new school facilities in the district. However, the need for the new facilities had existed since 1980. The Southern Local School District had over eight hundred improperly housed students identified in connection with its application for Classroom Facilities Act assistance. The trial court's findings concerning the state of the Southern Local schools prior to the completion of the renovation project are nothing less than staggering, and the fact that the schools were ever allowed to reach that point is simply outrageous. This case was commenced in 1991. Some of the trial court's findings concerning the Southern Local schools as they existed up to and during the time this case was litigated convincingly demonstrate how far some of Ohio's districts have sunk under the current system of school funding:

"When Superintendent [Carol] Spangler was employed in August 1991, elementary students were house[d] at New Straitsville Elementary, Corning Elementary, and Moxahala Elementary; junior high students were housed at Miller Junior High at Shawnee, and high school students were housed at Miller High School. The New Straitsville and Shawnee buildings were built around 1915, with Shawnee having some additions after that. Moxahala and Corning were both built in the 1920s.

"As a result of the lack of resources for comprehensive maintenance and upkeep, all of the buildings, other than the high school, were in very poor condition in 1991 when Ms. Spangler became Superintendent. The heating, electricity, ventilation, plumbing, and sewage systems in the elementary and junior high buildings needed comprehensive repair. The sewage system at New Straitsville

Elementary would flood over State Route 93 on occasion. Incidents such as the temperature in Moxahala's gym being only 20 degrees were not uncommon. * * * Asbestos was a primary concern in the elementary and junior high buildings. At Shawnee, the major part of the building was constructed with asbestos in the lower layer of the plaster. Because plaster was falling, some mornings the custodian and principal at the Shawnee building would go into rooms and knock plaster off the ceilings so that big chips would not fall on students during the day. * * * At Shawnee, the roof leaked, the lighting was poor, the heating was inconsistent, and there was no hot water in the bathrooms.

"Louis Altier, President of the Southern Local Board of Education, testified that he has farm animals that are housed better than students were housed in the Shawnee building. Whereas his animals were dry and warm, that could not be said about the students in the Shawnee building.

"The district did not have the financial resources to completely replace electrical systems and plumbing systems, to remove asbestos, and to perform the comprehensive maintenance that was necessary to keep the buildings in a safe condition.

"* * *

"Chris Thompson attended the New Straitsville Elementary for kindergarten, for the two weeks he spent in 2nd grade before being advanced a grade, and for 3rd grade (1984-85 and 1986-87). The building gave Christopher 'a dirty feeling.' There was plaster falling off the walls and ceilings and cockroaches had been seen crawling on the floor in the restrooms. Chris avoided using the restrooms at all while at school; he waited the entire school day to use the bathroom at home. The gymnasium floor was warped and it was so small that Chris found it difficult to play some sports because students would run into the walls. * * * The library was very small with inadequate book supplies and with outdated books.

Following a storm, the roof leaked and a large piece of the ceiling fell onto the floor and the library was closed for about two to three weeks. * * *

"In the 4th through 6th grades, Chris Thompson attended the Corning Elementary building (1987-88 and 1989-90). The building was very dirty, the bathrooms had cockroaches and other creatures crawling on the floors, possibly silverfish. A leaking roof was a real problem. In math class, water dripped like a waterfall from the ceiling into a bucket after rains. Sometimes, the students had to ask the teacher to be moved because the water was splashing on them. After a hard rain the night before, the constant drip into the bucket was very annoying. The library at Corning was very small with an inadequate supply of books and with outdated books. The science room was next to the furnace room, which made the science room very noisy, and it was hard for the students to concentrate or to hear the teacher talk. Plaster was falling off the walls at the Corning building.

"Chris Thompson attended the Shawnee building for the 1st grade (1985-86) and for the 7th and 8th grades (1990-91 to 1991-92). In the six years between his 1st grade and the 7th grade attendance, the building really had not changed much. The floors at Shawnee were warped, plaster was falling off the walls, and there were large holes in the walls in the front part of the building. * * *

"When Chris Thompson was at Shawnee, the gymnasium had a leaking roof, and at one time part of the gym was flooded due to leakage. When a ball hit the ceiling while students were playing kickball or volleyball, part of the ceiling came down. The locker rooms below the stage area and adjacent to the gym had almost no water pressure, stunk, and were unfit for student use. Students changed clothes in two storage rooms next to the stage, but had no shower facilities available.

"When Chris Thompson began to attend high school, the high school building did not have heat due to construction and renovation of the heating system in the fall of 1992 until the end of November or the beginning of December.

Students had to wear coats and gloves to classes, and were subjected to fumes from large kerosene heaters when the building got very cold.

"* * * All of the pupils who attended the elementary and middle school buildings at Southern Local remained improperly housed until the fall of 1993." (Citations to evidence omitted.)

{¶ 133} As a result of the passage of a 1990 local tax levy and state assistance provided through the Classroom Facilities Act, the district completed, in 1993, the construction of new elementary and middle school facilities. Shawnee, Moxahala, New Straitsville and Corning schools were closed. The new facilities have had a very positive effect on students and their performance. However, the new facilities have still left the district with numerous unmet facility needs. Miller High School was somewhat improved during the construction project, but the improvements were not nearly sufficient to correct the ills plaguing that facility. The district apparently does not raise enough funding to properly furnish the new facilities and will likely be unable to keep the new facilities in a state of good repair. Further, the district faced (and probably still faces) a problem as to what to do with the facilities that are no longer in use. It was estimated that to demolish Shawnee would cost the district $800,000. The district owns three other facilities that are no longer in use as schools. The district needs money to deal with these properties in a responsible manner.

*Northern Local School District*

{¶ 134} The plight of the Northern Local School District is truly tragic, as reflected by the trial court's findings of fact. As of the time of trial, Northern Local was thirtieth in line to get on the list of school districts approved for Classroom Facilities Act funding. The significance of this fact should not be overlooked. If Northern Local was not immediately entitled to funding for its facilities, it makes me wonder how disastrous the situation is in other school districts across this state

and how long it will take for the needs of the districts to be addressed under the current system of school funding.

{¶ 135} In July or August 1992, the bricks were bulging out near the parapet at the north end of the Somerset Elementary School. An engineer examined the building and recommended that it be closed. The Department of Education inspected the building and observed that the bricks on the parapet walls were bowed out and represented a hazard to pupils. The Department of Education strongly recommended that the facility be closed for safety reasons. The school district sought emergency financial help from the Department of Education and others, but was told that there was no money available to aid the district in addressing its emergency situation.

{¶ 136} In October 1992, the Northern Local School District Board of Education decided to close the Somerset school building. Before the building was closed, the district erected scaffolding around the entire building and canopies over doorways to protect students from falling bricks. When Somerset was finally closed, some of the students were required to be temporarily educated in facilities within the New Lexington School District. Busing the children to New Lexington on a daily basis resulted in the children missing part of the school day. As a result of the closing of Somerset Elementary, classes throughout the Northern Local School District had to be rearranged to accommodate the displaced Somerset school students.

{¶ 137} At the time of trial, Glenford Elementary School was housed in two separate buildings. The windows and roofs of both buildings leaked, the lighting was bad, and the restroom facilities were deplorable. State Route 204 runs between the two buildings. The road is heavily traveled, especially by trucks transporting sand. Kindergarten through second grade students must cross the highway up to five times a day for, among other things, lunch and recess. The restrooms smell bad, look terrible, and are in need of replumbing. Because of limited class space,

kindergarten students must climb three flights of stairs to use a bathroom. The roof in one of the buildings leaks even when it is not raining due to water trapped between layers in the roof. In November 1992, the Ohio EPA found high levels of arsenic in the water wells that service the Glenford school buildings. The district sought financial aid from the state to address this problem, but no aid was forthcoming.

{¶ 138} At Thornville Elementary, the roof and windows leak continually. Particle board was placed over peeling plaster. In the summer of 1993, when a piece of particle board was removed, maggot and ant infestations were discovered. The mortar is decaying and needs to be replaced or repaired.

{¶ 139} Recently, Northern Local was informed by an engineer employed to study the district's facility problems that if the Thornville and Glenford buildings were not renovated they would have to be closed. Given the debt limitation of R.C. 133.06, the district could not borrow enough to construct a building complex to house students in kindergarten through eighth grade. To build such a building, the district would have had to generate somewhere between $14 and $15 million. As of November 1993 the total assessed valuation in the district was approximately $90 million. The R.C. 133.06 debt limits restrict the district to nine percent of the district's total assessed valuation except under specified conditions. Thus, a new complex was not an option. Accordingly, the school board proposed to renovate Glenford, Thornville, Somerset, and the junior/senior high complex to meet the district's needs. To achieve that goal, the board put a $6.5 million bond issue before the voters in May and August 1993. The issue failed. The board placed another bond issue before the voters in November 1993 for $6.3 million (5.26 mills), which would not have been nearly enough for the district to take care of its facilities needs. That issue failed as well. The trial court found that the facilities in Northern Local "had not changed in the past 20 years."

III

Constitutional Guarantees Related to Public Education

{¶ 140} The history of some of Ohio's constitutional provisions relating to education is simply fascinating. Some of the history is set forth below to emphasize the important role education has played in the development of our state and nation.

{¶ 141} Following the Revolutionary War, the Confederate Congress, in the Land Ordinance of May 20, 1785, provided for the surveying and sale of lands in what was then known as the Western Territory. That territory, as described in the ordinance, included lands that would eventually become Ohio. In the Land Ordinance, Congress reserved one thirty-sixth of every township in the Western Territory expressly for the maintenance of public schools, stating: "There shall be reserved the lot No. 16, of every township, for the maintenance of public schools within the said township." 1 Laws of the United States 563, 565. Since the townships under the congressional survey were to be six miles square, this meant that a section of every township measuring one mile square would be devoted to educational use. Spayde, Lewis & Jollay, Baldwin's Ohio School Law (1984) 2, Section 1.03. "It was the intention of Congress in making this generous grant that these lands, approximately 704,488 acres in all, intelligently managed, would support the public schools of the state in perpetuity, so that there would be no need to tax the citizens for the cost of operating the public school system." *Id*.

{¶ 142} Following the enactment of the 1785 Land Ordinance, a group of land speculators incorporated to form the Ohio Company of Associates. See, generally, IV Dictionary of American History (1940) 162-163. This group, represented by Reverend Manasseh Cutler, contracted with Congress for the purchase of a large section of the public lands northwest of the Ohio River. *Id*. The terms of the negotiated agreement stipulated support for public education, requiring that lot No. 16 of each township was to be given perpetually to the purposes stated in the Land Ordinance of 1785, *i.e*., the maintenance of public schools. The agreement also included a provision that not more than two complete townships of

good land were to be given perpetually to the purposes of a university. See, generally, Swan, Land Laws For Ohio (1825) 15-25 (documenting provisions of law leading to the acquisition of lands by the Ohio Company of Associates). The provisions of this agreement formed the basis for other land purchases in the Ohio country. *Id.* at 26 *et seq.*

{¶ 143} In 1787, the Confederate Congress enacted the Northwest Territory Ordinance to provide for the government of the territory and the eventual establishment of states northwest of the Ohio River. The Northwest Territory Ordinance of 1787 provided, as an article of compact between the original states and the inhabitants of the territory northwest of the Ohio River, that: "Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." Section 14, Article III, Northwest Territory Ordinance of 1787. 1 Laws of the United States 475, 479. The means of forever encouraging the schools had been set forth in the Land Ordinance of 1785, in which lot No. 16 of every township was reserved for the maintenance of public education.

{¶ 144} The Land Ordinance of 1785 and the Northwest Territory Ordinance of 1787 set the stage for the development of the Northwest Territory into stabilized promised lands. The plan for stabilization revolved around a means of public education. Hyman, American Singularity (1986) 23-24, states that:

"Visions of the West as a nursery of republican virtues over a vast continent whose very boundaries were still unknown in 1787 excited Confederation congressmen in New York City and the framers of the Constitution in Philadelphia. Fee-simple ownership by large numbers of smallholders would transform the frontier, where civilization was at risk, into settlements where morality and laws (including the responsibilities to repay debts) would be honored and national cohesion maintained. Publicly supported education, a topic of the 1785 and 1787 statutes, would create literate, free farmers who would staff the governments

sketched in the 1787 law.  Because settlers derived their titles to land and attendant property from the nation, these unservile land-busters and their children, whose right to education was also a statutory duty of government, would be linked in grateful loyalty to the nation and to the new state they had conceived.

"This goal of linkage makes understandable why the Northwest Ordinance implanted commitments to public education in the territorial chrysalis of future states.  In planning the republic, most supporters of the Constitution and the ordinance espoused not-yet Federalist 'loose construction-internal improvement' doctrines and policies.  In addition to advocating roads, turnpikes, canals, and forts, such supporters gave priority to various forms of public education, all aiming to make the frontier quickly interdependent with the dismayingly distant East.  * * * Therefore, the 1787 Ordinance is known for its Article III, on schools:  'Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.'" (Footnote omitted.)

{¶ 145} On November 1, 1802, delegates assembled in Ross County, Ohio, for the purpose of establishing a state government and constitution for Ohio.  The delegates expressed their views on the fundamental importance of education by adopting, as part of the Ohio Constitution of 1802, two significant provisions. Specifically, Section 3, Article VIII of the Ohio Constitution of 1802 repeated the requirement of the Northwest Territory Ordinance that schools and the means of instruction must forever be encouraged.  Section 3, Article VIII of the Ohio Constitution of 1802 provided, in part:  "But religion, morality and knowledge, being essentially necessary to good government and the happiness of mankind, schools and the means of instruction shall forever be encouraged *by legislative provision*, not inconsistent with the rights of conscience."  (Emphasis added.)  In addition, the delegates at the 1802 Constitutional Convention agreed to the following language contained in Section 25, Article VIII of the 1802 Ohio

Constitution: "That no law shall be passed to prevent the poor in the several counties and townships within this state from an equal participation in the schools, academies, colleges and universities within this state, which are endowed, in whole or in part, from the revenue arising from donations made by the United States, for the support of schools and colleges; and the doors of the said schools, academies and universities, shall be open for the reception of scholars, students and teachers, of every grade, without any distinction or preference whatever, contrary to the intent for which said donations were made." Clearly, given the munificent land grants by Congress in support of public education, the framers of the 1802 Ohio Constitution had great expectations that Ohio's public school system, aided by legislative provision, would be adequate to afford an outstanding education (not just a rudimentary education) to the entire population.

{¶ 146} Ohio's second Constitutional Convention occurred in 1850-1851. Similar to the provisions of Section 3, Article VIII of the Ohio Constitution of 1802, Section 7, Article I of the Ohio Constitution of 1851 provides, in part: "Religion, morality, and knowledge, however, being essential to good government, it shall be the *duty of the General Assembly to pass suitable laws,* to protect every religious denomination in the peaceable enjoyment of its own mode of public worship, and *to encourage schools and the means of instruction.*" (Emphasis added.) Additionally, underscoring the importance of intellect and instruction, the delegates to the 1850-1851 Ohio Constitutional Convention devoted an entire Article of the Constitution (Article VI) to the subject of public education.

{¶ 147} Section 2, Article VI of the Ohio Constitution, which has remained unaltered since its adoption in 1851, provides: "The general assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the State; but no religious or other sect, or sects, shall ever have any exclusive right to, or control of, any part of the school funds of this State." The

debates from the 1850-1851 Constitutional Convention provide some insight into the purpose of Section 2, Article VI of the Ohio Constitution.

{¶ 148} The delegates to the 1850-1851 Ohio Constitutional Convention clearly viewed education as the duty of government and the right of all people regardless of their station in life. During the convention there were heated debates over the subject of education. For example, on Wednesday, December 4, 1850, the convention considered a report of the standing committee on education. II Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio, 1850-51 (1851) ("Debates") at 10. The report recommended adoption of three sections, one of which provided: "The General Assembly shall make such provision by taxation and other means (in addition to the income arising from the irreductible fund) as will secure a thorough and efficient system of Common Schools, free to all children in the State." *Id*. at 11. During the debates concerning this section of the report, William Sawyer of Auglaize County rose to propose an amendment that free public education be provided to white children only. *Id*. The proposed amendment did not fare well at the convention. James Taylor of Erie County rose to address the proposal. Portions of his stirring speech are entirely worthy of quotation here. Directing his comments to the racist inclinations of Mr. Sawyer, Taylor stated:

"I confess, sir, that I am surprised. I did not expect that a motion of this kind would be made by any gentleman on this floor. I did not, on the other hand, suppose that any proposition to extend the political rights of the colored citizens of Ohio would be adopted; but I had supposed that a knowledge of the law of self-preservation would have suggested to the gentleman from Auglaize [Mr. Sawyer] and to every gentleman upon the floor, that it would be good policy to give to all within the reach of our laws a good moral and intellectual training. I knew that this Convention was not prepared to increase the political rights of the black man; but I had hoped that all were willing to provide against his becoming the pest of society,

by being deprived of all opportunities for education. Shall we not secure protection to ourselves and our children by relieving the colored population of Ohio, from the absolute necessity of growing up in vice and ignorance? Shall we, by the adoption of the amendment of the gentleman from Auglaize, constitute a class who will become the inmates of our poor houses, and the tenants of our jails? I think it must be clear to every reflecting mind that the true policy of the statesman is to provide the means of education, and consequent moral improvement, to every child in the State, the offspring of the black man equally with that of the white man, the children of the poor equally with the rich.  * * *

"* * *

"* * *  Education will tend to make men moral and useful members of society, therefore let us provide for the education of every child in this state." Debates at 11.

**{¶ 149}** William Bates of Jefferson County stated:

"View this question as you will—as a matter of morality or of political economy, a question of right or expediency, the State would materially suffer if a provision to exclude any class of children from the benefits of common schools, should be engrafted in the new Constitution.  The experience of the past has shown that morality and virtue keeps pace with education and that degradation and vice are the inevitable results of ignorance.  Good policy, humanity, and above all, the spirit of the Christian religion, demands that we should provide for the education of every child in the State."  Debates at 13.

**{¶ 150}** Following Mr. Taylor's and Mr. Bates's statements and others, a motion was made to amend the section of the report to provide for a set amount of annual expenditures for the purpose of securing a thorough and efficient system of common schools available to all children in the state.  Debates at 13.  While this proposal was not adopted, it drew many statements reflecting how strongly the

delegates felt about the importance of education. For example, consider the eloquent speech of Samuel Quigley of Columbiana County, a physician:

"The third section of the report directs the Legislature to make full and ample provision for securing a thorough and efficient system of common school education, free to all the children in the State. The language in this section is expressive of the liberality worthy [of] a great State, and a great people. That this is an age of improvement and progress is admitted by all who are acquainted with the great and important transactions of the present century. That a spirit of education is increasing in our beloved country is known from common observation, and should not only be hailed, but cherished with delight.

"Science has dispelled the darkness from our land which for ages benighted the inhabitants of the old world, and gave the tyrant power to sway an iron sceptre over their subjects, and by discouraging instruction and keeping them in ignorance, perpetuated their servitude—continued them in degradation—shackled with despotic chains, not knowing that they were men capable of being free and governing themselves. This condition of things has become changed—intelligence, the truth of divine revelation—liberty of conscience—self-government—freedom of the press—free and fair discussion, together with freedom of thought, have brought our free citizens from under the dominion of tyranny, declaring and demonstrating to the world that great truth, that men are born free and equal and capable of governing themselves. Had not knowledge been shed upon the human understanding, all would have remained in the darkness of heathenism, and governed by superstition and fanaticism, our country would have still borne testimony to savage cruelty; the banks of our majestic Ohio would have been the theatre of the war dance and deeds of savage cruelty.

"* * *

"Intelligence is the foundation-stone upon which this mighty Republic rests—its future destiny depends upon the impulse, the action of the present

generation in the promotion of literature. Will we not, are we not, as patriots, bound in solemn duty to use our energies, our influence to forward this greatest of interests to present and future generations; and especially will the great State of Ohio fall short in so mighty an enterprise—so essential and indispensable a duty? * * * Arouse, then, citizens of Ohio, to your best interests, and show that you are not only able to compete in agriculture, in public improvement, in commerce—yes, and in the battlefield, with other States, but also in intelligence." Debates at 14-15.

{¶ 151} One of the delegates (William Hawkins of Morgan County) provided particularly clear insight into the concept of a "thorough and efficient" system of public education. He was "opposed to too great minuteness in the detail of our Constitution" concerning the specifics of education, but observed, "[W]e are warranted by public sentiment in requiring at the hands of the General Assembly *a full, complete and efficient system of public education*." (Emphasis added.) Debates at 16. He stated: "Enjoin upon the Legislature the duty of establishing an efficient system [of education], and we shall have done our duty." *Id.*

{¶ 152} Following these and other discussions, the report was recommitted to the standing committee on education. Debates at 18. Its revised report recommended adoption of the following:

"The General Assembly shall make such provisions, by taxation or otherwise, as, with the income arising from the school trust funds, will secure a thorough and efficient system of common schools throughout the State, and place the means of instruction in the common branches of education, for a suitable portion of the year, within the reach of all the children therein, of suitable age and capacity for learning; Provided, that no religious or other sect or sects, shall ever have any exclusive right to, or control of any part of the school funds of this State." Debates at 698.

{¶ 153} John Larwill of Wayne County moved to amend the first line of this section by striking the word "shall" and inserting the word "may." *Id.* at 699. The

proposed amendment was rejected without discussion. Mr. McCormick of Adams County then moved to amend the same section by striking out the words "a suitable portion," and substituting in lieu thereof the words "at least six months." *Id*. This and other proposals concerning the length of the school year were rejected upon a majority consensus that such matters are to be left for the legislature to determine. Debates at 699 *et seq*.

{¶ 154} The eventual product of the debates was the current version of Section 2, Article VI, mandating that the General Assembly "shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the State." As the Supreme Court of West Virginia recognized in reviewing the debates surrounding the adoption of Section 2, Article VI of the Ohio Constitution:

"There was no explicit definition of the words 'thorough and efficient' that appeared in the final committee report which the 1851 Ohio Convention adopted. The tenor of the discussion, however, by those advocating the entire education section as it was finally adopted, leaves no doubt that excellence was the goal, rather than mediocrity; and that education of the public was intended to be a fundamental function of the state government and a *fundamental right* of Ohioans." (Emphasis added.) *Pauley v. Kelly* (1979), 162 W.Va. 672, 685, 255 S.E.2d 859, 867.

{¶ 155} The trial court found that education was a fundamental constitutional right and that Ohio's system of school funding violated Section 2, Article VI, requiring the General Assembly to provide a thorough and efficient system of common schools. Other constitutional provisions the trial court relied upon in striking down Ohio's school funding laws are as follows:

(1) Section 2, Article I of the Ohio Constitution, which provides that:

80

"All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the General Assembly."

(2) Section 26, Article II, which states:

"All laws, of a general nature, shall have a uniform operation throughout the State; nor shall any act, except such as relates to public schools, be passed, to take effect upon the approval of any other authority than the General Assembly, except, as otherwise provided in this constitution."

(3) Section 3, Article VIII, which states:

"Except the debts above specified in sections one and two, no debt whatever shall hereafter be created by or on behalf of the State."

(4) Section 4, Article XII, which states:

"The General Assembly shall provide for raising revenue, sufficient to defray the expenses of the State, for each year, and also a sufficient sum to pay principal and interest as they become due on the state debt."

{¶ 156} While I have reviewed them, I make no comment regarding items (2), (3) and (4) immediately above because comment is not necessary in arriving at the conclusions reached herein.

IV

*Cincinnati City School Dist. Bd. of Edn. v. Walter*

{¶ 157} In *Walter*, 58 Ohio St.2d 368, 12 O.O.3d 327, 390 N.E.2d 813, this court reviewed constitutional challenges to the General Assembly's enactment of the Equal Yield Formula for computing state aid. See discussion in Part II, *supra*. The formula was designed to provide an equal sum of combined state and local funds, on a per-mill per-pupil basis, for each qualifying school district. The formula provided a two-tiered system of funding—every school district received an amount

per pupil per mill for the first twenty mills and additional amounts were given to each school district with millage above twenty mills up to thirty mills. The court in *Walter* discussed the applicable test for determining whether the Equal Yield Formula violated the Equal Protection Clause of the Ohio Constitution, stating:

"Simply stated, the test is that unequal treatment of classes of persons by a state is valid only if the state can show that a rational basis exists for the inequality, unless the discrimination impairs the exercise of a fundamental right or establishes a suspect classification. * * * If the discrimination infringes upon a fundamental right, it becomes the subject of strict judicial scrutiny and will be upheld only upon a showing that it is justified by a compelling state interest. That is, once the existence of a fundamental right or a suspect class is shown to be involved, the state must assume the heavy burden of proving that the legislation is constitutional." *Walter* at 373-374, 12 O.O.3d at 330, 390 N.E.2d at 818.

{¶ 158} In discussing whether education was to be considered a fundamental right guaranteed by the Ohio Constitution, the court in *Walter* cited *San Antonio Indep. School Dist. v. Rodriguez* (1973), 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16. *Walter* at 374, 12 O.O.3d at 331, 390 N.E.2d at 818. *Rodriguez* sets forth the test for determining whether education is a fundamental right under the United States Constitution. The *Rodriguez* test is whether the Constitution implicitly or explicitly guarantees a right to education. *Rodriguez* at 33-34, 93 S.Ct. at 1297, 36 L.Ed.2d at 43. *Walter* recognized that "if this court were to accept this test, educational opportunity would be a fundamental interest entitled to strict scrutiny." *Walter* at 374, 12 O.O.3d at 331, 390 N.E.2d at 818. The court in *Walter* rejected the *Rodriguez* test, however, finding a distinction between the grant of powers of the United States Constitution and the Ohio Constitution. *Id.* at 374-375, 12 O.O.3d at 331, 390 N.E.2d at 818-819. The court stated that "because this cause deals with difficult questions of local and statewide taxation, fiscal planning and education policy, we feel that this is an inappropriate cause in which to invoke

'strict scrutiny.' This case is more directly concerned with the way in which Ohio has decided to collect and spend state and local taxes than it is a challenge to the way in which Ohio educates its children." *Id.* at 375-376, 12 O.O.3d at 331-332, 390 N.E.2d at 819. The *Walter* court rejected the equal protection challenges to the Equal Yield Formula, finding that the per-pupil expenditure disparities in Ohio could be rationally justified on the basis of local control of education, *i.e.*, each local school district could develop programs to meet perceived local needs. *Id.* at 376-382, 12 O.O.3d at 332-335, 390 N.E.2d at 819-822. The court in *Walter* also rejected an argument that the Equal Yield Formula violated the Thorough and Efficient Clause of the Ohio Constitution, finding insufficient proof of a violation of the standards set forth in *Miller v. Korns* (1923), 107 Ohio St. 287, 140 N.E. 773. *Walter* at 386-388, 12 O.O.3d at 337-339, 390 N.E.2d at 824-826. See discussion of *Miller* in Part V, *infra*.

{¶ 159} The trial court found that *Walter* was not controlling precedent on the issues involved in the case at bar. The court of appeals disagreed, concluding that the system of educational funding had not substantially changed since *Walter* was decided and that, therefore, *Walter* dictated a finding that Ohio's current scheme of school funding is constitutionally acceptable. However, I find that *Walter* is clearly *not* controlling in the case at bar.

{¶ 160} The Equal Yield Formula at issue in *Walter* was repealed shortly after *Walter* was decided. The case at bar involves a funding scheme entirely different from that applicable in *Walter*. Moreover, *Walter* involved a challenge to only one aspect of school funding. Conversely, the case at bar involves a wholesale constitutional attack on the entire system of school funding, including the impact of tax reduction factors, mandated programs of school district borrowing, the inadequacy of classroom facilities, etc. Further, and perhaps most important, the decision in *Walter* clearly indicates that the General Assembly had provided in the legislation at issue in *Walter* a funding level under the Equal Yield Formula of $960

per pupil at twenty mills up to $1,380 per pupil at thirty mills. *Walter*, 58 Ohio St.2d at 371, 12 O.O.3d at 329, 390 N.E.2d at 817. The court in *Walter* specifically determined that the General Assembly had enacted the legislation to ensure $960 per pupil upon the recommendation of a joint, nonpartisan legislative committee that found that a $960 guarantee at the twenty-mill level was sufficient to provide the means for an adequate educational program of high quality in each district. *Walter* at 371-372 and 382, 12 O.O.3d at 329 and 335, 390 N.E.2d at 817 and 822, and fn. 1. The evidence in the case at bar clearly indicates that the funding level set by today's School Foundation Program has absolutely no connection with what is necessary to ensure a high quality education. Indeed, evidence in the record clearly demonstrates that the minimum funding level of the School Foundation Program has not been adequate to ensure a high quality education in each of Ohio's public school districts. Testimony indicated that a formula amount of $4,000 per pupil was necessary at the time this case was tried, whereas the General Assembly had set the basic per-pupil funding amount at about seventy percent of that rate. Further, at oral argument, both Justice Resnick and Justice Pfeifer established by their questioning that neither the General Assembly nor the Department of Education had commenced any study or made any finding as to the cost of a minimum level of education. Likewise at oral argument, the State Solicitor of the Office of the Attorney General of the state of Ohio conceded that if funding for primary and/or secondary education fell below the level necessary to provide every student a free basic, adequate education (a "floor," he called it), that would be violative of our Constitution.

{¶ 161} The trial court held that this court's decision in *Walter* "is confined to its own set of facts." I agree. The times and the law have changed since *Walter* was decided. In the 1970s, the system of school funding then in effect was determined to be constitutional. That system, the Equal Yield Formula was, for whatever reason, abandoned shortly after *Walter* was decided. Today, the record

before this court leads to the inescapable conclusion that Ohio's system of school funding cannot be reconciled with the applicable constitutional mandates concerning public education.

V

The Thorough and Efficient Clause of Section 2, Article VI

{¶ 162} In *Miller v. Korns,* 107 Ohio St. at 297-298, 140 N.E. at 776, this court stated that:

"Section 2, Article VI of the Ohio Constitution, provides as follows:

"'The General Assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, *will secure a thorough and efficient system of common schools throughout the state. * * *'*

"This declaration is made by the people of the state. It calls for the upbuilding of a system of schools throughout the state, and the attainment of efficiency and thoroughness in that system is thus expressly made a purpose, not local, not municipal, but state-wide.

"With this very state purpose in view, regarding the problem as a state-wide problem, the sovereign people made it mandatory upon the General Assembly to secure not merely a system of common schools, but a system thorough and efficient throughout the state.

"A thorough system could not mean one in which part or any number of the school districts of the state were starved for funds. An efficient system could not mean one in which part or any number of the school districts of the state lacked teachers, buildings, or equipment.

"In the attainment of the purpose of establishing an efficient and thorough system of schools throughout the state it was easily conceivable that the greatest expense might arise in the poorest districts; that portions of great cities, teeming with life, would be able to contribute relatively little in taxes for the support of schools, which are the main hope for enlightening these districts, while districts underpopulated with children might represent such taxation value that their school needs would be relatively oversupplied." (Emphasis *sic*.)

{¶ 163} The trial court's findings of fact document that the appellant school districts and other districts throughout this state are starved for funds. The court's findings document that the appellant districts and others lack appropriate books. Some districts, including the appellant school districts, lack appropriate buildings. This cannot be denied, given the state of the record and the identified $10.2 billion in facilities needs. The record documents that many school districts lack experienced and qualified teachers. Thus, applying the test of *Miller*, it is obvious that the General Assembly has failed in its constitutional obligation to ensure a thorough and efficient system of common schools.

{¶ 164} The debates from the 1850-1851 Constitutional Convention clearly indicate that the word "thorough" in Section 2, Article VI of the Ohio Constitution was intended to mean a system of education that is full, absolute, complete, and nearly perfect. See discussion in Part III, *supra*. The debates make clear that the word "efficient" was intended to mean useful, effective, and working well. *Id*. A review of the record demonstrates that Ohio's system of public elementary and secondary education is, to a degree, neither thorough nor efficient. In its memorandum decision in this case, the trial court stated:

"This Court heard thirty days of testimony as the only individual in the State of Ohio to be present for the entire proceedings. Attorneys, bailiffs, court reporters and members of the gallery were either replaced or were absent from some sessions. Throughout this case this Court heard from school children, teachers, principals, superintendents, school board members, legislators and other state personnel. The sincerity and conviction to educate from both the Plaintiff and Defense witnesses [were] evident. This Court saw grown men and women cry as they explained the conditions and situations in which some of the youth of this State are educated. They deserve better and the State as their bridge builders to the future [is] duty bound to provide them with better tools for a successful life. The law requires the same. Some students in the Plaintiff school districts lack equipment, supplies,

textbooks, technology, [and] proper handicap access and many of our special education students are not receiving an appropriate public education.

"In the *Walter* case the Supreme Court of Ohio relied upon the State's assurances that education was thorough and efficient in part based upon the minimum standards being met. Today the new minimum standards are not even being monitored and haven't been for several years. The new standard for review is the ninth grade proficiency test. At trial time 32 of 99 Seniors from Plaintiff Dawson-Bryant had not passed; 16 of 79 Seniors at Plaintiff Southern Local; 13 or [*sic*, of] 154 at Plaintiff Northern Local; 300 of 773 at Plaintiff Youngstown City Schools and 27% of Lima Seniors had not passed. Can a system that has nearly 17,000 Seniors who have not as yet passed the ninth grade proficiency test consider itself thorough and efficient? The same question can be asked of a system whose equality of funding ranks it the third worst in the country behind Missouri (declared unconstitutional) and Alaska. * * *

"Some of our students are being educated in former coal bins in Mt. Gilead. In Flushing the students have no restroom in the school building itself. In Brown County the only library is an abandoned library truck; the band practices in the kitchen and plays in the cafeteria during lunch. In Nelsonville the building is slipping down a hill. At Plaintiff Northern Local children are educated in modular units situated outside the school with no running water. At Plaintiff Southern Local students recently completed their entire school careers in buildings that for the most part were determined to be improper housing in 1981. * * *"

{¶ 165} There is no question that Ohio's system of school funding violates the Thorough and Efficient Clause of the Ohio Constitution. The same could be said with respect to the provisions of Section 7, Article I of the Ohio Constitution that mandate that the General Assembly pass *suitable laws* to encourage schools and the means of instruction. "Suitable laws" cannot mean laws which, by their

own operation or in conjunction with other laws, deprive Ohio's school children of the high quality educational opportunities to which they are entitled.

VI

Equal Protection

{¶ 166} Contrary to the conclusion reached by the court of appeals, *Walter,* 58 Ohio St.2d 368, 12 O.O.3d 327, 390 N.E.2d 813, did *not* determine the question whether education in Ohio is a fundamental constitutional right. That question was not directly presented to the *Walter* court. Rather, *Walter* dealt only peripherally with the question of the fundamental right of education when it rejected the fundamental-right analysis of *Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16. See discussion in Part IV, *supra.* Today, this court is specifically called upon to determine whether education in Ohio is a fundamental constitutional right. The trial court held, and I agree, that it is.

{¶ 167} Since *Walter* was decided, this court has repeatedly applied a test for determining fundamental rights consistent with the *Rodriguez* test, *i.e.*, whether the right at issue is explicitly or implicitly guaranteed by the state or federal Constitution. For example, this court recently held, in *Cleveland v. Arnold* (1993), 67 Ohio St.3d 35, 44, 616 N.E.2d 163, 170, that "[f]undamental rights (personal liberties) are those rights which are explicitly or implicitly embraced by our Constitution and the federal Constitution. Our goal should be to preserve the existence of these sacred rights." (Footnote omitted.) Clearly, the right to a free public education in Ohio has always been considered a right of the people and a duty of government. The Ohio Constitution explicitly so provides in its various provisions addressing the subject of education. Moreover, the right to a free elementary and secondary public school education is implicit in the concept of ordered liberty. The framers of the 1850-1851 Ohio Constitution clearly acknowledged that education is the foundation upon which all other individual liberties are based. Their debates can lead to no other conclusion than that

education is a fundamental right guaranteed to all of Ohio's school-age children. Further, the Land Ordinance of 1785 and Northwest Territory Ordinance of 1787 embodied the grand ideal that education was to be the cornerstone of the vast and orderly migration westward. Indeed, education is the institution upon which this great nation was built.

{¶ 168} Accordingly, I would hold that education in Ohio is a fundamental constitutional right guaranteed by the Ohio Constitution. As Judge Gwin so ably noted in his concurring and dissenting opinion in the court of appeals, "I believe that education is a fundamental right. More than one-third of the entire state budget is devoted to education. An entire Article of our State Constitution addresses public education, and it mandates that schools be adequately funded so that our schools are thorough and efficient. Finally, common sense dictates that nothing is more important to Ohio's children than to make them competitive and fulfilled personally. To hold otherwise is to bury our heads in the sand."

{¶ 169} Because education is a fundamental right, the school funding legislation is subject to a strict scrutiny standard of review for purposes of determining whether the legislation violates the Equal Protection Clause of Section 2, Article I of the Ohio Constitution. Appellees have taken the position that local control justifies the large wealth-based disparities created by Ohio's system of school funding. I disagree. Rather, I agree *in toto* with the trial court's observations:

"Local control in many of this State's school districts and specifically in the Plaintiff school districts is a cruel illusion. Plaintiff Northern Local School District has primarily engaged in 'crisis management' during the 1990's and has been forced to forgo building repairs, textbook renewal, advanced placement options and full handicapped access. Plaintiff Lima City Schools has spent over $10 million dollars since 1980 to comply with unfunded state mandates and has been unable to purchase necessary educational equipment and supplies, expand elementary

guidance services or offer all-day every-day kindergarten. Plaintiff Dawson-Bryant School District has been unable to implement advanced placement courses, all-day every-day kindergarten, textbook replacement and full handicapped access to its building. Plaintiff Southern Local School District is simply reacting to state mandated regulations and deciding what programs and services to cut. * * * Plaintiff Youngstown City School District no longer makes proactive decisions about what programs to add and policies to implement based upon the best interest of the students. Instead, * * * the board[']s decisions mainly regard the cutting of programs.

"It can be argued that the local school districts possess control of local education through the ability to raise their level of funding through tax increases. Due to the Plaintiff school districts being some of the poorest in the State this is not a viable option. The fact that school districts have the 'ability' to determine how dollars are spent in some circumstances is a hollow argument when there are not sufficient funds to provide for the educational and facility needs of their particular school district. * * *

"* * * As the Plaintiffs have argued in this case local control without discretionary funds is a myth and does not justify the vast disparities in educational funding and educational opportunity throughout this State. There is only one system of education in this State and that is a state system. The local control currently realized by the Plaintiff school districts is not sufficient justification for the discriminatory educational opportunities afforded to the students of this State."

{¶ 170} The concept of local control is a myth for the appellant school districts and others. The notion of local control is a particularly cruel illusion for school districts that have been subjected to state supervision under the provisions of R.C. 3313.48 *et seq*. Finally, on the issue of local control, if local control is really an issue, why have over five hundred fifty of the state's six hundred eleven

school districts joined together as a coalition to support this case?  Just asking the question would seem to answer the "local control" contention.

{¶ 171} The state bears a heavy burden of demonstrating a compelling state interest for the wealth-based disparities inherent in Ohio's system of school funding, but there are no legitimate excuses.  Ohio's system of school funding violates Section 2, Article I of the Ohio Constitution.

## VII

### The Trial Judge

{¶ 172} I believe the trial judge, the Honorable Linton D. Lewis, Jr., did a magnificent job in handling this most difficult case.  Judge Lewis clearly did not and does not deserve the criticism and abuse he has taken for doing his job.  From afar (and to my knowledge I have never met Judge Lewis), I have admired his restraint in not responding to unwarranted attacks from persons in high places—some of them lawyers.  He has acquitted himself well and has followed to the letter Canon 3(A) of the Code of Judicial Conduct, which provides that:  "(1)  A judge should be faithful to the law and maintain professional competence in it. *He should be unswayed by partisan interests, public clamor, or fear of criticism,"* and "(3)  A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity * * *."  (Emphasis added.)  He makes me, once again, proud to be a judge.

## VIII

### The Remedy

{¶ 173} In his Inaugural Address delivered on Monday, January 20, 1997, President William J. Clinton discussed his vision for "a land of new promise."  He said that:

"In this new land, education will be every citizen's most prized possession.  Our schools will have the highest standards in the world, igniting the spark of possibility in the eyes of every girl and every boy.  And the doors of higher

education will be open to all. The knowledge and power of the Information Age will be within reach not just of the few, but of every classroom  * * *.”

**{¶ 174}** In his State of the State Address delivered on January 14, 1997, the Governor of Ohio, in discussing the difficult choices that have to be made for the funding of competing worthwhile programs, said that he wanted “to focus on the one choice on which I know we can all agree—the need to build on the foundation we have laid to make Ohio’s schools *second to none, now and in the 21st century*.” (Emphasis added.)  “Perhaps,” said the Governor, “the most significant thing we have done since 1991 is to reinforce the idea that education is everybody’s business—*and that education improvement is our state’s number one priority*.” (Emphasis added.)  The Honorable Governor also noted that “in a recent national survey, 10 of our 13 public universities were ranked among the best in the nation.”

**{¶ 175}** In his State of the Union Address on Tuesday, February 4, 1997, in discussing the future of education in America and educational funding, the President said:

“One of the greatest sources of our strength throughout the Cold War was a bipartisan foreign policy.  Because our future was at stake, politics stopped at the water’s edge.  Now I ask you, and I ask all our nation’s governors, I ask parents, teachers and citizens all across America, for a new nonpartisan commitment to education, because education is a critical national security issue for our future and politics must stop at the schoolhouse door.”

**{¶ 176}** By our decision today, a majority of this court facilitates these admirable goals.  The remedy need not and should not be one which takes from the rich to give to the poor.  School districts that want to do even more for their school children than the bare minimum should not be penalized.  Likewise, higher education in Ohio should not be required to make even further sacrifices to meet the obvious current shortfall in primary and secondary educational funding.  Higher education institutions cannot be the “Red Cross” for primary and secondary public

education. For the job they are obviously doing their performance should be rewarded—not penalized. Thus, the remedy and solution must lie in other initiatives.[13] We can do better than our ranking of forty-eighth out of the fifty states in the extent of disparity of revenue and expenditure per pupil.

{¶ 177} Many of our public schools are in deplorable condition. This is a documented $10 billion problem. In addition, too many schools are without proper teaching facilities—labs, up-to-date textbooks, supplies and adequately compensated teachers. By our decision today we require the General Assembly to act with all deliberate speed to establish a constitutional system of school funding to address the formidable problems facing many of Ohio's school districts.

{¶ 178} Some might choose to ignore our decision. That would be unfortunate—not necessarily for us or them but for the school children of Ohio who depend upon all of us to give them, by way of educational opportunity, that which we ourselves were afforded. Accordingly, to ensure compliance with our decision, I am in complete agreement with the determination to remand this cause to the trial court with plenary authority to enforce our decision.

---

13. It should not go unnoticed or unmentioned that Governor Voinovich and the General Assembly have joined, under the Governor's leadership, to make Ohio the leading state in "Head Start" education. This humane initiative has reaped and will continue to reap tremendous dividends for our children and our state.

   It also has not gone unnoticed that the General Assembly has provided, in recent budgets, some additional funding for education and that even more is recommended in the current proposed state budget for the next biennium. These initiatives are laudable and the Governor and General Assembly should be commended for their efforts. The difficulty is that given the enormity of the problem, the current fiscal constraints and the convoluted scheme for funding education now on the law books of Ohio, such actions just cannot and will not get the job done.

IX

Costs and Attorney Fees

{¶ 179} The trial court awarded costs and attorney fees in favor of appellants. I agree with the majority's determination reinstating the award of attorney fees. The majority opinion does not discuss the award of costs but, by reversing the judgment of the court of appeals, this court has essentially reinstated the award of costs to appellants -- the parties who prevailed at trial.

X

Conclusion

{¶ 180} I join today's majority opinion without hesitation or reservation. Ohio's statutory scheme for funding public elementary and secondary education is unconstitutional. A review of the record and the governing law can support no other conclusion.

RESNICK, J., concurs in the foregoing concurring opinion.

_____

**ALICE ROBIE RESNICK, J., concurring.**

{¶ 181} I concur in the majority opinion and in the concurring opinion of Justice Douglas.

{¶ 182} I write separately primarily to underscore the fact that this case does not seek equality of education throughout Ohio, but rather seeks a quality education for every single child in Ohio regardless of where that child resides.

{¶ 183} The dissent contends that this case involves a nonjusticiable political question and that as a result this court should decline to address the issues presented. However, in 1979, when this court decided *Cincinnati School Dist. Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 383-384, 12 O.O.3d 327, 336, 390 N.E.2d 813, 823-824, this court made clear that in certain instances we would have jurisdiction to determine the constitutionality of Ohio's system of funding public

schools, and that the issue would be a justiciable question. We recognized and distinguished the propriety of judicial review from the deference we would give to the General Assembly's determinations of policy. But that deference is not without limits. The *Walter* court stated: "'A thorough system could not mean one in which part or any number of the school districts of the state were starved for funds. An efficient system could not mean one in which part of any number of the school districts of the state lacked teachers, buildings, or equipment.'

"***

"This court, therefore, intimated in *Miller v. Korns* [(1923), 107 Ohio St. 287, 140 N.E. 773], that the wide discretion granted to the General Assembly is not without limits. For example, in a situation in which a school district was receiving so little local and state revenue that the students were effectively being deprived of educational opportunity, such a system would clearly not be thorough and efficient." (Footnote omitted.) 58 Ohio St.2d at 386-387, 12 O.O.3d at 338, 390 N.E.2d at 825, quoting *Miller*, 107 Ohio St. at 298, 140 N.E. at 776.

{¶ 184} Today, indeed, we have a number of school districts that are starved for funds. We have school districts that lack adequate buildings and equipment. In 1997, when it is evident that the citizens of Ohio are unable to declare that the General Assembly is providing a "thorough and efficient" system of public schools for all of the students in Ohio, it would be irresponsible for this court to refuse to decide this question under the guise of calling it a "nonjusticiable political question."

{¶ 185} I join Justice Douglas's concurring opinion, in which he finds that education is a fundamental right. I wish to emphasize, however, that education need not be equal or substantially equal in all districts. Rather, there must be a threshold amount of funding provided by the state which affords each district in Ohio the ability to meet certain standardized requirements. It should be recognized

96

that districts may provide for their students above and beyond the state's responsibility.

{¶ 186} The dissent notes the great strides the General Assembly has made in funding education in Ohio since *Walter*. Yet the General Assembly does not know the actual per-pupil cost of education in Ohio, since it has not calculated the cost of a quality education since 1973-1974. Moreover, while educational funding has increased since *Walter* was decided, it is no longer based on an explicit assessment of the cost of a high-quality education. Education is funded as a residual after other mandated programs are funded.

{¶ 187} The dissent states that "evidence demonstrates that the General Assembly has discharged its constitutional duty for funding a 'thorough and efficient' system." The question to be answered after reviewing all of the evidence is whether a thorough and efficient system exists in a school district where some students are taught in a former coal bin, or where there are not enough books for each child, or where the science lab has no gas valves or running water, or where handicapped children are carried up and down stairs because the buildings are not accessible to wheelchairs, or where the buildings are structurally unsafe, have inadequate plumbing, or are without sanitary or indoor restrooms, or where the school buildings cannot be rewired for computers until an asbestos hazard has been eliminated. This is not a close question. The answer is obvious. From this list alone, it is evident that the General Assembly has failed in its constitutional duty to provide a "thorough and efficient" system of schools throughout Ohio.

{¶ 188} It is estimated that it will take $10 billion to reestablish adequate school facilities throughout the state. But the problem is not only facilities that are inadequate or in poor condition. In addition, it is all of the other myriad problems, including the lack of honors programs, language courses, and other electives in property-poor school districts, that put many of Ohio's children at a disadvantage when they try to enter colleges.

{¶ 189} It cannot be emphasized enough that a thorough and efficient system of common schools does not require uniformity or equality of all schools. Contrary to the dissenting opinion, equality is not the purpose of this case. Rather, the General Assembly is required by our state's Constitution to provide a quality and adequate education for all of Ohio's school students. It must assure every child of the right to enter a structurally safe building, which is staffed with sufficient teachers, and contains enough textbooks and equipment so that the child can develop self-esteem and intellectual abilities. Until this constitutional threshold has been met in each and every school in Ohio, a thorough and efficient school system will not exist.

{¶ 190} The General Assembly must first determine the cost of a basic quality education in both primary and secondary schools in Ohio, and then ensure sufficient funds to provide each student with that education, realizing that local property taxes can no longer be the primary means of providing the finances for a thorough and efficient system of schools. Continued reliance on property taxes for the majority of school finances will simply preserve the status quo of inadequacy and deny the students in property-poor school districts a thorough and efficient education.

DOUGLAS, J., concurs in the foregoing concurring opinion.

_____

**PFEIFER, J., concurring.**

{¶ 191} I join the majority of this court in concluding that the current school funding system violates the Thorough and Efficient Clause of the Ohio Constitution. The School Foundation Formula and related statutes do not adequately smooth out the unconscionable funding inequities that exist between school districts in this state. These disparities in funding are direct evidence of a system that is inefficiently designed and administered.

{¶ 192} Even within a single county, disparities can be remarkable. For example, the actual tax yield per pupil per operating mill in Cuyahoga County ranges from $581.57 in Cuyahoga Heights to $21.06 in East Cleveland. In 1994, the year from which these figures were taken, it required over twenty-seven mills in East Cleveland to yield what one mill yielded in Cuyahoga Heights.

{¶ 193} In Trumbull County, the property valuation per pupil ranges from $194,649 in Lordstown Local to $42,297 in McDonald Local. In Clermont County, the property valuation per pupil ranges from $254,365 in New Richmond to $33,283 in Felicity-Franklin. New Richmond received more state aid per pupil than over sixty school districts with lower property valuation per pupil.

{¶ 194} In Cuyahoga Heights and Independence, taxpayers paid an average of twenty-two mills in 1993 and were able to spend an average of $11,891 per pupil. In East Cleveland, Lakewood City and Olmsted Falls, taxpayers paid an average of over seventy-eight mills in 1993 and were able to spend an average of only $5,564 per pupil. Thus, on average, residents of Cuyahoga Heights and Independence paid less than one third the millage paid in East Cleveland, Lakewood City and Olmsted Falls but were able to spend over twice as much per pupil.

{¶ 195} These disparities were not caused by a lack of commitment to education. The residents of East Cleveland, Lakewood City and Olmsted Falls have taxed themselves heavily but are handicapped by their low property base. A system of funding that relies heavily on property taxes while producing such disparities and further exacerbates the disparities by providing state funds to wealthy school districts cannot be considered thorough and efficient.

{¶ 196} The majority opinion examines a constitutional mandate and determines that the present funding structure fails to meet that mandate. It does neither more nor less than the syllabus law sets forth.

{¶ 197} In contrast, the minority would require us to forgo addressing the issue before us. They would defer the determination of this vital constitutional

standard to the General Assembly. This approach would severely limit the constitutional authority of this court and would, in the long term, harm both the legislative and judicial branches of government.

{¶ 198} Moving to the merits, the minority would do nothing. They would require us to ignore coal bin classrooms, free-floating asbestos fibers, leaking roofs, and arsenic-laced water and determine that the current system complies with the Thorough and Efficient Clause. A fair reading of the minority opinion leaves one with great difficulty imagining a system that would violate the minority's understanding of the Thorough and Efficient Clause. In short, the minority gives a "dead letter" interpretation to the Thorough and Efficient Clause.

{¶ 199} The concept of providing free compulsory education for every citizen, while a constitutional mandate, is nevertheless an ongoing experiment. Public education is a constantly evolving process.

{¶ 200} The delegates to the constitutional convention of 1850-1851 added the Thorough and Efficient Clause to the Constitution due to their distinct disappointment with the General Assembly's treatment of education at that time. They intentionally rejected more specific language in favor of the more fluid term "thorough and efficient." They expected the measure of "thorough and efficient" to expand as time passed and the state matured. The delegates placed on their and each subsequent generation the burden of constantly evaluating whether the constitutional standard was being met. We honor their foresight by giving life and meaning to their language.

{¶ 201} The General Assembly has long been aware that the current funding structure is constitutionally flawed. It has been impossible to adequately address the problem because wealthy school districts have staunchly defended the status quo. This decision rejects the status quo and requires the General Assembly to act.

{¶ 202} The solution to the problem before us cannot come exclusively from the legal or political system. The General Assembly cannot write a statute,

and we cannot write an opinion, that requires parents to love their children, to provide proper nutrition for their children, to challenge and nurture their children, to read to their children, or to do any number of other things that are vitally important to the growth and educational development of their children. We can require the General Assembly to comply with the Constitution of this state by implementing a funding scheme that secures "a thorough and efficient system of common schools throughout the state." Neither the plain language of the Ohio Constitution nor our collective consciences allow us to do otherwise. We have accepted our constitutional duty and dispatched it as best we could. We are confident the General Assembly will do likewise.

_____

**MOYER, C.J., dissenting.**

{¶ 203} Only infrequently are the members of this court required to balance our appreciation for the principle of separation of powers among the three branches of government against our desire to use the considerable powers of this court to mandate action to improve the imperfect. The issue in this very important case is not whether education in Ohio should be better. All seven members of this court would agree that in an ideal school setting, all children would be taught in well-maintained school buildings by teachers with high salaries and would read from the latest-edition school books. Rather, the question presented is whether specific financing statutes adopted by the Ohio General Assembly violate the words and intent of the Ohio Constitution. By its words, the Constitution requires the General Assembly to "make such provisions, by taxation or otherwise, as *** will secure a thorough and efficient system of common schools throughout the state." Section 2, Article VI, Ohio Constitution. We find that the statutes withstand plaintiffs' constitutional challenge because, rather than abdicating its duty, the General Assembly has made provisions by the challenged statutes for funding a system of schools with minimum standards throughout the state. The issues of the level and

method of funding, and thereby the quality of the system, are committed by the Constitution to the collective will of the people through the legislative branch.

{¶ 204} One cannot disagree with the aspirations of the majority to provide a school system that enables children to "participate fully in society," that provides "high quality educational opportunities," and that "allows its citizens to fully develop their human potential." However, the majority relies upon the phrase "thorough and efficient" to declare Ohio's education financing system unconstitutional despite the fact that our Constitution commits the responsibility for ascribing meaning to the phrase "thorough and efficient" to the General Assembly and not to this court. The majority of this court, moreover, apparently interprets the Constitution as requiring that all schools be of the same undefined level of high quality without relying on any supporting text of the Constitution, and equates imperfect schools with an unconstitutional system of funding. We disagree with these conclusions.

{¶ 205} We must apply well-established standards before declaring statutes unconstitutional. Among those established standards is a strong presumption that enactments of the General Assembly are constitutional. *State ex rel. Jackman v. Cuyahoga Cty. Court of Common Pleas* (1967), 9 Ohio St. 2d 159, 161, 38 O.O.2d 404, 405, 224 N.E.2d 906, 908-909. It is not the function of this court to assess the wisdom or policy of a statute or statutory scheme. Rather, we are limited to determining whether the General Assembly acted within its legislative power in enacting that statute. *Austintown Twp. Bd. of Trustees v. Tracy* (1996), 76 Ohio St.3d 353, 356, 667 N.E.2d 1174, 1175-1177.

{¶ 206} It has also been recognized that evidence of a long-standing legislative practice "goes a long way in the direction of providing the presence of unassailable grounds for the constitutionality of the practice." *United States v. Curtiss-Wright Export Corp.* (1936), 299 U.S. 304, 328, 57 S.Ct. 216, 224, 81 L.Ed. 255, 267. Local property taxes have funded Ohio schools since 1825—*before* the

adoption of the Education Clause. *Walter,* 58 Ohio St.2d at 378, 12 O.O.3d at 333, 390 N.E.2d at 820. Local property taxes were the *sole* source of funding until 1906. *Id.* Nonetheless, the majority dispenses with the state's[14] reliance on this historically based method of funding, thereby usurping the authority of the General Assembly.

{¶ 207} A fundamental question in this case is which branch of government shall decide the issue of what level of funding of public education satisfies the constitutional standard of "thorough and efficient." To answer this question we rely upon common-law tests that have guided the courts in this country since the first state constitution was adopted over two hundred years ago. For the reasons that follow we respectfully, and jointly, dissent from the opinion of the majority.

I

Separation of Powers/Justiciability

{¶ 208} In Federalist Paper No. 47, James Madison stressed the importance of judges refraining from lawmaking: "Were the power of judging joined with the legislative *** the judge would then be the legislator." The Federalist Papers (1961) 303.

{¶ 209} In *Marbury v. Madison* (1803), 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60, 73, the court established that "[i]t is emphatically the province and duty of the judicial department to say what the law is." The court also pronounced, however, that the judicial branch does not have the authority to answer "[q]uestions in their nature political, or which are, by the constitution and laws, submitted to" another branch of government. *Id.* at 170, 2 L.Ed. at 168.

{¶ 210} We conclude that the question of what level of funding satisfies the constitutional standard of a "thorough and efficient" system of education is a question of quality that revolves around policy choices and value judgments

---

14. Throughout this opinion, the defendants-appellees will be collectively referred to as "the state."

constitutionally committed to the General Assembly. We conclude that defining a "thorough and efficient" system of education financing is a nonjusticiable question.

{¶ 211} We do not maintain that this court is without jurisdiction over this case. Rather, we conclude for the reasons stated *infra* that we are restrained by the fundamental principle of separation of powers and the related doctrine of nonjusticiability from deciding what level of educational quality a "thorough and efficient" system of public schools requires.

{¶ 212} Such restraint should be exercised only after the court has decided a threshold justiciable issue, that is, whether the General Assembly has made provision by taxation or otherwise to secure a thorough and efficient system of schools. In view of the clear intention of the delegates to the Constitutional Convention of 1851, the words of the Constitution and the agreement among the parties to this case that all plaintiff school districts have met the minimum standards set by the State Department of Education, we conclude that the justiciable question has been answered in favor of the defendants.

{¶ 213} Beyond the threshold question, the term "thorough and efficient" is a question of quality, which is a political question that the Ohio Constitution leaves to the legislature to determine.

{¶ 214} The nonjusticiability of a political question is a function of separation of powers. *Baker v. Carr* (1962), 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663, 682.[15] "The political question doctrine excludes from judicial review

---

15. *Walter* discounted the justiciability argument and any reliance on *Baker v. Carr,* (1962), 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, finding that *Baker* did not represent the Supreme Court's most recent pronouncement on the issue, and "whatever viability this doctrine had was certainly greatly dampened by the later decision in *Powell v. McCormack* (1969), 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491." *Walter.*, 58 Ohio St.2d at 384, 12 O.O.3d at 336, 390 N.E.2d at 823.

However, recent Supreme Court decisions reveal that *Baker* is considered the leading case on justiciability. See *United States Dept. of Commerce v. Montana* (1992), 503 U.S. 442, 112 S.Ct. 1415, 118 L.Ed.2d 84 (relying on *Baker* to find issue presented did not warrant invocation of political question doctrine); *Nixon v. United States* (1993), 506 U.S. 224, 113 S.Ct. 732, 122 L.Ed.2d 1 (relying on *Baker* to define a nonjusticiable controversy). Additionally, the *Nixon* court's explanation of *Powell*'s holding thwarts the *Walter* court's view of that case. *Powell*, the *Nixon*

those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of [the legislature] or the confines of the Executive Branch. The Judiciary is particularly ill suited to make such decisions, as 'courts are fundamentally underequipped to formulate national [or state] policies or develop standards for matters not legal in nature.'" *Japan Whaling Assn. v. Am. Cetacean Soc.* (1986), 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166, 178, quoting *United States ex rel. Joseph v. Cannon* (C.A.D.C. 1981), 642 F.2d 1373, 1379.

{¶ 215} The fact that this lawsuit implicates other branches of government, or has political overtones, does not automatically invoke the political question doctrine. A political question is one that requires policy choices and value judgments that have been expressly delegated to, and are more appropriately made by, the legislative branch of government. *Japan Whaling Assn.,* 478 U.S. at 230, 106 S.Ct. at 2866, 92 L.Ed.2d at 178. The doctrine is one of political questions, not political cases. The doctrine was not designed so that courts might evade their responsibility to interpret the Constitution and we do not apply it here as a means of avoiding our constitutional responsibility. Rather, it was designed "to *restrain* the Judiciary from inappropriate interference in the business of the other branches

---

court explained, was "based on the *fixed* meaning of '[q]ualifications' set forth in Art. I, § 2. The claim by the House that its power to 'be the Judge of the Elections, Returns and Qualifications of its own Members' [under Art. I, § 5] was a textual commitment of unreviewable authority was defeated by the existence of this separate provision specifying the only qualifications which might be imposed for House membership." (Emphasis *sic*.)

In contrast, the Ohio Constitution does not provide a *fixed* meaning of "thorough and efficient." In fact, a review of other sections in Article VI of the Ohio Constitution reveals that instead of providing a fixed meaning of "thorough and efficient," the Constitution grants the General Assembly even broader discretion in education matters. See Section 1, Article VI; Section 3, Article VI. Nor is the phrase "thorough and efficient" susceptible of a *fixed* meaning. Matters of education are fluid and subject to changing conditions and ideas. Most important, education matters inherently involve policy choices that are inappropriate for determination by the judiciary.

of Government." (Emphasis added.) *United States v. Munoz-Flores* (1990), 495 U.S. 385, 394, 110 S.Ct.1964, 1970, 109 L.Ed.2d 384, 396.

{¶ 216} The words of the Ohio Constitution commit to the General Assembly, not the courts, the responsibility to fund a "thorough and efficient" system of public schools. The General Assembly has exercised that power, as Ohio unquestionably has a system of public schools that is designed and funded to meet the educational guidelines established through the Department of Education. The level and method of funding beyond those minimum standards constitute, however, a nonjusticiable political question.

{¶ 217} In *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710, 7 L.Ed.2d at 686, the United States Supreme Court identified the characteristics of a political question: "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion ***."

{¶ 218} In *Nixon v. United States* (1993), 506 U.S. 224, 228, 113 S.Ct. 732, 735, 122 L.Ed.2d 1, 8-9, the court, in examining the text of the Constitution, outlined the procedure to follow to determine if an issue was nonjusticiable: Courts "must, in the first instance, interpret the text in question and determine whether and to what extent the issue is textually committed [in this instance, to the legislative branch]. *** [T]he concept of a textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards for resolving it; the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch."

{¶ 219} In accordance with the *Nixon* test, our Education Clause commits to the General Assembly the power to define a "thorough and efficient" system of

schools. Section 2, Article VI states: "The *general assembly shall make such provisions*, by taxation or otherwise, as \*\*\* will secure a thorough and efficient system of common schools throughout the state \*\*\*." (Emphasis added.) Once the constitutional threshold has been met, the Education Clause commits to the General Assembly the responsibility and authority to determine the financing necessary for the level of the quality of education.

{¶ 220} Moreover, the constitutional debates demonstrate that the framers of the Education Clause believed that establishing specific criteria for constitutionally required financing of education was best left to the General Assembly. Delegate J. McCormick, dissatisfied with the amount of money previously appropriated by the General Assembly, argued in support of an amendment to require a minimum amount of monetary support in the Constitution. That amendment was rejected. II Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio, 1850-51 (1851) ("Debates") at 17. Delegate Charles Reemelin envisioned that "all attempts to create a system would be left to the General Assembly." *Id*. at 17. Delegate Van Brown believed that the Education Clause was of a limited general purpose, that being that "there should be schools; and that the means for supporting them should be provided; and that the details should all be left to the General Assembly." *Id*. at 703.

{¶ 221} Consistent therewith, this court has held that the General Assembly's power over public schools is "plenary." *Hancock Cty. Bd. of Edn. v. Moorehead* (1922), 105 Ohio St. 237, 244, 136 N.E. 913, 915. We have also recognized that the court has "no responsibility and no authority" over the "wisdom or the policy of [education] legislation." *State ex rel. Methodist Children's Home Assn. of Worthington v. Worthington Village School Dist. Bd. of Edn.* (1922), 105 Ohio St. 438, 448, 138 N.E. 865, 868.

{¶ 222} This finding of a textual commitment to the General Assembly of the quality of education is further bolstered by a lack of judicially demonstrable or

manageable standards for determining what constitutes a "thorough and efficient system of common schools." Such standards "forestall reliance by [courts] on nonjudicial 'policy determinations.'" *Immigration & Naturalization Service v. Chadha* (1983), 462 U.S. 919, 942, 103 S.Ct. 2764, 2780, 77 L.Ed.2d 317, 339.

{¶ 223} For example, it is significant that the plaintiffs themselves offered neither a constitutional definition of a thorough and efficient system nor direction regarding constitutional funding of such a system. The majority opinion provides the General Assembly with minimal guidance in developing a constitutional school financing system. Aspirational phrases urging that state financing of educational systems enable citizens to "fully develop their human potential," and afford "high quality educational opportunities" are no more amenable to judicial interpretation or enforcement than is the term "thorough and efficient."

{¶ 224} As succinctly stated by the Illinois Supreme Court, "[w]hat constitutes a 'high quality' education, and how it may best be provided, cannot be ascertained by any judicially discoverable or manageable standards. The Constitution provides no principled basis for a judicial definition of high quality. *** Nor is education a subject within the judiciary's field of expertise, such that a judicial role in giving content to the education guarantee might be warranted. Rather the question of education quality is *inherently one of policy involving philosophical and practical considerations* that call for the expertise of legislative and administrative discretion." (Emphasis added.) *Commt. for Educational Rights v. Edgar* (1996), 174 Ill.2d 1, 28-29, 672 N.E.2d 1178, 1191.

{¶ 225} The Rhode Island Supreme Court similarly recognized inherent problems when the judiciary undertakes to decide education matters. "What constitutes an appropriate education or even an 'equal, adequate, and meaningful' one, is 'not likely to be divined for all time even by the scholars who now so earnestly debate the issues." *Pawtucket v. Sundlun* (R.I. 1995), 662 A.2d 40, 58,

quoting *San Antonio Indep. School Dist. v. Rodriguez* (1973), 411 U.S. 1, 43, 93 S.Ct. 1278, 1302, 36 L.Ed.2d 16, 49.

{¶ 226} Plaintiffs' own expert acknowledged the policy-based nature of education decisions when he said that "the foundation level reflects *political* and *budgetary* considerations at least as much as it reflects a *judgment* as to how much money *should* be spent on K-12 education." (Emphasis added in part.)

{¶ 227} These policy decisions—political, budgetary and value judgments—are inextricable from education matters, requiring a balancing of interests that are textually and traditionally committed to the General Assembly, and the General Assembly, not this court, is the proper forum in which competing taxation, budgetary and spending decisions are made. The judicial branch is simply neither equipped nor empowered to make these kinds of decisions.

{¶ 228} The language of the Education Clause, the history surrounding its adoption, and our precedent (including *Miller v. Korns*, *supra*, 107 Ohio St. 287, 140 N.E.2d 773, upon which the majority relies) all uniformly suggest that determination of educational funding adequacy is the responsibility of the General Assembly. In both *Miller* and *Cincinnati School Dist. Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 387, 12 O.O.3d 327, 338, 390 N.E.2d 813, 825, the court left the terms "thorough" and "efficient" undefined in deference to the principle that the Ohio Constitution entrusts the definition of those terms to the General Assembly.

{¶ 229} Although we may personally favor it, it is not this court's place to order the General Assembly to give education "high priority" in its budget allocations, any more than it is our place to set policy or prioritize the allocation of funds to other state programs. Members of the legislative branch represent the collective will of the citizens of Ohio, and the manner in which public schools are funded in this state is a fundamental policy decision that is within the power of its citizens to change. Under our system of government, decisions such as imposing new taxes, allocating public revenues to competing uses, and formulating educational standards are not within the

judiciary's authority. As noted by the United States Supreme Court in *Rodriguez*, "the ultimate solutions [to perceived problems associated with school funding systems] must come from the lawmakers and from the democratic pressures of those who elect them." *Id.*, 411 U.S. at 59, 93 S.Ct. at 1310, 36 L.Ed.2d at 58.

{¶ 230} Moreover, we find it unlikely that the public is "willing to turn over to a tribunal against which they have little if any recourse, a matter of such grave concern to them and upon which they hold so many strong, though conflicting views. If their legislators pass laws with which they disagree or refuse to act when the people think they should, they can make their dissatisfaction known at the polls. *** The court, however, is not so easy to reach *** nor is it so easy to persuade that its judgment ought to be revised." *Seattle School Dist. No. 1 of King Cty. v. State* (1978), 90 Wash.2d 476, 563-564, 585 P.2d 71, 120 (Rosellini, J., dissenting).

{¶ 231} In that determinations of educational funding adequacy and quality are inherently fluid, we believe that the majority's well-intentioned willingness to enter this fray today will only necessitate more comprehensive judicial involvement tomorrow as educational theories and goals evolve, conditions throughout the state change, and the General Assembly responds. The experiences of other states provide ample proof of the troubled history of litigation that ensues when the judiciary deems itself to be the ultimate authority in setting educational funding mechanisms and standards, as revealed by the following citations: New Jersey: *Robinson v. Cahill* (1973), 62 N.J. 473, 303 A.2d 273 ("*Robinson I*"), followed by *Robinson v. Cahill* (1973), 63 N.J. 196, 306 A.2d 65 ("*Robinson II*"); *Robinson v. Cahill* (1975), 67 N.J. 35, 335 A.2d 6 ("*Robinson III*"); *Robinson v. Cahill* (1975), 67 N.J. 333, 339 A.2d 193 ("*Robinson IV*"); *Robinson v. Cahill* (1976), 69 N.J. 449, 355 A.2d 129 ("*Robinson V*"); *Robinson v. Cahill* (1976), 70 N.J. 155, 358 A.2d 457 ("*Robinson VI*"); *Robinson v. Cahill* (1976), 70 N.J. 464, 360 A.2d 400 ("*Robinson VII*"); *Abbott v. Burke* (1985), 100 N.J. 269, 495 A.2d 376 ("*Abbott I*"), followed by *Abbott v. Burke* (1990), 119 N.J. 287, 575 A.2d 359 ("*Abbott II*"); *Abbott v. Burke* (1994), 136 N.J.

444, 643 A.2d 575 (*"Abbott III"*); Texas: *Edgewood Indep. School Dist. v. Kirby* (Tex. 1989), 777 S.W.2d 391 ("*Edgewood I*"), followed by *Edgewood Indep. School Dist. v. Kirby* (Tex. 1991), 804 S.W.2d 491 ("*Edgewood II*"); *Carrollton-Farmers Branch Indep. School Dist. v. Edgewood Indep. School Dist.* (Tex. 1992), 826 S.W.2d 489 ("*Edgewood III*"); California: *Serrano v. Priest* (1971), 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 ("*Serrano I*"), followed by *Serrano v. Priest* (1977), 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929 ("*Serrano II*"); *Serrano v. Priest* (Cal. App. 1986), 226 Cal. Rptr. 584  ("*Serrano III*"); *Butt v. State* (1992), 4 Cal.4th 668, 15 Cal.Rptr.2d 480, 842 P.2d 1240; Connecticut: *Horton v. Meskill* (1977), 172 Conn. 615, 376 A.2d 359 ("*Horton I*"), followed by *Horton v. Meskill* (1982), 187 Conn. 187, 445 A.2d 579 ("*Horton II*"); *Horton v. Meskill* (1985), 195 Conn. 24,  486 A.2d 1099 ("*Horton III*"); *Sheff v. O'Neill*, *supra*, 238 Conn. 1,  678 A.2d 1267.  Each of these cases from other states represents the grim reality of a state supreme court involving itself in setting minimum educational standards, which has resulted in years of protracted litigation, ultimately placing the courts in the position of determining state taxation methods, budgetary priorities and educational policy.

II

Failure of Proof

{¶ 232} Although fundamental principles of separation of powers and constraints on judicial review should have, but have not, guided the disposition of this very important case, we nevertheless proceed to analyze the issues as presented by the parties.

{¶ 233} The majority retreats from our long-established judicial deference to the determination by the legislative branch of educational funding adequacy and quality, while providing virtually no guidance to the General Assembly as to what the adequate levels of constitutional funding might be. Borrowing the words of another jurist in an analogous case, "if I were a member of either the executive or legislative branch of our government, I would have but the slightest glimmering of what kind of legislation would comport with the majority's mandate ***." *Sheff v. O'Neill, supra,* 238 Conn. at 128, 678 A.2d at 1329 (Borden, J., dissenting).

A

The Record

{¶ 234} In view of the reliance of the plaintiffs and the majority upon anecdotal evidence of conditions of some schools districts, it is important to emphasize that the record also reveals compelling evidence supporting our conclusion that the plaintiffs did not meet their burden of proving that the General Assembly has failed to establish and fund a thorough and efficient system of education. Rather than supporting the conclusion that the General Assembly has totally abdicated the responsibilities imposed upon it by the Education Clause, the record demonstrates that, in recent years, the General Assembly has responded to unfavorable conditions in some Ohio schools by providing a significant infusion of additional funds to primary and secondary education, particularly in those districts most in need. Examination of recent General Assembly initiatives supports the

conclusion that that body is moving to ensure adequacy and reduce inequalities of educational opportunity in Ohio.

**{¶ 235}** Plaintiffs' own expert testified that in one survey, Ohio ranked eleventh among the fifty states in per-pupil educational spending according to one measure, and fourteenth by another. Since 1980, increases in the foundation level of state support have outpaced the rate of inflation by sixty percent. During the 1980s, the state's share of education funding increased from thirty-seven to forty-seven percent of total educational spending. In July 1991, Am.Sub.H.B. No. 298 appropriated money for "equity aid" to ameliorate disparity between the richest and poorest districts. *Id.* at Section 59.02, paragraph entitled "School Finance Equity," 144 Ohio Laws, Part III, 3987, 4551. This aid totaled approximately $45 million to the poorest two hundred eighteen school districts in Ohio in fiscal year 1993. It was distributed pursuant to R.C. 3317.0213 and 3317.0214. Sub.H.B. 671, Section 2, 144 Ohio Laws, Part IV, 6062, 6064. Thereafter, this supplemental equity aid increased to approximately $60,000,000 in fiscal year 1994, $75,000,000 in fiscal year 1995, $90,000,000 in fiscal year 1996, and $100,000,000 in fiscal year 1997. Am. Sub.H.B. No. 152, Section 36, line item 200-500, and Section 36.06, 145 Ohio Laws, Part III, 4400, 4417; 1995 Am.Sub.H.B. No. 117, Section 45, line item 200-500. Since this case was tried in 1993, the state school foundation level has increased from $2,871 to $3,500 per pupil. Am.Sub.H.B. No. 152, Section 36.12, 145 Ohio Laws, Part III, 4432-4433; R.C. 3317.022(A).

**{¶ 236}** At the time of trial, new technology grant legislation totaling approximately $5 million had been enacted to provide funds to Ohio schools for purchases of computers and associated equipment. Sub.H.B. No. 671, Sections 4 and 5, 144 Ohio Laws, Part III, 6064. Since trial, additional school technology initiatives have been enacted, resulting in appropriations of $95 million in the 1995-1996 capital appropriations bill (Am.Sub.H.B. No. 790, Sections 30-33, 145 Ohio Laws, Part IV, 7681-7683), $125 million in the 1996-1997 budget bill (1995 Am.Sub. H.B. No. 117,

Section 45, line item 200-698 and Section 45.36), and an additional $150 million for the 1997-1998 capital appropriations bill (1996 Am.H.B. No. 748, Section 21).

{¶ 237} One expert testified that it was "virtually indisputable" that Ohio's system of school finance was more equitable in 1991 than in 1979 when *Walter* was decided. The trial court expressly found less of a relationship between current expenditures per pupil and assessed valuation per pupil in school year 1988-1989 than in either of school years 1980-1981 or 1982-1983, demonstrating increased equality. Similarly, state basic aid in 1991 was more strongly distributed in inverse proportion to assessed valuation per pupil than in 1979.

{¶ 238} The current foundation program does, in fact, narrow the gap between educational spending in rich and poor districts. In poor districts, state aid may represent as much as eighty percent of the foundation amount provided to the district.

{¶ 239} In 1993, the pupil-teacher ratio in Ohio public schools was the eighteenth lowest ratio in the country. Snyder & Hoffman, State Comparisons of Education Statistics: 1969-70 to 1993-94 (1995 U.S. Department of Education) 18, Figure 9.

{¶ 240} Thus, the evidence demonstrates that the General Assembly has discharged its constitutional duty for funding a "thorough and efficient" system.

B

Equality and Adequacy

{¶ 241} Plaintiffs contend that "thorough and efficient system" means a system which guarantees equality and adequacy in public education in Ohio.[16] The

---

16. The majority has stated that the General Assembly is not required to create a new financing system that "must provide equal educational opportunities for all." However, the majority has remanded this cause to the trial court, which is to retain jurisdiction until legislation in conformity with the majority opinion is enacted. The trial judge found and the plaintiffs argued in this court that the Constitution does require equality of educational opportunities. Because the majority opinion requires a "complete systematic overhaul," "an entirely new school financing system" and that "the establishment, organization and maintenance of public education are the state's responsibility," we believe it is necessary to discuss the arguments that relate to equality and adequacy.

plaintiffs contend, first, that the state's public school financing scheme violates a constitutional requirement of equal educational opportunity and, second, that the state has failed to ensure that a constitutionally required minimum standard of education has been met.

{¶ 242} Plaintiffs' two-pronged argument reflects those made in recent school funding cases litigated throughout the country. See McUsic, The Use of Education Clauses in School Finance Reform Litigation (1991), 28 Harv. J. Leg. 307, 308-309; Enrich, Leaving Equality Behind: New Directions in School Finance Reform (1995), 48 Vanderbilt L.Rev. 101, 104 *et seq*. In that equality and adequacy are entirely separate concepts, a proper resolution of the cause before us depends upon separate analysis of those two concepts in light of the requirements imposed by the Education Clause of the Ohio Constitution.

1

Equality

{¶ 243} The state does not dispute that disparity exists in the funding of elementary and secondary public schools among Ohio school districts. The state concedes that public schools throughout the state differ widely, *e.g*., in available course offerings, quality of school facilities and other resources, and available extracurricular activities. The parties do dispute, however, whether the Ohio Constitution permits these disparities to exist.

{¶ 244} In arguing that the Education Clause requires equality, plaintiffs contend that each Ohio child has a fundamental right to compete on a "level playing field" of educational opportunity with all other Ohio children. The trial court accepted this line of argument, and held that the Education Clause imposed upon the General Assembly a duty to create a system of education "that will allow students to be educated *at similar levels* and provide students with *similar opportunities for growth*

*and educational benefits*." (Emphasis added.)[17] The state, in contrast, argues that the requirement of a thorough and efficient system of public education simply does not include equality.

**{¶ 245}** In reviewing this clause, this court should follow established principles of constitutional interpretation. Pivotal in the construction of constitutional, as well as legislative, provisions is the intention of the drafters. *Castleberry v. Evatt* (1946), 147 Ohio St. 30, 33 O.O. 197, 67 N.E.2d 861. Thus, when we interpret a constitutional provision it is our duty to ascertain the object of the people in adopting it, and then to give effect to that object. *Id.* We determine that intention by looking first to the words used. We then examine the meaning of those words at the time of their adoption. It is also appropriate to consider the history surrounding adoption of the provision, if available. See *State ex rel. Swetland v. Kinney* (1982), 69 Ohio St.2d 567, 23 O.O.3d 479, 433 N.E.2d 217.

**{¶ 246}** Having applied those principles, we conclude that plaintiffs' interpretation of Ohio's Education Clause as requiring equal educational opportunity for all Ohio schoolchildren is unduly broad, was not intended, and would result in either an enormous increase in tax support of schools to raise the lowest-funded districts to the level of the highest-funded districts, or a decrease in funding for the highest-funded districts so that there is equal funding for all. Neither the language of the Education Clause itself nor its history justifies the plaintiffs' contention that our Constitution requires that all Ohio schoolchildren attend schools that are funded equally.

**{¶ 247}** The plain language of our Education Clause, in contrast to the language of other state constitutions, makes clear that our Constitution does not

---

17. The majority does not address the equal protection arguments of the parties and does not declare that education is a fundamental right subject to strict scrutiny. In these respects, *Walter*'s holding survives and we find it unnecessary to discuss the issue.

include terms expressly requiring equality of educational opportunity. Cf. Section 1(1), Article X, Montana Constitution (guaranteeing "[e]quality of educational opportunity" to each person of the state); Section 2(1), Article IX, North Carolina Constitution (requiring "a general and uniform system of free public schools, *** wherein equal opportunities shall be provided for all students"); Section I, Article IX, Florida Constitution ("Adequate provision shall be made by law for a uniform system of free public schools ***); see, generally, Hubsch, The Emerging Right to Education Under State Constitutional Law (1992), 65 Temp. L. Rev. 1325, 1343 -1348.

{¶ 248} The Ohio Constitution could have been drafted with similar language. It was not. And surely sometime during the past one hundred forty years, the citizens of Ohio could have amended their Constitution to require that all public schools be equally funded. They have not.

{¶ 249} In our view, the plaintiffs rely too heavily on the comments of individual delegates to the constitutional convention in determining intent, rather than looking to what the convention as a whole agreed to following full debate. Analysis of the history surrounding the drafting of the Ohio Constitution leads to the conclusion that it was not the majority intent in adopting the Education Clause to guarantee equality of educational opportunity. This conclusion is supported most directly by the express rejection of proposed amendments to the Constitution which would have had just such an effect. For example, Delegate J. McCormick proposed that all state and local funds generated throughout the state be consolidated and distributed equally among all the schoolchildren of the state. Debates at 17. In opposition, Delegate D.P. Leadbetter spoke against "any attempt to equalize by consolidation the local funds of the State, [in that it] would enlist numbers against the Constitution, who would drag it down in spite of the efforts of its friends." *Id*. The proposal was defeated.

{¶ 250} Similarly, at the time the Education Clause was adopted, the length of the school year varied throughout the state. In some areas, school sessions lasted only three months while other areas provided school years in excess of six months.

*Id*. at 703-704.  A proposal was made, and defeated, that the new Constitution require that all Ohio schools be open a minimum of six months of the year.  In rejecting the proposed amendment, the delegates clearly sanctioned a system where educational opportunity varied from place to place throughout the state, convincingly rebutting the argument that the framers intended the Education Clause to require equality.

{¶ 251} Some courts, including the trial court in this case, have held that the history surrounding use of the words "thorough" or "efficient" in state constitutional education clauses justifies the conclusion that those clauses must provide statewide equality of opportunity.  See, *e.g.*, *Robinson v. Cahill, supra,* 62 N.J. at 513, 303 A.2d at 294; *Edgewood*, *supra*, 777 S.W.2d at 394-397; *Rose v. Council for Better Edn.* (Ky. 1989), 790 S.W.2d 186, 205-206.

{¶ 252} We simply are unable to stretch the commonly understood meaning of "thorough and efficient" to include "equality."

{¶ 253} The majority interprets the Education Clause as imposing a duty upon *the state* to provide a system of public education.  We concur with that premise, but do not believe, nor do we believe the majority intends to hold, that the Education Clause thereby precludes individual local school districts from supplementing state funds in pursuit of the goal of seeking educational excellence.  Nonetheless, by concluding that "the establishment, organization and maintenance of public education are the state's responsibility" with only incidental reference to the local funding or management of public schools, the majority has at least impliedly relegated local control to an insignificant role.

{¶ 254} The majority opinion and the syllabus law of the case eliminate all vestiges of the current system by which the state provides its funds to public school districts—all are declared to be unconstitutional.  It follows that the General Assembly cannot comply with its constitutional mandate by continuing its course of substantially increasing the flow of funds to poorer school districts and special funding for specific purposes to all districts.  It seems that, although the majority

has not said so, the General Assembly has two options that may satisfy the plaintiffs' view of equity in providing an "equal playing field": (1) The adoption of a new tax structure that will provide sufficient revenues to bring the school funding of the poorest districts up to an undefined level of support, or (2) placing a statutory limit on the ability of some districts to spend what they choose to spend on public education.

{¶ 255} We note that in New Jersey the legislative response to judicially mandated equalization "has been to increase spending in special needs districts while limiting spending in wealthier districts" to put a cap on school spending. *Neptune Twp. Bd. of Edn. v. Neptune Twp. Edn. Assn.* (1996), 144 N.J. 16, 675 A.2d 611. Nothing could be more ironic than if our holding today were to reduce the quality of Ohio's best public schools in the interest of raising the quality of those most in need of improvement.

{¶ 256} There is no public good in achieving funding equality if the new statewide standard is a forced equalization of funding that prohibits the residents of one school district from spending as much as they wish to educate their children in order that public school districts be "equal." Under such circumstances, those inclined to purchase an educational edge for their children may well devote their excess resources to private, rather than public, education. In the end, equalization of funding of public schools would not end wealth-based disparity; it would merely reestablish the economic lines on which that disparity exists. Even the majority asserts that wealthy school districts should be allowed to augment their own programs.

{¶ 257} Although there is a range of per pupil spending from $3,500 to $12,000, such variances do not necessarily mean that low-spending districts spend too little. Arguably, such disparities exist because some communities choose to spend more. The state itself acknowledges that the vigorous legislative attention to the problems of the most needy of Ohio schools must continue. Plaintiffs have not

submitted evidence of the per-pupil cost of adequately educating an Ohio schoolchild. How can we declare a system of funding public education to be unconstitutional when none of the parties even attempt to prove what would constitute such a system?

2

Adequacy

{¶ 258} Plaintiffs assert that implicit in the phrase "thorough and efficient system" is a requirement that each Ohio school child be afforded the opportunity to receive an "adequate" education. They contend that Ohio's current system of funding primary and secondary education has resulted in school districts in Ohio being so grossly underfunded as to force those districts to offer educational opportunity which can only be described as inadequate. They equate adequacy of educational opportunity with availability of education of high quality.

{¶ 259} In contrast, the state contends that the Education Clause requires the General Assembly only to provide each public school student with an opportunity to receive a basic education. Inherent in its argument, and consistent with our holding in *Walter*, is the premise that the constitutional phrase "thorough and efficient" cannot be deemed to impose a duty to provide a "quality" education if the term "quality" is used to mean more than the basic education required by the minimum standards formalized in the Ohio Administrative Code. See Ohio Adm.Code Chapter 3301-35. The educational minimum standards established by the Department of Education are incorporated into the Administrative Code, and carry the force of law, and are consistent with the mandate of the Education Clause that the opportunity to obtain a basic education be afforded every Ohio child.

{¶ 260} The majority requires the General Assembly to provide sufficient funding by taxation or otherwise to ensure that all schools are safe, in good repair, and adequately supplied, and in compliance with all applicable laws. But, while these criteria seem more closely aligned with the state's position that adequacy requires only a basic education, the majority further advises that Ohio's children should be educated

so that they are "able to participate fully in society" and to "fully develop their human potential." It would be difficult to disagree with such laudable goals for any school system, public or private. But if it is the majority's intent to incorporate these standards into <u>constitutional requirements</u>, it is equally difficult to imagine the creation of any funding system that would pass constitutional muster.

{¶ 261} The majority notes that some components of the existing system constitute "weaknesses." But surely the existence of weaknesses in a legislatively devised funding system cannot be the basis of a finding of unconstitutionality.

{¶ 262} We agree with the majority's conclusion that the framers of our Constitution deemed the providing of education to every Ohio child to be of great importance to the state's future, and intended to guarantee that every Ohio child have an opportunity to receive an adequate education.

{¶ 263} Defining adequacy, however, requires consensus as to the purposes education is to serve—Plainly a function legislative in nature. To define adequacy would presuppose that there is a bottom line of educational quality below which no school may constitutionally be allowed to fall. That bottom line would have to be flexible, so that it may change over time with changing conditions.

{¶ 264} In *Rose*, *supra*, 790 S.W.2d 186, the Kentucky court defined an "efficient system" to include nine minimum characteristics. It found that an efficient system requires substantially uniform schools throughout the state and the provision of equal educational opportunities to all Kentucky children. It further found that, under an efficient system, the Kentucky General Assembly not only has *sole* responsibility for funding common schools, but also a duty to monitor the state's schools "to assure that they are operated with no waste, no duplication, no mismanagement, and with no political influence." *Id.* at 213.

{¶ 265} Reading these extensive requirements into the definition of the single word "efficient" bears "'simply the imprimatur of result oriented jurisprudence cloaked in superfluous reasoning.'" *Commt. for Educational Rights v. Edgar, supra*,

174 Ill.2d at 16, 672 N.E.2d at 1188, quoting Note, State Constitutional Law--Public School Financing--Spending Disparity Between Wealthy School Districts and Poor Urban School Districts, Caused By Reliance on Local Property Taxes, is Violative of the "Thorough and Efficient Education" Clause (1991), 21 Seton Hall L. Rev. 445, 480.   See, also, *Hornbeck v. Somerset Cty. Bd. of Edn.* (1983), 295 Md. 597, 632-639, 458 A.2d 758, 777-780 (collecting cases, and determining, at 632, 458 A.2d at 776, that "[t]o conclude that a 'thorough and efficient' system *** means a full, complete and effective educational system throughout the State *** is not to require a statewide system which provides more than a basic or adequate education to the State's children."). Imposition of such extensive requirements is certainly inconsistent with the history surrounding adoption of Ohio's Education Clause.

{¶ 266} Plaintiffs stipulated in the trial court that they were all in compliance with state minimum standards on their most recent scheduled evaluations.  In that "an Ohio Administrative Code section is a further arm, extension, or explanation of statutory intent implementing a statute passed by the General Assembly," *Meyers v. State Lottery Comm.* (1986), 34 Ohio App.3d 232, 234, 517 N.E.2d 1029, 1031, it follows that those plaintiff schools met the standard of adequacy established by the General Assembly at that time.  Plaintiffs did not prove that compliance with the minimum standards then in effect was insufficient to provide an adequate education. Plaintiffs did not attempt to prove that any graduate of any of the plaintiff school districts had been refused entrance to college because his or her diploma was unacceptable.   No Ohio school was shown to have been denied accreditation. Plaintiffs did not prove that any Ohio child was without a school to attend.

{¶ 267} Plaintiffs attempted to prove that conditions in some Ohio schools amounted to educational deprivation.  But, as in *Walter*, plaintiffs did not provide evidence that any student received fewer than the full number of days of instruction required by law, and, as in *Walter*, "the record reveals that several *** school districts that claim to be 'starved for funds' in fact offer programs and services in excess of

state minimum standards." *Walter*, 58 Ohio St.2d at 387, 12 O.O.3d at 338, 390 N.E.2d at 825-826.

{¶ 268} The majority concludes that "[l]ack of sufficient funding can also lead to poor academic performance," and that "[p]oor performance on the ninth grade proficiency tests is further evidence that [plaintiff school districts] lack sufficient funds with which to educate their students."

{¶ 269} The strength of correlation between expenditures and test results is subject to debate. By way of example, while plaintiff district Northern Local ranked in the bottom quarter of all Ohio school districts in total revenue and expenditure per pupil in 1992, its passage rate on the ninth grade proficiency test has been higher than the state average. It has been reported that Ohio public school students rank above the mean of national scores on both the SAT and ACT. Feistritzer, Report Card on American Education: A State-by-State Analysis 1972-73 to 1992-93 (1993) 18. In 1992, Ohio eighth grade students scored one point higher than the national average of two hundred sixty-six in mathematics proficiency, and Ohio public school fourth grade students scored three points above the national average of two hundred sixteen in reading proficiency. Snyder & Hoffman, State Comparisons of Education Statistics: 1969-70 to 1993-94 (1995 U.S. Department of Education) 46 and 48, Tables 15 and 16.

{¶ 270} Proficiency test results should not be used to measure the sufficiency, or insufficiency, of educational funding. Proficiency test results are just as easily correlated with external socio-economic factors, *i.e.*, poverty, unemployment, health, and degree of family involvement. Again, in the words of Justice Borden, "[a]lthough schools are important socializing institutions in our democratic society, they cannot be constitutionally required to overcome every serious social and personal disadvantage that students bring with them to school, and that seriously hinder the academic achievement of those students." *Sheff, supra*, 238 Conn. at 144, 678 A.2d at 1336 (Borden, J., dissenting).

**{¶ 271}** There simply is no proof that changing Ohio's funding system or infusing additional funds will improve education. See, for example, *Missouri v. Jenkins* (1995), ___ U.S. ___, ___, 115 S.Ct. 2038, 2055, 132 L.Ed.2d 63, 88, where the court noted that, despite massive court-ordered expenditures in the Kansas City school district providing its students with school "facilities and opportunities not available anywhere else in the country," those students had not come close to reaching their maximum potential, and that the "learner outcomes" of those same students were "at or below national norms at many grade levels."

**{¶ 272}** One commentator has concluded that "available evidence suggests that substantial increases in funding produce only modest gains in most schools." Clune, New Answers to Hard Questions Posed by *Rodriguez*: Ending the Separation of School Finance and Educational Policy by Bridging the Gap Between Wrong and Remedy (1992), 24 Conn. L.Rev. 721, 726.

**{¶ 273}** Moreover, the constitutional mandate that the General Assembly fund a thorough and efficient system requires only that each Ohio child be given an *opportunity* to receive an adequate education. Success in education is not solely the responsibility of the providers of public education. Students themselves, their families, and their local communities bear their own responsibility, inside and outside the classroom. Students themselves must attend classes and study, and they need encouragement and support in those efforts.

**{¶ 274}** We simply do not find, on this record, that plaintiffs carried their burden of proving that school districts have been unable to provide students with an adequate education due to a lack of funds. That being the case, a constitutional violation has not been proven.

### III

### Local Control

**{¶ 275}** While it is true that the framers of our Education Clause envisioned educational opportunity for all, the framers contemporaneously acknowledged and

approved of a statewide educational system in which local districts were primarily responsible for providing educational opportunity to their children. When the Education Clause was adopted, determination of adequacy was dependent upon the resources available at the local level and the amount local residents were willing to spend on educating local children. See Debates at 702-704.

{¶ 276} This court has previously recognized that inherent in the concept of local control is the freedom to "devote more money to the education of one's children." *Walter*, 58 Ohio St.2d at 377, 12 O.O.3d at 331, 390 N.E.2d at 820. Equally inherent in the concept of local control is the freedom of local taxpayers to devote less money to local education. So long as it does not deprive children of basic educational opportunity, that decision is constitutional. *Id*.

{¶ 277} The interests of local taxpayers and local schoolchildren may, at times, conflict. The parties stipulated that less than fifty percent of school tax issues submitted to local voters passed in 1987 through 1992. Voters in plaintiff Northern Local school district have defeated no fewer than twelve school levies since 1982, and one of the plaintiff school districts (Dawson-Bryant) placed no education tax levy on its ballot between 1980 and 1992 for fear of failure, *even though its residents are taxed at a millage below the state mean*.

{¶ 278} The majority imposes an obligation on the state to rectify the shortcomings of individual schools when the quality level of education within any individual district "falls short of the constitutional requirement that the system be thorough and efficient." However, the Education Clause mandates neither that each Ohio school be "thorough and efficient" nor that education be "thorough and efficient." It requires the General Assembly to establish and fund a thorough and efficient *system* of schools. The system is not unconstitutional because individual school buildings have fallen into disrepair, or because individual school districts face funding challenges. See *Leandro v. N. Carolina (*1996), 122 N.C. App. 1, 8-10, 468 S.E.2d 543, 548-549. Nor does proof of such facts necessarily mean that those

districts have failed to fund and provide an adequate educational opportunity for their students.

{¶ 279} Local control of public schools is a pillar of our system which neither the plaintiffs nor the state wants eliminated. But inherent in local control must be local responsibility, both on the part of voters, who influence the amount of local funding of local schools, and of local school boards and administrators, who allocate available funds. Where local taxpayers refuse, or are unable, to increase their property taxes, school boards necessarily are called upon to make hard choices to reduce costs. See *Russell v. Gallia Cty. Local School Bd.* (1992), 80 Ohio App.3d 797, 610 N.E.2d 1130 (elimination of busing). Local control, by definition, contemplates the exercise of discretion by local school officials to prioritize the expenditure of funds. While the trial court found that one of the plaintiff school districts had inadequate funding to meet all minimum standards, the impact of that conclusion is diminished by the court's further conclusion that this same district spent more money on salaries and on improving student-teacher ratios than required by minimum standards.

{¶ 280} Local boards of education and administrators have historically been responsible for allocating funds, setting salaries and fringe benefits, designing curricula beyond state requirements, and choosing materials and technology.

{¶ 281} While plaintiffs forcefully argue that the record contains no evidence of local mismanagement, this simply was not emphasized by either plaintiffs or defendants in the trial court. That having been said, anyone who has served on a board of education has experienced the difficult tasks involved in setting priorities for allocating school district funds -- negotiating employee contracts, adding or eliminating educational programs, choosing which social services will best meet the needs of students who come to school ill prepared to learn, and selecting superintendents and administrative staff. It is our view that all parties to this suit failed to address one of the most important issues in public education in this state

or any state -- the prudent management of the substantial tax monies available to school districts.

## IV

## Remedy

**{¶ 282}** In ordering the elimination of the School Foundation Program and establishment of a system with less disparity among districts, the majority has effectively removed other reform alternatives from the General Assembly's consideration. We agree with the United States Supreme Court when it observed that a legislative body has the right to accomplish educational reform "'one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.'" *Rodriguez*, 411 U.S. at 39, 93 S.Ct. at 1300, 36 L.Ed.2d at 46, quoting *Katzenbach v. Morgan* (1966), 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828, 840.

**{¶ 283}** The General Assembly may, for example, decide to increase the foundation amount while preserving the underlying property-tax-based foundation system of school funding. Or it may legislate the consolidation of the less efficient school districts into larger regional districts, or otherwise legislate measures to increase economies of scale.

**{¶ 284}** Even accepting the majority's conclusion that the current funding system fails to provide a thorough and efficient system, the General Assembly should be given all available options as it attempts to design a funding system that will be deemed constitutional by this court, including keeping, but modifying, the current system.

**{¶ 285}** The majority has determined that the entire system for funding public education in Ohio is unconstitutional. Yet most of the factual support cited for the majority's conclusion relates to the condition of school buildings and other facilities. Since most of the plaintiffs' evidence relates to allegations of inadequate school buildings and facilities, the remedy should be narrowly tailored to those issues.

V

Conclusion

{¶ 286} All parties in this action have acknowledged that the level of funding education varies throughout the state, and that significant capital deficiencies exist in some Ohio school buildings and facilities. No one wants a child to attend school in a building with leaky roofs and inadequate plumbing.

{¶ 287} However, in the absence of proof of a constitutional violation, the fact that hard problems require hard solutions does not justify judicial second-guessing of the educational funding system established by the General Assembly. Regardless of the appeal of plaintiffs' policy arguments before this court, their arguments are simply addressed to the wrong branch of government. Those who believe that the Education Clause should be changed have procedures available to them by which the Constitution can be amended. See Section 1, Article II (establishing right to referendum).

{¶ 288} In the final analysis, however, it is as true now as it was at the time of the adoption of the Education Clause in 1851 that "if enough has not been hitherto done for education, it is because public sentiment has not demanded it; and if we attempt to go in advance of that sentiment, we shall not be followed and shall be forced to retreat." Debates at 16.

{¶ 289} Our dissent should not be viewed as an endorsement of the status quo. However, in the absence of a showing that the statutes in question violate the Constitution, responsibility for correcting the funding of Ohio's educational system does not rest with this court.

{¶ 290} As members of the judicial branch of government, we must stop our inquiry upon reaching the determination that the General Assembly has done what our Constitution requires it to do. The record before us does not demonstrate that the General Assembly has failed to comply with its constitutional mandate to "make such

provisions, by taxation or otherwise, as *** will secure a thorough and efficient system of common schools throughout the state."

**{¶ 291}** We jointly agree that the judgment of the court of appeals should be affirmed.

COOK and LUNDBERG STRATTON, JJ., concur in the foregoing dissenting opinion.

————————————